UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Illson, Judge

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| VS. | ) | **NO. CR 14-00139-SI** |
| | ) | |
| David John Lonich, et al., | ) | |
| | ) | |
| Defendants | ) | |
| _____ | ) | |

San Francisco, California
Friday, November 18, 2016

**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES:**

For Plaintiff:
> BRIAN STRETCH
> United States Attorney
> 450 Golden Gate Avenue
> San Francisco, California  94102
> BY:  **ROB REES**
> **ADAM REEVES**
> **ARVON PERTEET**
> **ASSISTANT UNITED STATES ATTORNEYS**

For Defendant David John Lonich:
> COLEMAN & BALOGH LLP
> 235 Montgomery Street
> Suite 1070
> San Francisco, CA 94104
> BY:  **ETHAN BALOGH, ESQUIRE**
> **DEPUTY FEDERAL PUBLIC DEFENDER**

(Appearances continued on the next page)

Reported By:  Pamela A. Batalo, CSR No. 3953, RMR, FCRR
              Official Reporter

APPEARANCES CONTINUED:

For Defendant Sean Clark Cutting:
                        JONES DAY
                        1755 Embarcadero Road
                        Palo Alto, CA  94303
                    BY:  **NEAL J. STEPHENS, ESQUIRE**
                        **JEFFREY RABKIN, ESQUIRE**


For Defendant Brian Scott Melland:
                        GEORGE C. BOISSEAU
                        740 4th Street, Second Floor
                        Santa Rosa, CA  95404
                    BY:  **GEORGE BOISSEAU, ESQUIRE**

<u>**Friday - November 18, 2016**</u>                              <u>**11:32 a.m.**</u>

**P R O C E E D I N G S**

---oOo---

**THE CLERK:**  Calling CR 14-139, USA vs. David John Lonich, Sean Cutting, and Brian Melland.

**MR. REES:**  Good morning, Your Honor.  Rob Rees for the United States.

**THE COURT:**  Good morning.

**MR. STEPHENS:**  Good morning, Your Honor.  Neal Stephens on behalf of Mr. Cutting, who is not present today.

**THE COURT:**  His appearance was waived?

**MR. STEPHENS:**  Yes.  We covered that at the last hearing.

With me also is Mr. Jeff Rabkin.

**MR. RABKIN:**  Nice to see you.

**THE COURT:**  Good morning.  Nice to see you.

**MR. BOISSEAU:**  Good morning, Your Honor, George Boisseau on behalf of Mr. Melland, who is present before the Court.

**MR. BALOGH:**  Good morning, Your Honor.  Ethan Balogh on behalf of Mr. David Lonich.  He is present on pretrial release.

May I ask that the clients be permitted to be seated?

**THE COURT:**  Yes.

**MR. REES:**  Your Honor, just to add, it's also Adam

1    Reeves and Arvon Perteet for the United States.

2              **THE COURT:**  I'm sorry. I couldn't hear you, Mr. Rees.

3              **MR. REES:**  I'm sorry.  It's also Adam Reeves and Arvon

4    Perteet for the United States.

5              **THE COURT:**  So we have all the big guns here.  Geez.

6              **MR. STEPHENS:**  Your Honor, we're back before you today

7    following a status conference on October 28th when the

8    Government brought forward a Superseding Indictment.  And,

9    Your Honor --

10             **THE COURT:**  Is there a file?

11             **MR. STEPHENS:**  -- I asked the defense counsel to go

12   ahead and review the Superseding Indictment and come back today

13   and describe to the Court what our intentions are in relation

14   to the Indictment, and I'm prepared to do that.  Obviously

15   defense counsel may have some additional comments.

16        There are three key points, Your Honor, and then I can go

17   through them in a little bit more detail.

18        We are prepared to file a motion to dismiss the

19   Superseding Indictment based on Sixth Amendment grounds, and I

20   can have that filed on behalf of Mr. Cutting next Tuesday.

21        There are a couple other smaller motions that we would

22   bring, including a motion to strike some language based on the

23   Court's prior ruling on the initial Indictment.  There are two

24   counts which we think are outside the statute of limitations

25   which we would file on, and then there is also a couple counts

1  where Mr. Balogh had raised an issue in the prior Indictment

2  regarding pleading an omissions theory.  They have corrected

3  that as to some of the counts, but haven't included the duty to

4  disclose language in some of the new counts so we would

5  challenge that as well.  That's number one.  Number two --

6         **THE COURT:**  Would all of this be filed by next week?

7         **MR. STEPHENS:**  I am prepared to file our motions on

8  those issues on Tuesday.

9         **THE COURT:**  Which is November --

10         **MR. STEPHENS:**  22nd.

11         **THE CLERK:**  Monday?

12         **MR. STEPHENS:**  No.  Tuesday.

13         **THE COURT:**  Okay.

14         **MR. BOISSEAU:**  Before you write that, that may not be

15  something that we can do -- on behalf of Mr. Melland, that I

16  can do by Tuesday.  But I agree with all counsel's comments

17  regarding the motions.  It's just the timing.

18         **THE COURT:**  Okay.  Mr. Boisseau, you represent

19  Mr. Melland?

20         **MR. BOISSEAU:**  Mr. Melland.

21         **THE COURT:**  So you intend to either file or join in

22  motions to that same effect?

23         **MR. BOISSEAU:**  Well, I would join in the motions, and

24  I intend to file my own motions.  It's just I can't comply with

25  the Tuesday filing date because I'm right in the middle of a

1  preliminary hearing in state court, and with the holidays and

2  everything else --

3          THE COURT:  When could you file?

4          MR. BOISSEAU:  Pardon me?

5          THE COURT:  When could you file?

6          MR. BOISSEAU:  I was looking at my calendar.  I would

7  file by December 6th.

8          THE COURT:  I'm just writing this down.  I'm not

9  saying anything yet.

10     And what Mr. Balogh?

11     MR. BALOGH:  My intent would be to stay on the

12 aggressive schedule that is being suggested by Mr. Stephens.

13 Just in the broad sense, the breadth of the new charges and the

14 breadth of the new discovery that's being suggested we need to

15 have suggests to me that part of what's going on here and why

16 the delay in the change is to try to avoid our March trial, and

17 I want very much to maintain our March trial, but as you'll see

18 and I think Mr. Stephens will continue on sort of identifying

19 what is going on, there is a tremendous amount of new work to

20 do.

21     And I think normally what the Government might expect is

22 well, we should just vacate that trial date and have it down

23 the road sometime, and we're not going to do that.  And so that

24 means we're going to have a tremendous amount of work between

25 now and March 9th on top of the work we already had, but that

1    means we have to roll up our sleeves and start working hard,

2    and I'm prepared to do that.

3        But I think Mr. Stephens has more detailed points to alert

4    the Court to what has happened with the Superseding Indictment.

5        **THE COURT:**  But, in any event, Mr. Stephens outlined

6    some motions he plans to file.  Do you plan to file similar --

7        **MR. BALOGH:**  I'm going to join his motions.  We will

8    talk about them.  To the extent I have a drafting role, I'll

9    have a drafting role.  But the schedule and the motions he has

10   identified, we have discussed, and I'm in agreement with

11   Mr. Stephens.

12       **THE COURT:**  I don't know if you want to respond now,

13   Mr. Rees, or should we wait for the whole list of issues they

14   want to raise?

15       **MR. REES:**  Whatever the Court would prefer.  With

16   respect to those motions, we will get a schedule and we will

17   respond to them and we'll hear them.

18       **MR. STEPHENS:**  Two other points I would want to raise,

19   Your Honor, and then I can give you a little more context on

20   the motions.

21       One is at the last hearing, the Court set a December 1st

22   date by which the Government needs to provide all exculpatory

23   information to defense counsel, as well as identify their trial

24   exhibits.  It is critical to us that that date stick.  And then

25   as to the trial date, I agree with Mr. Lonich's counsel that

1  I'm not --

2          THE COURT:  Balogh.

3      MR. STEPHENS:  Yeah.  I'm not prepared on behalf of

4  Mr. Cutting yet to seek an extension.  I think it's important

5  to see what we get from the Government on December 1st and then

6  also give Your Honor an opportunity to review our motion,

7  including the motion to dismiss.

8      And to give you just a little bit of a flavor, Your Honor,

9  for the -- what the motion to dismiss is going to be, it's

10  going to be based on three statements that the Government made

11  to the Court on October 28th which I don't think are accurate.

12      They said that they brought the Superseding Indictment --

13  the motion is going to be based on the Sixth Amendment

14  depravation of their right to a speedy trial based on unfair

15  prejudice given the timing by which they brought this

16  Indictment, and it's going to be supported by three things:

17      One, they informed the Court that they brought the motion

18  as soon as they possibly could.  What Your Honor is going to

19  see is that --

20          THE COURT:  They brought the motion?

21      MR. STEPHENS:  I'm sorry.  They brought their

22  Superseding Indictment as soon as they possibly could.

23      We have now had a chance to digest the Superseding

24  Indictment.  It is a broad expansion of their original

25  Indictment which was filed in March of 2014.

In the Superseding Indictment, they have now brought allegations related to a different real estate development called Petaluma Greenbriar, which did not exist in the first Indictment.

The first Indictment was focused on a development in Santa Rosa, not Petaluma, related to the 101 Houseco transactions, which we have spoken about a little bit in motions.

They also have brought new allegations, new charges, that Mr. Melland and Mr. Cutting misrepresented or concealed information from the FDIC.  That not did exist in the initial Indictment.  And they have also now brought allegations that Mr. Melland and Mr. Cutting took actions that brought down the failure of Sonoma Valley Bank.  None of that existed in the initial Indictment, which was filed back in 2014.

The facts that underlie all these new allegations have been known to the Government since 2010.  So there's significant concern on our part that it's a six-year delay, now bringing in allegations that date back 10 years, and then that is going to impinge on their Sixth Amendment rights.

**THE COURT:**  Is the Santa Rosa -- or the Petaluma transaction older than the 101 Houseco?

**MR. STEPHENS:**  Yes.  It goes back to 2007 and 2008.

The other two concerns that we have Mr. Balogh flagged a little bit.  One relates to the current status of discovery.

At of the last status conference, the Government represented that there was only approximately five boxes of discovery left to provide to defense counsel.  That's not true.

What we have learned since then is we have pressed the Government to try and figure out how much of the mountain we still have to climb on discovery.  We learned -- that day they handed us some discovery.  In the cover letter of that discovery, it indicated that they still had 23 boxes, not 5, left to produce to us, plus 15 disks, and we have inquired how much volume is on these disks, and we still don't have any kind of page estimate as to how much is on these 15 disks.

On top of that, between the last hearing and this hearing, we received a letter from Mr. Rees as I was pressing him trying to figure out how much volume is out there and learned that they have email files that they haven't processed or reviewed from Sonoma Valley Bank, including emails from my client and other key bank personnel that were involved in the loan transactions at issue, both in the original Indictment and in the Superseding Indictment.  And we don't have an estimate as to what the page count is on that.

Third, they've told us that there is a whole other category of documents in the Government's possession with the FDIC, a member of the prosecution team, that they haven't even reviewed yet and they can't give us an estimate on how much is there.  So we've got --

**THE COURT:** Could you say that sentence again? I didn't follow you.

**MR. STEPHENS:** There are a series of other bank documents that the FDIC seized from the bank when it closed in 2010 which the Government has not reviewed, even though they're with the prosecution team. They haven't reviewed them. They don't know what's in them. There could be *Brady* in them. And we think it's critical that all that material gets reviewed before December 1st so we know if there are emails in there, including -- or bank files, loan committee approvals, emails from my client which are in these PST files which we haven't seen, that exonerate our client, dating all the way back to the first Indictment. All that stuff should have been done years ago, and we're just finding out about it now. We are gravely concerned about it.

On top of that, the third point would be the *Brady* point, which is at the last hearing, the Government represented to the Court that as soon as they have *Brady* information or exculpatory information, they turn it over to us. What we've learned and which we will present to the Court in our motion on Tuesday is they are sitting on a mountain of material that they have not even reviewed. And it's clear in the Ninth Circuit that information, whether it's held in Mr. Rees' office or it's held at the FDIC, the Government -- the prosecutors have an obligation to review that information for *Brady* to see if there

1    is something in there that would exonerate the three defendants

2    in this case and bring it forward.  We haven't seen it yet.

3        I'm concerned about -- my experience as an AUSA is in

4    another district, but when I was an AUSA, one -- our pros

5    memos, as we were getting ready to charge, had to include

6    anything that would go to credibility of Government witnesses,

7    anything that would go to *Brady* issues, so the chiefs could

8    appreciate whether or not you are going to go forward with the

9    Indictment.

10       In this district, I have had a case where I had a client

11   who was pushing very hard -- white collar case, parallel

12   prosecution with the SEC -- pushing very hard because he was

13   convinced that there were emails that showed that he didn't do

14   what he was being alleged to have done on a particular stock

15   option backdating trial.  The prosecution in that case, to her

16   credit, tried very hard to get that information out, but it

17   wasn't until three days before trial that those emails came out

18   that exonerated my client.  He was acquitted at trial, and the

19   SEC had to dismiss their case.  Went through a seven-year

20   ordeal, completely exonerated, still can't find a job as a

21   lawyer.

22       So we have significant concerns about the state of

23   discovery, the state of *Brady*, and why it took so long for them

24   to indict.  Again, dating back to my time as an AUSA, you'd

25   figure out your best case and you would bring it forward.  They

could have brought this case forward in 2014.  We have now spent almost three years preparing to defend a case on 101 Houseco, and then this bombshell gets dropped on us, greatly expanding everything.  We have to re-climb the 1.5 to 2 million pages of documents we have already reviewed to look at them for these new counts and now also have to deal with this other mountain of evidence that hasn't been produced to us yet.

We have serious concerns that we want to bring forward to the Court.

THE COURT:  Mr. Rees?

MR. REES:  Your Honor, you gave us a December 1st deadline to make sure that we have everything from *Brady* and everything that we would possibly use in our case in chief.

I didn't know about that deadline when I made the representations about the five additional boxes, so we, of course, went back and burned the barn down, and we are getting every discovery we can possibly imagine that they could possibly need.  We continue to do that.

I have a discovery production today that I'm happy to hand over if you will give me an order to release grand jury transcripts.

THE COURT:  So ordered.

MR. REES:  Thank you.

This production includes that.  I don't think I have ever given that type of material so far in advance of trial.

1    There is one set of information out there that is very

2 distinct from anything that would be in the trial team's

3 possession.  I very much disagree with Mr. Stephens on the

4 subject of what he's referring to as being within the trial

5 team.

6    We do have an FDIC/OIG agent on our case.  The FDIC, to an

7 extent, is on our trial team.  We don't dispute that and we

8 have been gathering documents from them.  But recognized at the

9 creation of the FDIC and recognized at least in other contexts

10 in the Ninth Circuit, the FDIC-R, the FDIC as receiver, is a

11 distinct entity of -- created by the Government.  What it does

12 is when a bank fails, it goes and it has to, to my

13 understanding -- it has to just keep the bank going as it makes

14 a transfer to another bank that is -- takes over.

15    In that capacity, they do two things.  The first is that

16 they have a team that goes in and tries to collect every

17 possible document that could have any relevance to a civil

18 lawsuit involving the failure of the bank.  These are documents

19 that in their widest imagination could have anything to do with

20 some expected suit having to do with the failure of the bank.

21    Now, that they have -- that's the 23 boxes.  We said if

22 you would like to take a look at these boxes, I think we can

23 make that available to you.  Our subset is things that the

24 FDIC, as the -- in their investigative capacity thought had to

25 do with this case.  That's what we have turned over.

1   Everything that we have been able to find of relevance to this.

2   But we said there's a sort of expanded thing that the receiving

3   institution, the FDIC-R collected.  If you would like that, we

4   can make that available.  So, we now --

5           THE COURT:  That was true in 2014?

6           MR. REES:  That happened at the closure of the bank.

7   This receiver comes in.  They get those boxes --

8           THE COURT:  Right.  And that -- it went under in 2010;

9   right?

10          MR. REES:  That's always been there.

11          THE COURT:  So it's always been there.

12          MR. REES:  It's not available to us.  I could not get

13  that material without a subpoena and a protective order.  They

14  just won't give it to me.  The FDIC-R is separate.  We have

15  case law saying that we're a distinct entity --

16          THE COURT:  But if you asked me, I'd give you a

17  subpoena.

18          MR. REES:  I did get a subpoena because they asked to

19  get these 23 boxes.

20          THE COURT:  So you got it?

21          MR. REES:  I just need one more signature on the

22  protective order, and I will produce it by December 1st.

23      Beyond that, the receiver does a massive data dump of the

24  bank because that's what they have to do to keep it running.

25  That's part of their records.  I'm talking teller emails, every

1    single depositor's bank records, all the money that's going

2    through the bank, all the signature cards, just a massive data

3    dump of the whole thing.

4        I don't think that has any possibility of relevance in

5    this case, and I can't access it anyway.  But we have told them

6    that that is out there, and if they would like to subpoena

7    that, they are welcome to it.

8        But that kind of data is very sensitive data, for one

9    thing, because of the financial privacy issues involved.  And I

10    really don't think there is any chance that can be considered

11    part of the prosecution team; otherwise, in any case, no matter

12    how big or small, even a check kiting case, if the bank fails,

13    suddenly the discovery obligation is to the multi-terabytes,

14    and I just don't think that that can be the answer.

15        But if they want it, they can have it.  We are more than

16    four months before trial.  I have talked to the FDIC-R.  They

17    will respond to a subpoena.  My subpoena was a trial subpoena

18    so they didn't even have to give us the stuff four months in

19    advance of trial.  They did.  They are willing to work.  If

20    somebody wants to look at all these teller records, they're

21    going to need a distinct protective order because of the

22    privacy issues.  It's going to take work by them, but we said

23    listen, if you want to leave no stone unturned, including

24    looking through a teller's emails, you can do that.  We want

25    you to know that's out there.

But in terms of our December 1st deadline, we don't have any interest in trying to comb through that material.  We don't think it's relevant.  We have no interest in introducing any of that material in our case in chief, and so anything that we thought could even possibly -- that was a larger scope than what we had, we said we make it available, and we have once we get this last signature.

That is really what is going on here.  The discovery, yes, was bigger than the five boxes, but, again, we're trying to make sure, so we can keep our trial date, that we are getting them everything they could possibly need and more to make sure that everything is running shipshape.

**THE COURT:**  Including *Brady*?

 **MR. REES:**  Including *Brady*.  We are going to make even rough notes available from all of the interviews that we have available for them to review.  Again, something I do not typically do.  But if we're going to have a trial and this is a larger and complex case, I will take some of those additional steps.

One of the things that we have got as part of this is -- an FDIC subpoena, some time ago, had even gotten the -- one of the lawyer's for the bank rough notes.  I will -- I'm going to make those available.  All these notes that this lawyer took when he was looking at suing -- some suit involving 101 Houseco.  Take a look at those notes.  We are being as open as

we possibly can here.

Again, the only thing that we are not at this time going to -- we don't have possession of, we are not planning to subpoena, is these terabytes of bank records that have to do with customers of Sonoma Valley Bank and teller emails and that type of information.  In fact, of all the emails accounts -- they get them all, every one that they can find, when they receive the bank.

We went through the proposed jury questionnaire of the defense, and every single person that was on their jury questionnaire as a potential witness in this case, we just went and said okay, give us those email accounts, and we can't imagine that any other emails account would be relevant.

But they know about them.  They're there.  If they want them, they can get access to them.  We are working our hardest to meet the Court's deadline of December 1st.  I think we're going to make it.  It's going to be about as comprehensive as we can do.

MR. STEPHENS:  Your Honor, if I can respond briefly, and I greatly appreciate the time that you have devoted to us today.  I think it's important that you know two things.

One, I received -- I sent an email to Mr. Rees back in September of 2015 where I asked him -- I was asking him about the scope of *Brady*.  "The issues I would like to resolve are the scope of the agencies involved," because I was trying to

1    figure out -- just confirm before we filed the motion who was

2    within the scope of the prosecution team.

3        His response back to me, "With respect to your first

4    question," this is October 16, 2015, "I agree that the federal

5    agencies you cite -- SIGTARP, the FDIC, FBI, FHFA and IRS --

6    were part of our team, at least in the larger overall

7    investigation that led to these charges."

8        I was asking him then.  The FDIC's part of the

9    investigation team.  You have to scrub that stuff.  You, the

10   prosecutors, have to scrub information held by the FDIC who sat

11   in on their witness interviews for *Brady* and for exculpatory

12   information.  So this goes back over a year.

13       **THE COURT:**  There is nothing before me right now, but

14   what he said is the FDIC has two hats, and we did it in the hat

15   that is the prosecutorial hat, but we didn't do it in the hat

16   that is the receiving hat.  I'm not deciding anything today,

17   but that's what he said, so I did hear that.

18       **MR. STEPHENS:**  So I appreciate and respect that,

19   Your Honor.

20       Just one more point, and I know I'm at the end of my rope

21   here.  I get it.

22       Another letter from Mr. Rees to all defense counsel,

23   January 30, 2015, indicating, "We are in possession of a

24   forensically-copied hard drive of materials taken by the FDIC

25   the night Sonoma Valley Bank failed.  We believe that all the

1   materials have been produced to you."

2        MR. REES:  Again, this is -- we have for years been

3   trying to get them every single information that we have.  The

4   FDIC-R piece was actually -- when you gave me that deadline,

5   we -- and I burned down the barn to find it, that's really the

6   first that I knew that there was this whole separate entity out

7   there, and so we immediately took the steps to say hey, this is

8   there.  We will get you things that we think could possibly

9   have relevance, and the rest of it, go ahead and subpoena.

10  They make it available for you if you think there is anything

11  there that you could possibly want or need.

12       MR. BALOGH:  I'm going to take a little different take

13  on it --

14       THE COURT:  Okay.  But just briefly, Mr. Balogh.

15       MR. BALOGH:  Just for discovery, I don't want this

16  material.  It's in his possession.  He will find the *Brady* in

17  there and give it to me or he will be in violation of the law.

18  I'm not going to do his job for him.  He's got it in his

19  possession.  I don't want it.  Take me off the order.  Don't

20  give it to me.  Get me my *Brady*, please, Mr. Rees.  I

21  understood him to say that's his responsibility.  I expect him

22  to meet it, but I don't want those boxes.

23       MR. REES:  No, Your Honor.  I will be producing it to

24  all defense counsel.  It's not appropriate to give some

25  material to some and not to others.  It will be produced to all

1   defense counsel.

2       I do need Mr. Balogh's signature on the order.  If he's

3   going to refuse to sign it, I will submit it and hope that

4   Your Honor signs it anyway.

5       **MR. BALOGH:**  See, that's the problem.  I don't want

6   this.  He is using this as a sword against us.  Take me off

7   the protective order.  Don't give it to me.

8       **THE COURT:**  Mr. Balogh, I am going to order him to

9   give it to you, and I'm going to order you to take it.  If you

10  need to sign a protective order to take it, then do so.  If you

11  want to not read it, that's entirely up to you.

12      **MR. BALOGH:**  Here is the problem with that, Your

13  Honor.  He is, by doing so, by forcing this on me, he forces

14  his *Brady* obligation on me --

15      **THE COURT:**  He still has the *Brady* obligation.

16      **MR. BALOGH:**  Once he gives it to me, he says, "It's in

17  there.  I disclosed all the *Brady*.  You find it, Mr. Balogh.  I

18  have given it to you, and I, by giving you the mountain, by

19  giving you the Pacific ocean, I have given you all the fishnet

20  to find the fish."  And by me refusing it and saying, "No, no,

21  no.  At this late date, I don't want the ocean, it remains your

22  responsibility, you go through it and you find" --

23      **THE COURT:**  Is that right, Mr. Rees?

24      **MR. REES:**  It's -- is what right?

25      **THE COURT:**  Well, I guess I was thinking of *Brady*

1    differently.  I thought you to had to go through and find the

2    *Brady* and give them the *Brady*.

3         **MR. REES:**  I have to give them anything that could

4    possibly be *Brady* --

5         **THE COURT:**  So then you say you drive up three or four

6    moving vans full of documents and say, "there might be

7    something in there"?  That's what you think?

8         **MR. REES:**  I don't know what they think *Brady* is.

9    Because --

10        **THE COURT:**  You always say the Government knows what

11   the *Brady* obligations are.  The Government always say that.

12        **MR. REES:**  I know the Government's *Brady* obligation is

13   to get them the materials so they can find any possible scrap

14   that they think might be helpful to their clients.

15       I don't represent their clients.  I don't know their

16   defenses.  They are allowed to keep that secret from me and

17   they do.  I have no idea what they think is going to be *Brady*.

18   So that's the way it works in every case in this district, is

19   that we give them every material that they could possibly think

20   could have *Brady* so they can put on the very best case for

21   their client.

22       So, yeah, I go through that material to put my case on,

23   and then they go through that material to put their case on.

24   And that's -- we want to make sure that we have exactly equal

25   access so that I'm not holding anything back.  And I think

1    that's always been in the spirit --

2           THE COURT:  I understand what you are saying.  I'm

3    still going to -- I'm going to tell him to give the boxes to

4    everybody.  I'm going to tell you to take the boxes.  What you

5    do with it after that is entirely up to you.  But you can't

6    just say "I don't have it because I didn't take the box."

7           MR. BALOGH:  But that's the point --

8           THE COURT:  And whether that is a *Brady* -- whether

9    that is compliance with *Brady* or not, it seems to me, is a

10   separate question.  But you're going to have to take your box.

11   So don't say, "Well, they have the boxes and I don't have the

12   boxes.  So I don't have your" --

13          MR. BALOGH:  He said he's not introducing the evidence

14   in his case in chief --

15          THE COURT:  I don't have anything before me,

16   Mr. Balogh, that is a discovery dispute.

17          MR. BALOGH:  Before I get them, can I litigate why I

18   should not be required to --

19          THE COURT:  If you want to file a motion on how he

20   ought not give you something, why sure, you can do that.

21          MR. BALOGH:  Thank you.  I will.

22          THE COURT:  Okay.

23          MR. REES:  Your Honor, I would ask then that the --

24   okay.  These are the 23 boxes that I -- I don't have in my

25   possession yet because the FDIC has told me that they won't

give them to me until the protective order is signed.  So I
would ask that we vacate the December 1st --

        **THE COURT:**  No.  I'm not going to do that.

        **MR. REES:**  If he is going to file a motion and it's
not heard before then, what am I supposed to do?

        **THE COURT:**  I'm going to -- I'm going to order -- I
don't know what your motion is going to say.  But I -- as far
as I'm concerned, you are giving him the boxes.

        **MR. REES:**  Okay.

        **THE COURT:**  As far as I'm concerned, you better sign
that protective order or else I will just issue some kind of an
order that will deal with that.  But if you say it's not fair,
the consequences are incorrect and it's a violation of my
constitutional rights or something, you can tell me that.
That's what I thought your motion was going to be about.

        **MR. BALOGH:**  That's fine.

        **THE COURT:**  But we won't have it that you just won't
take the box.  That's not going to work.  So you need to sign
if that's what it takes the FDIC to be happy to give you the
box.

        **MR. BALOGH:**  I think -- the FDIC needs you to issue an
order telling -- issuing a protective order telling us what the
protection is.  The FDIC doesn't require anything of me per se.
He would like to do it by stipulated order, but he doesn't need
a stipulated order.  He needs the --

**THE COURT:** Okay. Then I will sign an order. I don't care how that works. I just want you to know, as far as I'm concerned, he is going to give you the box, and then you can tell me later on why that was dirty pool, but he is going to give you the box. And I'm not going to extend the December 1st deadline.

**MR. REES:** That's fine. As long as I can get the order, I can get that out.

Again, just so the Court understands the procedure here, we gave over an index and we said, "This is stuff we have learned is at this FDIC-R. If you want it, we can work to get it to you."

**THE COURT:** FDIC-R?

**MR. REES:** The receiver. Sorry. The FDIC receiver.

And so I wasn't trying to foist the boxes on them. This was actually a request by -- the defense said, "Yes, we would like to have access to that," so I worked to give them that access.

I've never heard an objection from Mr. Balogh to get these documents. So this is at the defense request.

**MR. BALOGH:** I have never spoke on the subject, so it's not at my request.

**MR. REES:** There was an email --

**THE COURT:** In any event, you are going to get the boxes, Mr. Balogh. I just want you to understand that.

1   **MR. BALOGH:** I understand the Court's position. I

2 will address it in writing at the appropriate time.

3   **THE COURT:** So now let's go back to the motions. We

4 know that you want to file motions right away. If you filed by

5 November 22nd --

6   **MR. STEPHENS:** I had a suggested briefing schedule,

7 Your Honor, because Your Honor has a hearing already set on

8 December 20th on the taint material. So --

9   **THE COURT:** Okay.

10   **MR. STEPHENS:** -- my suggestion was I file on Tuesday.

11 The Government gets two weeks to oppose, which would be

12 Tuesday, December 6th. We would have a week until

13 December 13th to file a reply, and then the hearing is on the

14 20th.

15   **MR. REES:** That, I think, probably works out well

16 since we already have the --

17   **THE COURT:** Okay.

18   **MR. REES:** -- suppression hearing that day. So our

19 opp is --

20   **THE COURT:** So then your oppo would be December 6th.

21   **MR. REES:** Okay.

22   **THE COURT:** And the reply would be December 13?

23   **MR. STEPHENS:** Yes, Your Honor.

24   **THE COURT:** So that's fine with me.

25  Now, Mr. Boisseau, what about you?

1     **MR. BOISSEAU:**  I didn't control the timing on the

2     Superseding Indictment.  I have had a lot of matters I've had

3     to take care of, prepare for, and everything else.

4          I can get my brief and my motion on December 6th.  That

5     realistically gives me enough time to do all the legal

6     research, preparation, everything else.

7          I cannot comply with the Tuesday filing date because I'm

8     going to be in court hearings on Monday and probably on

9     Tuesday.  So I won't be able to do that.  But my motion won't

10    look a lot different from Mr. Stephens.

11         **THE COURT:**  Why don't you go ahead and file it, and if

12    it won't work out to have it heard on the 20th, we will have it

13    heard some other time later.  But if it turns out to be

14    sufficiently similar that people are comfortable, we can just

15    go ahead and hear it on the 20th.  How is that?

16         **MR. BOISSEAU:**  That's fine.

17         **THE COURT:**  Mr. Rees, if you can, you can file an oppo

18    on December 13th or you can tell me why we need to put it out

19    later than that.

20         **MR. REES:**  So wait. I'm sorry --

21         **THE COURT:**  He would file on December 6th.

22         **MR. REES:**  He's going to file on December 6th?

23         **THE COURT:**  Yes.

24         **MR. REES:**  And then I'll respond on the 13th?

25         **THE COURT:**  By a week later, if you can.  If it turns

1    out to be similar to what Mr. Stephens has filed, you can tell
2    me that.  Or if you feel like it needs a whole bunch of other
3    things, you can tell that, too.
4              **MR. REES:**  Okay.
5          **THE COURT:**  And so then we will all be together again
6    on December 20th.
7        Anything else for now?
8              **MR. STEPHENS:**  No, Your Honor.
9              **MR. BOISSEAU:**  Thank you, Your Honor.
10             **MR. BALOGH:**  I just want to confirm, we get the trial
11   exhibits on the 1st of December?
12             **MR. REES:**  No.  That was not the order.  The order of
13   the Court was that we produce -- it was a discovery cutoff.
14   Anything that we would intend --
15         **THE COURT:**  The Government is ordered to produce all
16   exculpatory evidence and all evidence that will be used during
17   trial by December 1st.
18             **MR. REES:**  We already have a deadline for the exhibit
19   list.
20             **MR. BALOGH:**  I want to address -- I do want to keep
21   this March trial date beyond belief, Your Honor.  So given --
22   and maybe we -- should we brief it in this thing and discuss it
23   on the 20th?  But I think this is the case, given the nature of
24   the expansion of the Indictment -- and just, you know, for the
25   last year after the Court granted my motion in part, every time

we came to court, the three of us -- me, Mr. Boisseau and
Mr. Stephens -- would talk to Mr. Rees and say, "What's going
on with the Superseding Indictment?" He said the same thing
every time. "I'm just buffing out the factual allegations
about the bankers. I'm just buffing out the allegations. I'm
getting more detail. More detail."

And at the last minute, the eleventh hour, to get 15 new
counts and new theory is inconsistent with new detail. It's
diametrically opposed. That's fine. We're going to litigate
it.

But I do think this is a case where I'm going to want all
the witness exhibits at least 60 days out, which would be
January 9th. I think we have this March 7th pretrial, and so
we can discuss that now if you want or --

**THE COURT:** No, we don't need to discuss that now.

**MR. BALOGH:** Is that something I can bring up paper on
on the 22nd, on Tuesday, for discussion of when we are going to
have trial exhibits and more trial organizational things
because the expansion of the case, if it doesn't get dismissed,
is going to require, I think, a little more management to make
sure we are all in a position to try this case --

**THE COURT:** We can talk about that.

**MR. BALOGH:** I will bring a motion on the same
schedule that you set for Mr. Stephens' motions.

**THE COURT:** Tracy, do we have other stuff on on the

20th?

**THE CLERK:** Not until the afternoon. We have some stuff on in the afternoon, but this is scheduled for 11:00. We can move it up, if you wanted, to like 10:00, to give more time.

**MR. STEPHENS:** That's fine, Your Honor.

**THE COURT:** All right. Then 10:00.

**MR. BALOGH:** Thank you, Your Honor.

(Proceedings adjourned at 12:05 p.m.)

CERTIFICATE OF REPORTER

        I certify that the foregoing is a correct transcript
from the record of proceedings in the above-entitled matter.


DATE:   Tuesday, November 22, 2016


_____
Pamela A. Batalo, CSR No. 3593, RMR, FCRR
U.S. Court Reporter