UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE SUSAN ILLSTON, JUDGE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| VS. | ) | **No. CR 14-139 SI** |
| | ) | |
| DAVID LONICH, SEAN CUTTING, and BRIAN MELLAND, | ) | |
| | ) | |
| Defendants. | ) | |
| ——————————————— | ) | San Francisco, California |
| | | Tuesday, December 20, 2016 |

### TRANSCRIPT OF PROCEEDINGS

**APPEARANCES:**

For Plaintiff:
        BRIAN J. STRETCH
        UNITED STATES ATTORNEY
        450 Golden Gate Avenue, 11th Floor
        San Francisco, California  94102
    **BY:  ROBERT DAVID REES**
        **ADAM A. REEVES**
        **CLAUDIA A. QUIROZ**
        **ARVON PERTEET**
        **ASSISTANT UNITED STATES ATTORNEYS**

For Defendant Sean Cutting:
        JONES DAY
        1755 Embarcadero Road
        Palo Alto, California 94303
    **BY:  NEAL JAMES STEPHENS, ESQUIRE**
        **JEFF RABKIN, ESQUIRE**

(Appearances continued on next page)

Reported By:  Katherine Powell Sullivan, CSR #5812, RPR, CRR
              Official Reporter - U.S. District Court

**APPEARANCES (CONTINUED):**

For Defendant David Lonich:

           COLEMAN & BALOGH LLP
           235 Montgomery Street, Suite 1070
           San Francisco, California 94104
       **BY:**  **ETHAN A. BALOGH, ESQUIRE**

For Defendant Brian Melland:

           **GEORGE C. BOISSEAU, ESQUIRE**
           740 4th Street, Second Floor
           Santa Rosa, California 95404

**Tuesday - December 20, 2016**                    **10:06 a.m.**

**P R O C E E D I N G S**

---oOo---

**THE CLERK:**  Calling criminal 14-139, United States versus Lonich, Cutting, and Melland.

**MR. REES:**  Good morning, Your Honor.  Rob Rees, Adam Reeves, Claudia Quirox, and Arvon Perteet for the United States.

**THE COURT:**  Good morning.

**MR. REEVES:**  Good morning.

**MR. PERTEET:**  Good morning.

**MS. QUIROX:**  Good morning.

**MR. STEPHENS:**  Neal Stephens, Jones Day, along with Jeff Rabkin, on behalf of Mr. Cutting who is present before the Court.

**MR. BALOGH:**  Good morning, Your Honor.  Ethan Balogh on behalf of David John Lonich.  He's present before the Court on pretrial release.  I ask that he be permitted to sit at counsel table.

**THE COURT:**  Sure.

**MR. BALOGH:**  Thank you.

**MR. BOISSEAU:**  Good morning, Your Honor.  George Boisseau on behalf of Brian Melland, who is present before the Court.

**THE COURT:**  Good morning.

1          Have you got everybody?

2                  **MR. REES:**  We do.

3              **THE COURT:**  Well, we have a number of motions on this

4      morning.

5          We have Mr. Cutting's motion to dismiss the superseding

6      indictment.  We have Mr. Cutting's motion for disclosure and

7      identification of exculpatory evidence.  Mr. Lonich's motion

8      for disclosure and identification of exculpatory evidence.

9      Mr. Cutting's motion for disclosure of grand jury transcripts.

10     Mr. Cutting's motion to strike the omissions theory from Counts

11     One, Two, and Eleven as insufficiently pleaded.  Mr. Cutting's

12     motion to strike surplusage from paragraph 19 in Counts

13     Fourteen through Twenty.  Mr. Cutting's motion to dismiss

14     Counts One and Eleven as time barred.  And Mr. Lonich's further

15     motions to suppress.

16         Is that everything?

17                 **MR. STEPHENS:**  Yes, Your Honor.

18                 **MR. BALOGH:**  Yes, Your Honor.

19             **THE COURT:**  Okay.  Well, I hate to have you all

20     standing there at attention like that; although, you're free to

21     of course.  But I think probably let's start with the

22     superseding indictment and the motions related to that.

23         I have some questions that I'll just throw out, and then

24     I'll be happy to hear anything you want to tell me.  I have

25     reviewed reasonably voluminous material already on these

matters.

First, let me ask you, Mr. Stephens, if I dismiss the superseding indictment, is it correct that the following motions then would become moot at this time:  Motion for disclosure of grand jury transcripts; motion to strike the omissions theory from Counts One, Two and Eleven; motion to strike surplusage from 19 in Fourteen through Twenty; and motion to dismiss One and Eleven as time barred?

**MR. STEPHENS:**  I think that's correct, Your Honor.

I would, on the grand jury testimony, still want to be heard on the concept that there could be material in the colloquies that could be relevant to a motion to dismiss for prosecutorial misconduct.  But as to the others, yes, I think they all become moot.

**THE COURT:**  Motion to dismiss what for prosecutorial misconduct?

**MR. STEPHENS:**  So if we're allowed access to the grand jury colloquies, there could still be in there a basis to move to dismiss the indictment that would remain, related to the 101 Houseco, if statements were made to the grand jury that were inconsistent with the evidence on 101 Houseco.

**THE COURT:**  Let me ask you this, Mr. Rees.

Are you up?

**MR. REEVES:**  I'm Adam Reeves.  Good morning, Your Honor.

1    **THE COURT:**  Okay.  Tell me your name again.

2    **MR. REEVES:**  Reeves, Adam Reeves.  Good morning.

3    **THE COURT:**  Oh, this is complicated.

4    **MR. REEVES:**  Yes.  We had another trial like this, and

5    we got through it.  I'll respond to Rees if you like.

6    **THE COURT:**  Well, I'll try to do Reeves, if I can.

7    You look a little bit like Christopher Reeves.

8    **MR. REEVES:**  Thank you.

9    **THE COURT:**  That will make it easier.

10   If I grant the motion to dismiss the superseding

11   indictment, could the government refile those charges as a

12   separate matter?

13   **MR. REEVES:**  Yes, we could, Your Honor.

14   **THE COURT:**  Why did you wait so long to file this?

15   **MR. REEVES:**  You know, I think that's a good question.

16   I think we tried to address it in our papers.

17   **THE COURT:**  You said it's my fault because I set an

18   October date as the final date you might file.  And I don't

19   actually accept that as a good reason that you delayed.  So I'm

20   wondering if there's any other reason.

21   **MR. REEVES:**  I don't think we said it was the Court's

22   fault.  I don't view it as the Court's fault.  I view it as a

23   series of circumstances in which the Court ordered a

24   superseding indictment.

25   **THE COURT:**  I didn't.  I struck stuff out of your old

indictment and said if you wanted to you could try to fix it.

    **MR. REEVES:**  Fair enough.  True.

    **THE COURT:**  And that was in January of 2016.

    **MR. REEVES:**  Okay.  And it was clear then and the
Court set a deadline.  And I think the government at that
point --

    **THE COURT:**  I didn't set a deadline then.  It wasn't
until much later.

    **MR. REEVES:**  The deadline was set in August.

    **THE COURT:**  No.  Well --

    **MR. REEVES:**  My understanding -- again, I'm coming
into this a little later.  I've certainly conferred with
Mr. Rees a lot about it.

    **THE COURT:**  Actually, a lot of the things I'm curious
about perhaps you weren't there for.

    **MR. REEVES:**  I'll do the best I can.  I might turn to
my co-counsel to supplement it.

  The simple fact is the government was one way or another
confronted with a need to supersede the indictment in response
to the Court's orders with regard to the language of the
indictment that was struck.

  I think if that had not happened the case probably would
have proceeded to trial on the original indictment.  But
confronted with --

    **THE COURT:**  Oh, I find that staggeringly difficult to

accept. You've added effectively two more conspiracies; one huge conspiracy and one little conspiracy. You've added an entirely different set of transactions. And you've now charged that these bank defendants are responsible for the collapse of the bank.

Those are all new things. And you just -- because I struck -- because I struck "and other folks" from the first indictment that's what prompted this? I mean, that just doesn't make sense.

**MR. REEVES:** That's what prompted the need to return to the grand jury. And confronted with the need to return to the grand jury facing a trial date, recognizing that we're going to go to trial, I don't agree that this is a radically different indictment.

We added the Petaluma Greenbriar transactions which are, in essence, again focused on the hidden role of Mr. Madjlessi. That was part of our production early on. It's been litigated in other context by the defendants. It's been a part of this case for a long time.

And those allegations have been added --

**THE COURT:** Everywhere except in this courtroom. It hasn't been part of the indictment. It hasn't been part of anything argued to me.

It is true I find now that there were -- this Petaluma thing was the subject of a whole separate lawsuit in

1  Judge Seeborg's court, which he didn't relate this case to on

2  account of there was nothing about that in this case at the

3  time, and there hasn't been up until basically now.

4        **MR. REEVES:**  Well, I accept all that, Your Honor.

5        All I can tell you is that it's another set of loans in

6  which the interest of Mr. Madjlessi was again concealed from

7  those approving the credit at the bank and eventually by the

8  bank examiners.

9        So I view the lies to the examiners as a follow-on type of

10  crime.  Why wouldn't we add that to a case that's going to

11  trial in four months?

12        Again, the discovery, I think, is one of the best lenses

13  for looking at this.  And the incremental amount of discovery

14  that relates to the new charges is incrementally small.

15        **THE COURT:**  I'll tell you what I think about the

16  discovery.  What I think about the discovery is this:  There's

17  a lot of issues about the discovery.  There's a lot of problems

18  with searching the discovery and all this electronic production

19  business which we can talk about later.

20        But there -- there are millions of documents in this case;

21  right?

22        **MR. STEPHENS:**  Yes.

23        **MR. REEVES:**  Yes.

24        **THE COURT:**  And the defendants who have a trial date

25  in March have been plowing through those documents in mind with

what the charges are.

And the fact that you're not producing incremental discovery doesn't mean they're not going to have to go back through all that old stuff and look and see what it tells them about any charges that you've now brought.

So there's a huge amount of discovery that's associated with these new charges if you say it's all in there to begin with.

**MR. REEVES:** They -- and they have four months to do that. Okay. That's -- that's not an inconsiderable amount of time.

These are not unknown issues given the other parallel proceedings. I think the deep question here that should be answered is whether the delay, such as it was, really has prejudiced the defendants.

And I think with the amount of time that they have to prepare for trial, the incrementally small amount of discovery, that they can meet that burden.

And I think the Court's initial questions are correct. These are charges that could be properly brought by the United States now. They're within the statute of limitations.

And -- and, as a matter of fact, it's a 10 year statute of limitations. And all of the jurisprudence surrounding these types of cases for dismissing charges for failure to try them within the speedy trial time, several of them distinguish cases

1   like this sort of white collar cases with lots of discovery

2   from other cases where the -- the relief the defendants are

3   seeking are really very factually distinct from the types of

4   circumstances going on here.

5       When you look at the three cases that I believe both

6   parties cited, in which this type of dismissal of charges was

7   granted, there are facts that are not remotely like ours.

8       An eight-and-a-half-year failure by the government in one

9   case, in the *Doggett* case, to even look for a defendant who had

10  fled from the United States and returned -- fled to Panama and

11  then returned to the United States.

12      There's another case in which a file was lost for five

13  years, okay.  That would justify this type of relief.

14      But I think given the amount of discovery that happened,

15  the circumstances that surround, as I've tried to articulate

16  them, the filing of a superseding indictment in compliance with

17  orders or directions from the Court, as we viewed it and for

18  the reasons I've tried to explain, undercuts any claim that

19  we're been negligent or acted in bad faith.

20      **THE COURT:**  What about the memos from your agents

21  years ago that recommended or suggested that these charges be

22  brought?  Years ago.

23      **MR. REEVES:**  I'm not saying that they didn't.  The

24  charges weren't brought, and you know --

25      **THE COURT:**  It just feels like a sandbag, is what it

1    feels like.

2         **MR. REEVES:**  I question that, frankly.  I don't know

3    why it would be a sandbag.

4        Again, the centerpiece of this case is the role of Bijan

5    Madjlessi and excessive lending and excessive risk associated

6    with one borrower who got in way too deep with a small bank.

7        The Petaluma Greenbriar loans are exactly of the same

8    tenor, and they are well-known to these defendants for a long

9    time.  They would be known from our own discovery which we

10    produced years ago.  Okay.

11        They would be known from the litigations that they've done

12    elsewhere.  And they're part of the same thrust, same theory of

13    the government's case.  That those lies would extend to the

14    bank's regulators are also the exact same theory.

15        This is not radical.  This is not difficult.  And with the

16    amount of time that remains, it does not justify this type of

17    relief.

18        If there is some -- you know, the early production of

19    trial exhibits or the -- you know, there's an alternative

20    request for particulars, portions of which might make sense

21    given where we are to keep the case on track, that's -- that

22    might be a more appropriate type of relief.

23        But dismissing otherwise valid charges brought within the

24    statute of limitations, not justified on this record.

25        **THE COURT:**  Mr. Stephens.

**MR. STEPHENS:** Thank you, Your Honor.

I point out a couple of things in follow-on comments to the government's presentation here.

One, there's intentional misconduct -- or intentional delay here. And that's a big difference between the cases that were analyzed.

They were trying to distinguish the *Doggett* case. I would draw the Court straight back to the *Doggett* case. And if you look at the way they analyze the second factor, they say that if there is a finding that the delay was intentional, which we've laid out, and which Your Honor recognizes in the questions that you've asked, that it's an overwhelming case for dismissal. It's virtually automatic.

That was a case that was analyzed under a negligence standard. There it was negligent why the delay occurred. Here it's deliberate and intentional. That should end the inquiry, and there should be a dismissal.

When I think about it, what struck me when I was filing the motions on the *Brady* issue, the grand jury motion and the motion to dismiss the indictment, is accountability.

The government is going to try and focus the attention on the defendants. But what's under the microscope right now is their conduct and their actions. And their actions were deliberate to delay.

One more point that I would make is, it again seems like

the government is saying 3 million documents is easy to navigate and there's not more -- much more coming.

But our understanding is that there might be 11 million documents or pages of documents at the FDICR which we contend is a matter of the prosecution team and which we'll get to when we talk about the *Brady* issue.  They've acknowledged to us in the past is part of their prosecution team.  So there's still a chance that there's a significant amount of discovery out there.

And we still do not have the PST files for Sean's email in a manner that we can actually review.

So there's -- there's -- and I'll go through it all if you want me to, Your Honor.  I can demonstrate that there's actual prejudice here.  There's actual prejudice here even under a negligence standard.  But it's intentional delay.  And intentional delay, given the length of the delay, 36 months, the first factor under *Barker* is conceded by the government.  The second factor under *Barker*, it's intentional.  At that point it's virtually automatic that we win.

**MR. BALOGH:**  May I add a couple of things, Your Honor, since I have joined in this motion?

**THE COURT:**  Okay.  Briefly.

**MR. BALOGH:**  I will be.  I don't think you got an answer to your first question about why the delay.  And I want to make sure the record is clear what happened.

**THE COURT:**  Well, what he said is, gee whiz, if you hadn't done something to our indictment in the first place we wouldn't have filed anything.  But there were little things that needed to be fixed, so then we decided to file the new one.

That's effectively what you said; right?

**MR. REEVES:**  Yes, Your Honor.  I agree.

**MR. BALOGH:**  Exactly.  Because this case -- and that's why we filed that motion last year, because this case was always about bringing Petaluma Greenbriar in at the end as trial, as in it's broad enough, Your Honor.  That's what the "and others" language let them do.

And I rose my hand and said, Judge, we've got to strike that language.  If they're going to allege something, make them allege it.  But we can't play surprise at trial with a million other transactions with Bijan Madjlessi because Petaluma was always part of this case.

That's why they had their memos.  It was always a 404(b) aspect to it.  And when you struck it in January, now they had to make a choice:  Are we going to try to pull that in and replead it or not?

Two things happened from January until October 28th.  One, they -- they went -- and every time I came here, you remember, I think you chided me.  I said, When are they going to file this indictment?  They're going to delay.  It's going to be a

1    problem.  It's going to be a problem.  Said, Mr. Balogh, you

2    certainly complain a lot.  It's going to be fine.  Cooper

3    worked out fine.  This is not going to happen.

4         We were here in May and complained.  They were saying the

5    same thing to us the whole time.  What Mr. Rees said is, we're

6    just going to buff out the allegations against the bankers.  So

7    they're leading us down one path.  That's not what they did.

8         And then we come here in August.  And at that point

9    Mr. Rees had told us by the end of August he was going to

10   supersede.  And Your Honor said it's fine by the end of October

11   because we all expected the same thing.  We didn't expect a

12   radically new case.

13        But they intentionally delayed something they were always

14   going to do.  And that's Mr. Stephens' most important point.

15   They knew that when we struck -- when the Court struck "and

16   others" if they wanted to have Petaluma Greenbriar they had to

17   plead it.

18        But first we showed up in May.  We fought about a court

19   date.  I fought for October.  I begged this Court for the first

20   available setting.  I didn't get my way that day.  When I asked

21   for a first available court date, the government said that was

22   March but still didn't supersede.  And at the end of October,

23   that's when they unmasked this.  I think it's radically

24   different.

25        And the other point I'd make is there is real prejudice.

I prepped this case.  Mr. Lonich got me for good or bad, for
skills and detriments.  But when I went through that discovery
of Petaluma Greenbriar, this is all stuff I could map.  He
doesn't work for Madjlessi now.  That's not a conspiracy he's
alleged to be in.

And now all the work I've done to prepare the Houseco
case, I've got to go back because I'm alleged -- my client is
alleged to have joined a different conspiracy that predates his
employment by Madjlessi.

But I -- the government's position is, well, since you
weren't there, you don't have to worry about it.  And I
respectfully disagree.  My client is alleged to be part of a
conspiracy.  I need to go back and do all that work for all the
prior discovery, all the millions of pages with now new
millions of pages coming.  That's fundamentally unfair.

But I think at bottom this was their plan from the jump,
to add Petaluma Greenbriar.  And they waited for maximum
advantage against us, to hurt us for tactical advantage, and
that's why this case is dismissible.

The last thing I'll say is, I respectfully disagree with
my colleagues.  If the Court grants a Sixth Amendment motion
here, they can't refile it.  It's dismissed with prejudice
forever.  And that's Torrio Sanders.  Because we've been
prejudiced by the delay in bringing charges.

If they want to bring it again, yes, Your Honor could

dismiss without prejudice.  But the last time or the only time

I've had a judge of this court grant me a Sixth Amendment

dismissal was *United States vs. Torrio Sanders*.  And

Judge Wilken dismissed the case because of delay by the

government.  That was negligent delay.  And the Ninth Circuit

affirmed.

And so I think theoretically if you think the prejudice is

alleviated in a different way where we have this court date,

whatever down the road escapes it.  But I think the Sixth

Amendment you can also say if they intentionally delayed for

three and a half years to bring these charges for tactical

advantage over these defendants, that's unfair.

I think both under the Fifth and Sixth Amendments the

Court can dismiss these charges.  And we can go to trial on

Houseco.  And they live with the case they brought without the

cheats that were built into it that were taken out a long time

ago.

**MR. REEVES:**  Your Honor, for that to make any sense

the government would not have produced the Petaluma Greenbriar

documents when we did.

How can you make a finding of sandbagging when we've

disclosed a lot of this information for years?

Further, how can you say that there's an intentionality to

what we're doing when we have followed the course of the

litigation in this case, abided by the Court's rulings, and hit

the schedule that was asked for and agreed to?

I just think that if maybe the Court views your ruling and the effect of your ruling differently. But it's the government's compliance with those rulings and the way the litigation proceeded for the last year that I think deeply rebuts any claim that we're trying to deliberately sandbag anybody. The reality is, we were faced with the need to go back to a new grand jury, re-present the case. And we added four counts. Okay.

We added admittedly, certainly, the Petaluma Greenbriar loans. But they are of a nature exactly like the other types of loans in the case. Why wouldn't we do that?

I do think, and that's the sense, this case is like other cases where you see a superseding indictment reasonably advance of trial.

So I deeply disagree with the claims the defense are making, and I don't think there's a basis in the record for any type of finding of misconduct by the government.

**MR. STEPHENS:** Your Honor, may I respond to that?

**THE COURT:** Okay. And then Mr. Boisseau.

**MR. BOISSEAU:** Sure.

**MR. STEPHENS:** So all I'm asking the Court to do is run the analysis to the *Barker* factors and apply the Supreme Court's ruling in *Doggett*.

I'm not asking for a finding of misconduct. What we're

1   asking for is a dismissal of the indictment.

2       The fact that the delay is intentional is supported by the

3   evidence and the record that Your Honor demonstrated in the

4   questions that you asked today.

5       I'd also point you straight back to the declaration that

6   they filed, which straight out says that they waited until the

7   case was going to go to trial and then they came forward with

8   this indictment.  It's prejudicial and it was intentional.

9       Just one more point, just quickly, to correct the record.

10  My good friend Mr. Balogh said something that is -- a little

11  bit contradicts with the declaration I filed about what I was

12  told about these coming allegations as we were sitting here

13  waiting for a status conference before the Court.

14      My understanding is that they were going to add context

15  about Sonoma Valley Bank.  Not bankers, but the bank.

16      That's all I have, Your Honor.

17          **THE COURT:**  Thank you.

18      Mr. Boisseau.

19          **MR. BOISSEAU:**  We joined in -- Mr. Melland joined in

20  Mr. Cutting's motion to dismiss and all the other motions.  But

21  Mr. Melland is in the identical position of Mr. Cutting.

22          **THE COURT:**  Okay.  Thank you.

23      Is it correct that when the government reinterviewed

24  various loan committee members in October 2016, a lot of them

25  couldn't remember anything?

1      MR. REES:  On that point, Your Honor, it was the

2  memory varied.  Some had very clear memory and some didn't have

3  a clear recollection.

4      MR. REEVES:  May I ask, please, is the Court's inquiry

5  focused on the sort of diminution in witness memory and the

6  effect of the delay on witness memory?

7      THE COURT:  That is one issue, yes.

8      MR. REEVES:  Yes, I think that's an important issue.

9  I would agree, on behalf of the government, that that's an

10  important issue.

11      That issue is unchanged by the filing of the indictment,

12  of the superseding indictment, because the witness memory will

13  be tested at the trial that was scheduled in March.  So there's

14  nothing --

15      THE COURT:  Memory may be changed by 31 months delay

16  in filing the new charges.

17      MR. REEVES:  Not in the moment that they will testify

18  in March 2017, it won't.  It will still -- it's an important

19  factor, but there's nothing -- in *United States vs. Gregory*,

20  the Ninth Circuit case that I think should guide the Court's

21  ruling here, it really is a question about prejudice associated

22  with the delay in the filing of the superseding indictment.

23  That's the question that the Court should zero in on as -- I

24  respectfully submit.

25      And there's nothing about the filing of the indictment,

the superseding indictment in October, that is going to improve or degrade witness memory in March 2017.

    **THE COURT:** And I'll ask you, Mr. Reeves, but if you don't know you can ask your colleagues, how did the government get the FDICR documents that were produced to the defendants in January 2015 and in March 2016?

    **MR. REEVES:** I will let Mr. Rees --

    **MR. REES:** I will comment on that, Your Honor.

We do have an FDIC -- FDIC -- what do you call it? -- inspector general, which is the investigative agency for FDIC, agent on the case. Over the course of the investigation, he has obtained material from both the FDIC and the FDICR.

    **THE COURT:** So it's voluntary production?

    **MR. REES:** I'm not sure about that. I don't know the original manner in which this was obtained by him. But through that investigation, he obtained material from the FDICR.

So that -- there's always been material from the FDIC that we've produced. And, again, the 90 percent that we produced at the setting of the trial date, there was certainly FDICR material within that.

When it got time to -- and you set our discovery deadline December 1st, as I said, I wanted to burn down the barn and make sure we had everything. Not maybe just what the agent thought was important, but everything that we could get.

So we made sure to get everything from the FDIC that we

1  could get, turn that over.  And then we turned over a -- a --

2          **THE COURT:**  And how did you get that?

3          **MR. REES:**  The FDIC?

4          **THE COURT:**  The stuff you just talked about, where

5  you're doing it in an abundance of caution.  You said we got

6  that.  How did you get it?

7          **MR. REES:**  That was by subpoena.

8          **THE COURT:**  By subpoena?

9          **MR. REES:**  So we subpoenaed the FDIC and just said,

10 give us everything you have related to any of this.  And then

11 we --

12          **THE COURT:**  So you did that in the fall of this year?

13          **MR. REES:**  Yes, in the fall of this year, to make sure

14 we had it all.  Because, again, I wasn't sure exactly what the

15 agent got.  I wanted to make sure it was complete.

16     And then we discovered an index of -- I think it was 33 or

17 34 boxes that was held by the FDICR.  The defense said they

18 wanted that.  So I subpoenaed the FDICR and said, please give

19 us that.

20     When I was working with the FDICR about those 33 boxes,

21 they said, well, just so you know, there's tons of stuff

22 because when the FDICR takes over a bank it's everything.  It's

23 depositor records and, you know, every single depositor, and

24 signature cards, and everything else like that.

25     I said, well, okay, that doesn't sound like it's going to

have any relevance to our case.  But I disclosed to the defense
that there is this material that is out there, and we talked
about it at the last calling of the case, that doesn't sound
like it's going to be of any relevance.

So there's basically three sets of FDIC documents that I
produced, and then a fourth we've made available with equal
access by a subpoena.  Stuff the investigators obtained.  Then
there was the stuff that I subpoenaed from the FDIC to make
sure that that was complete.  The 33 boxes the defense asked
for from the FDICR, that's all been disclosed in discovery.

And then there's the additional electronic holdings of the
FDICR that just basically copies everything when the
institution fails, that is available to the defense by
subpoena.  They won't give it to us without a subpoena.
They'll give it to the defense with a subpoena.

And that is the stuff that we -- that is the only subgroup
that we are saying, you know, I haven't gone through that
stuff.  I don't intend to introduce that stuff at trial.  To
the extent -- the 33 boxes are a subset of that obviously.  But
aside from those 33 boxes, all that depositor information or
whatever else they copied, that stuff I don't intend to
introduce at trial.  And I don't intend to produce but have
made it available by subpoena.

In fact, Mr. Cutting's attorneys asked, Well, who's the
person they would subpoena.  I would say, Here's the person.

1 We can work with you to help you get that if you think you want

2 it.

3         THE COURT:  The FDIC documents from January 2015, how

4 did you get them?

5         MR. REES:  Well, we've been disclosing it since we

6 charged the case, stuff from the FDIC that was obtained by the

7 FDIC agent in the course of his investigation.

8         So there's been FDIC stuff from the get-go that was part

9 of the investigation.  But, again, the more recent production

10 was me just making sure we were thorough.  There was nothing;

11 cherrypicked.  It was comprehensive.  And of course --

12         THE COURT:  I'm trying to understand.  What's the

13 difference between the FDIC material produced in January 2015

14 and the FDIC material produced this fall?

15         MR. REES:  We have had, sort of, rolling productions

16 of material that has included FDIC material obtained as part of

17 the investigation.

18         So I'm not sure exactly what the 2015 stuff was, but we've

19 always been trying to get our discovery out in an appropriate

20 manner.  The defense has it exactly the way we have it.  And

21 we've had rolling productions of FDIC stuff obtained by the

22 agent.

23         So that -- but, again, when it came time for a *Brady*

24 disclosure, I wanted to make sure that wasn't cherrypicked in

25 any way; that we had a complete set.

And the passage of time as well.  The investigation started before the FDIC charged Mr. Cutting and Mr. Melland with the Petaluma Greenbriar and the 101 Houseco scheme that we've basically charged.  And so I want to make sure we had all that material as well.

MR. STEPHENS:  Your Honor, may I just clarify the record on this?  There's a couple of things.

One, when the bank was disclosed -- and this is as represented to us by the government and is documented in our papers.  I attached a letter, the discovery letter which Your Honor is referring to, going back to January 2015, where they talk about the government says, Here are the files that the FDICR -- including email files, that were taken from the bank when the bank closed in 2010.

So I think your question was, Do you have a subpoena when you received those materials?

In the record, in my declaration, there's a statement -- I believe it's paragraph 6 of my reply declaration -- where there's information that they are receiving information from the FDICR, including all these emails going back to 2011, because there's an email from SIGTARP to Mr. Reeves saying, We've got all these emails; is it okay for us to go ahead and start reviewing them?

My point and the question I thought the Court was getting to was, well, you must have subpoenaed those in 2011 because

you're now telling us you need a subpoena to get information from the FDICR.

I have looked through some of the materials that have been made available to us. Some of those include some subpoenas. There may be a subpoena to the FDICR back in 2011. I didn't see one in the materials that I was able to review.

So if they had one, given what we filed in our papers, in our moving papers, I think that they would have brought that forward to the Court and say, Here's the subpoena we issued back in 2011.

But it's clear that they had material from the FDICR in 2011. It's clear that the prosecutors were aware that there was this entity called the FDICR. It's clear that they told us that the FDIC writ large was on their prosecution team.

There was no carve-out of the FDICR. There's no carve-out in the Ogden memo for the FDICR and it's somehow different from everybody else.

When you look at this from a *Brady* standpoint, they've had this material. I'm not aware they had to subpoena it going back in 2011 and 2015, but apparently they do now. And it's -- I don't think that the record, as represented to the Court from the government, on this point is accurate.

     **MR. REES:** I disagree with that.

     **MR. BALOGH:** For the defense, Your Honor --

     **THE COURT:** Just a second. I'm sorry.

1          **MR. REES:**  As I said, anything that we had that was

2     obtained during the course of the investigation we produced,

3     including the January 2015 --

4          **THE COURT:**  The question is, the January 2015

5     material, was it produced personally through a subpoena or not?

6          **MR. REES:**  That I don't know.  And I'm sorry I don't

7     know the answer to the Court's question on that point.  I

8     assume it was, but I can't represent that it was because,

9     again, that was -- the agent went out and was investigating

10    this.  And I don't know exactly how they obtained certain

11    material.

12         And they did obtain certain material from the closing of

13    the bank.  I don't think that-- that's been known to the

14    United States, been known to the defense.  There's nothing

15    controversial about that.

16         The only thing I personally learned, relatively late in

17    the game, is that there was hugely voluminous electronic

18    material, including all this depositor account information that

19    to me, if I subpoenaed the FDIC for complete material, handed

20    over everything that we've gotten from the FDICR that the

21    investigators thought was of any interest, plus all the 34

22    boxes that the -- that were seized exactly pursuant to what

23    they thought could possibly be relevant to a litigation, civil

24    litigation, but still litigation about the fall of the bank, to

25    me that is as complete as can be.

All these depositor accounts that are out there, the FDICR, these gigabytes of information, we've made that available to the defense. They know about it. It's not suppressed for *Brady* purposes.

I didn't produce it because that's just incredibly voluminous production of entirely irrelevant material as best we can figure. Just a gigantic fishing expedition.

If they want it, they can have it. They can subpoena it. But it's really a subset of material at this one branch at the FDIC that I don't think anybody can represent that there's any known information in there that could be possibly relevant to this case.

**MR. STEPHENS:** Your Honor, if I may, this includes Mr. Cutting's emails. Those are the PST files, email files, seized by the FDICR when the bank closed in 2010.

**MR. REES:** Which we produced.

**MR. STEPHENS:** We're staying still waiting on Mr. Cutting's emails.

They produced some emails on the Court's December 1st cutoff date. They produced them to us in unprocessed format so we can't search and review them.

And my point is, that's still coming in December of 2016 when there's representations that they didn't know who the FDICR was. And it's clear on the record that they did. It's clear on the record that they've had these documents forever.

1    And we've got them in dribs and drabs and bits and pieces

2  here, now, in December 2016, still not in a format we can

3  search.

4    I take issue with the representation to the Court that

5  this FDICR stuff is irrelevant and we can go get it if we want

6  it.  I want to read my client's emails.

7         **MR. REES:**  That's been produced.  It's been produced.

8         **THE COURT:**  All of Mr. Cutting's emails have been

9  produced?

10        **MR. REES:**  Yes.  We produced a set that we believe was

11  comprehensive a very long time ago.

12    When we were talking with the FDICR we said, okay, let's

13  make sure it's comprehensive.  And so we produced every single

14  email file of Mr. Cutting, Mr. Melland, a group of people that

15  could have any relevance to the bank.  We produced that by the

16  December 1st cutoff, and they have it.  The defense has it in

17  exactly the same format that we do.

18        **MR. STEPHENS:**  Your Honor, if I may.  They gave us a

19  discovery letter.  It's in my initial declaration, my moving

20  declaration, where there's some discovery letters that came

21  from them in the October and November time frame.  I can find

22  it here in a second.

23    But, basically, there's an attachment to it which in color

24  shows what PST files for which custodians have not been

25  provided to us.  There were more than two names, but there are

two names on that list that I'll call to the Court's attention, of email files that haven't been produced. Mr. Cutting's was one of them.

Another individual who worked at the bank who may be a witness in this case is Alexis Tomsen. When we were doing our review, we weren't seeing enough email from Ms. Tomsen. So it all started by me going to Mr. Reeves and saying, Are you sure that you produced to us all the email from Ms. Tomsen?

And it took them a while to get back to us. When he finally got back to us he said, No, they're not there. Here's a list of the custodians that we produced and the custodians we didn't produce. Shaded in green, next to Ms. Tomsen, is Mr. Cutting.

**MR. REES:** We shaded in green all the ones that we wanted to make sure to get. There's, I think, no dispute that the Cutting emails that we wanted to make sure were comprehensive overlap with the Cutting emails we already gave out.

And, again, I take very seriously the Court's *Brady* discovery cutoff. And, of course, if they're going to ask, "Do you have the Alexis Tomsen emails?" I'm going to go down and try to find out, if they think that's relevant, and produce it, and want to make sure that it's a hundred percent.

Once I'm talking with the FDICR, here's the people of relevance to this case, I want to make sure I have a hundred

percent because I don't want to have an issue where the Cutting
emails that I produced way earlier in the case were not
comprehensive.  I don't want to have that circumstance.  So I
made sure that they were.

      **MR. STEPHENS:**  Your Honor, it's Exhibit D to my
declaration.

      **THE COURT:**  November 9th?

      **MR. STEPHENS:**  Yes, Your Honor, that's correct.

And in the cover letter, Your Honor, on the top of page 2,
the letter from Mr. Reeves reads:

"We have continued to research your request for Alexis
Tomsen's emails.  The FDIC determined late last week that they
had additional images of Sonoma Valley Bank employees'
Microsoft Outlook files, including that of Alexis Tomsen.  See
attached list."

And then that's the list that appears at the very last
page of the Exhibit I.

      **MR. REES:**  Which is exactly as I said.  They asked for
Alexis Tomsen emails.  We went and we got that for them, along
with other employees of relevance to this case, to make sure
that it was comprehensive.

And that's, again, exactly what -- I took the Court's
December 1st cutoff seriously so I could make sure it was, in
fact, comprehensive.  And it's something that an investigator
had done in the past, if there were any gaps in that, that

there were no longer any gaps.

       **MR. BALOGH:**  Can I add a few things, Your Honor?

       **THE COURT:**  Okay.

       **MR. BALOGH:**  Thank you.

   One, I want to be clear Mr. Rees has said a few times the defense asked for stuff.  "The defense."  "They."

   Mr. Lonich hasn't asked for any of this.  So I object to the words "they" or "we gave them" or "the defense" because that's just not true.

   Mr. Cutting has asked for stuff.  If they want to tell what Mr. Cutting asked for, that's fine.  But please don't sully up my record by inaccurate representations.

   Two, the most important question we don't have an answer to.  And this was raised in the briefs.  And it's the delta between how did we get the FDICR stuff in January versus the stuff gotten now?

   And as I understand it, Mr. Rees --

       **THE COURT:**  Say that again.

       **MR. BALOGH:**  The difference between why was -- how was the FDICR materials that were produced in January, how they were received is still unanswered.  And that's the most critically important point.

       **THE COURT:**  In January 2015?

       **MR. BALOGH:**  Yes.  How they were acquired.  What Mr. Rees has said is an agent got them, which I think means no

subpoena.  Because agents --

**THE COURT:**  He's not sure how the agent got them.

**MR. BALOGH:**  Can agents issue subpoenas?  Because I don't believe they can.  I think you need lawyers to issue subpoenas.

And so if the agent is getting it, then it's voluntary. And that raises a critical point.  So we've got to hammer down that fact because if preJanuary '15 some IG agent can go to the FDICR and cherrypick what he wants, but now at the end of 2016 all of a sudden the FDICR requires a subpoena, why?  That's a real problem for the government.  But we need to know the answer.

If they issued a subpoena beforehand, then they got them both by subpoena, we have consistency.  But if they got those materials without a subpoena, then now claiming they need a subpoena is a real problem.  So I think we have to drill down on that.

I would ask the Court to direct the government to answer that question clearly.  How did they obtain those documents? If they can't do it today by his recollection, he didn't come prepared for the hearing, fine.  Let's get that answer.

The last thing, which is the flip side of it, and I asked for this in my papers is, I would like to see and have unsealed the application for subpoena that was issued now.

Mr. Rees cannot issue a subpoena, 17(c) subpoena for

production before court without an order from Your Honor.
Which means he either made an application, you approved it,
that's been held under seal, and that should now be disclosed
to the defense so that we can see the application, the bases
for the subpoena.

Because as we've noted in our papers, under Mr. Rees's
telling, it's an improper subpoena. You can't subpoena stuff
that you're not going to use. You can't subpoena stuff as a
fishing expedition. He said it was a trial subpoena, not a
grand jury subpoena. That was his representation last time. I
would like to see the application and I would like to see the
subpoena.

If he didn't do it by an application to this Court under
Rule 17(c), we'll have a different problem to address. But I
think since this Court's core function, first of all, is to
find facts, those are two facts I think Your Honor needs to
know before proceeding on the motion, and to know clearly the
mechanism by which all of these documents were obtained,
including seeing the subpoenas that were used with regard to
either.

Thank you.

**MR. REES:** Your Honor, it's really just irrelevant.
The issue is whether they have been provided discovery and the
mechanism --

**THE COURT:** How did you get the more recent batch?

1        **MR. REES:**  That was a trial subpoena, not a Rule 17(c)

2   subpoena.  I did not ask to have the Court order the early

3   production of that.  Rather, I gave a trial subpoena to the

4   FDICR, and they voluntarily said, We want to help you get this

5   material in a timely fashion.  And they gave it to us in

6   advance of trial.

7        **THE COURT:**  So you subpoenaed it for March --

8        **MR. REES:**  Yeah.

9        **THE COURT:**  -- of next year.

10       **MR. REES:**  They said, We want to work with you.  Let's

11   get it to you.  So they did.

12       **MR. BALOGH:**  I would think that using this court's

13   process for early production and cooperation, I don't think

14   that comports with the local rules.

15       **THE COURT:**  And then the earlier one, I would like for

16   you to track down how you got the materials that were

17   referenced in the January 2015 time frame.

18       **MR. REES:**  I can track that down.

19       But, again, Your Honor, if the FDICR required an access

20   letter or a subpoena and they've changed their position, I

21   think for purposes of this case, if they are willing to accept

22   a subpoena for March, the only thing that's outstanding is this

23   subset of these --

24       **THE COURT:**  I'm curious.

25       **MR. REES:**  I can get to the bottom of that, of course.

1          **THE COURT:**  Thank you.

2          **MR. REES:**  At least for purposes of resolving these

3     questions, the only thing that's really of any note is the

4     material we haven't produced; all the depositor records.

5          They have told me that they will equally treat the

6     defense -- if they want to give a March trial subpoena, they

7     don't have to go to Court and order early production.  They

8     will work with the defense to produce it.  They will work with

9     them with their subpoena.

10         If they want access to that material, all those depositor

11    records, they have it.  They have that access.  They can get

12    it.  The FDIC will work with them.

13         **MR. STEPHENS:**  Your Honor, if I can supplement

14    Mr. Balogh's request.  It's also the emails that they got in

15    October of 2011, as stated in my declaration.

16         **THE COURT:**  2011?

17         **MR. STEPHENS:**  2011.  That's -- that's when SIGTARP

18    was speaking with Mr. Reeves about going forward with the

19    review of the email files of the Sonoma Valley Bank employees

20    that were seized by the FDICR when the bank closed.

21         So I'm also asking, in 2011, you must have gotten those

22    somehow.  Did you get them by subpoena or how?

23         **THE COURT:**  Do you know how those were obtained?

24         **MR. REES:**  It's before my time on the case.  But I can

25    try to figure out --

1          **THE COURT:**  Were you saying Mr. Reeves or --

2          **MR. STEPHENS:**  Yes.

3          **THE COURT:**  -- Mr. Rees?

4     So were you on this at the time?

5          **MR. REEVES:**  I was at the very beginning.  I dropped

6     out.  And I'm happy to be back.

7     I can offer some process comments that may be correct.  Or

8     maybe more judicially, I can wait, doublecheck, and inform the

9     Court what happened.

10    But I do think that it would be normal -- I'm not certain

11    that it happened in this case, and we would like to

12    double-check.  But it would be normal for us to issue an access

13    request to the FDIC enforcement group and obtain information

14    that way.

15    And I think -- but I need to verify, and I would ask the

16    Court's permission to verify this before we commit, and we are

17    happy to provide a submission that answers the Court's

18    question.  I think that's what happened here.  I think we

19    obtained information pursuant to an access request and not

20    subpoena.

21    The second point I think is also operative here, that we

22    are happy to illuminate, is that there has been a changing

23    position within the FDIC about access to information, okay.

24    So I think there is a fluidity to some of the process that

25    has been going on here that has brought us to the need for a

1  subpoena now.  We're happy to tighten this up, put it in a

2  submission and answer the Court's question.

3           **THE COURT:**  Thank you.

4      Anything else on this particular issue?

5           **MR. STEPHENS:**  No, Your Honor.

6           **THE COURT:**  Okay.  Perhaps you discussed this already,

7  but it's not clear to me.  Is it correct that the discovery

8  just produced in November of this year includes material that

9  the government has had since 2010?  Is that right?

10          **MR. REES:**  I don't think so.  I think that we had

11 produced -- I believe that 90 percent of the discovery was

12 produced by the date we set a trial.  I think that's just --

13 that's all the stuff we have.

14     I don't think anything in November was stuff we already

15 had.  Maybe a document or two as we were going through.  But

16 mostly that was the 23 boxes from the FDICR, the comprehensive

17 PST files, the email files, and material that we obtained from

18 the FDIC's investigation into the Petaluma Greenbriar 101

19 Houseco material from 2012.

20     So a lot of material was in existence but we, the

21 government prosecutors, did not have it.

22          **THE COURT:**  The FDIC information on 101 Houseco and

23 the Petaluma Greenbriar you didn't have?

24          **MR. REES:**  In 2012, they initiated a -- basically,

25 they banned Mr. Cutting and Mr. Melland from banking, relating

to what they did with Petaluma Greenbriar and 101 Houseco.

And so there were fairly voluminous files of an FDIC investigator who had dove into all these issues to prepare that. And that's what Mr. Stephens responded to back in 2012 and was made aware of these.

We didn't have that investigator's complete file. And, again, we wanted to make sure everything was comprehensive. So most of that stuff we went -- we asked for it all; notes, everything that that investigator had done, all the emails that they had flagged.

And we produced it as that attorney enforcer had organized the case. So there's, like, a binder with here's all the evidence that supports that Petaluma Greenbriar 1 was a fraud. And here's all the evidence. It's all organized. And it's produced to the defense exactly that way.

So in terms of --

**THE COURT:** And you only got that --

**MR. REES:** We only got that in October or November, when we said we need to make sure we have a complete/comprehensive anything that the FDIC would have ever done about this. So we got that.

But, again, in terms of going back to prejudice, the evidence on this scheme that we've superseded to just make more comprehensive is organized by this enforcement attorney so they can see exactly how the case -- I mean, it's binders with

1  literally here's email 1, email 2, that the evidence supports

2  these claims.

3      So, you know, they can say that they have -- oh, the

4  discovery is glitchy and all this other stuff.  But the only

5  time they ever told us it was glitchy, we turned around and

6  reproduced it to them in the manner that they asked for it to

7  be produced, in these single-page tiffs.

8      That's what they have.  They have an attorney's, from the

9  FDIC, full binders organizing all the evidence in this case.

10 Helpful to us too that we got back in October, November.

11     But in terms of discovery with months to go before trial,

12 there's no secret about how the government will structure this

13 case.  It's no secret to Mr. Stephens, who has known how the

14 government has organized the charges that include Petaluma

15 Greenbriar and 101 Houseco since he responded to those very

16 charges in 2012, when they were alleged against Mr. Cutting.

17     So I can represent to the Court that -- and not blaming

18 the Court in any way, but when the Court said, okay, you're

19 going to have to -- I mean, I view it as I'm going to have to

20 supersede because I want to make sure the indictment is

21 comprehensive and fits the orders of the Court.  I said, okay,

22 I'm going to have to supersede.  And it took some months

23 because, you know, it's an investigation and it's new material.

24     But Your Honor said, okay, here's your deadline.  And we

25 worked and we met the deadline to get it done.  And it wasn't

1  on my mind, even though it was always sort of out there, until

2  I knew I needed to supersede.

3      But in terms of prejudice, they've never even asked to

4  continue the trial.  They say, okay, let's do it in March.

5  They just say, but it's sort of unfair.

6      But the heart of their motion is some sort of Speedy Trial

7  violation.  But nothing has changed about the trial.  The trial

8  has been set in March for many months.  They haven't asked for

9  more time.  They don't need more time that they're saying.  We

10  haven't asked for more time.  There's been no actual delay of

11  the trial.

12      And that's, to me, at the heart of if you're saying we

13  need to, you know, dismiss with prejudice counts of an

14  indictment because of a Speedy Trial violation, but no trial

15  has ever been moved or nothing has changed about that trial

16  date, that seems curious to me.

17      And I guess the last thing I would say is to me this is --

18  it's common, I think the Court has seen this before of, okay,

19  if this thing is really happening, let's go back and -- I mean,

20  our office will charge 924(c)s.  We'll go back and charge

21  higher weights on drugs.

22      **THE COURT:**  That's a lot different.

23      **MR. REES:**  Well, I'm not sure if it is, if that's

24  always been out there.  If it's always been out there that the

25  guy had a gun and committed a crime of violence, and the

government chose not to charge a 924(c), and then the case gets set for trial and our office says, okay, well, we're going to try to bring our most comprehensive case and supercedes with a 924(c), I think that is very similar in the sense that this has always been out there, the defendants have always known about it. There came a need for a superseding indictment. The trial hasn't changed, and we've just made our indictment more comprehensive.

And I would echo Mr. Reeves in terms of the gravamen of this case has always been about getting money to Madjlessi under false pretenses.

It turns out that there was three other loans that are all exactly the same, same amounts of money, three other sets of loans where they do just that.

And that's really -- you know, it's four counts that charge this set of loans that they have been aware of, they've litigated, and that they've known for all time. And it doesn't affect the trial date in any way.

**MR. STEPHENS:** Your Honor, if I may --

**THE COURT:** What about the trial date?

**MR. STEPHENS:** If I could, I want to correct the record. Because your question to Mr. Reeves was, have you had these documents since, you know, 2010, 2011?

And as I understand his answer, it was: Most all of them? No. There's just a few more of these are trickling out, and

this is stuff we just got.

That's not accurate because what we're talking about and what's referenced in the discovery letters are all the email files from the Sonoma Valley Bank employees that were taken by the FDICR in 2010.  Those have been in the government's possession since that time.

Regardless of whether the FDICR is on the prosecution team or not, the government has had those -- the prosecutors have had those since 2011.  And I think the Court is clear that our position is the FDICR is clearly on the pros. team.  So when they have this stuff, the government, the, quote, government writ large has this stuff.  So that was, I don't think, accurate.

Number two, he referenced a letter exchange between the FDIC enforcement and myself when I was at the Cooley firm.  If you read my response back, I tell them here's -- here's what we think of your case.  But we haven't seen any of your documents. I didn't have documents from them.  I was just saying here are themes you need to think through before you go forward with this.

And I don't think Mr. Reeves was intentionally saying that.  But I just want to make sure that the Court is clear.  I didn't -- this file that just got produced with the agent who organized everything, I didn't have that.

And then --

1          **THE COURT:**  I thought you said he did.

2          **MR. REES:**  He had the -- there was a document that's

3     like a charging document that says, here's what you did with

4     Petaluma Greenbriar and with 101 Houseco.  He had that in 2012.

5          **THE COURT:**  He didn't have the binder.

6          **MR. REES:**  The binders we got him in October or

7     November.

8          And, again, about the emails he's just mistaken.  We

9     produced all the emails that we had well in advance of trial.

10          We had to go get -- because he asked for the Alexis Tomsen

11     emails, to make sure it was comprehensive, we got a full set of

12     all the emails of any relevance.  We had not had that before.

13     And that's what we produced.

14          **MR. STEPHENS:**  So if they didn't have the emails

15     before, why are there documents in the record indicating that

16     they got all the emails from the Sonoma Valley Bank employees

17     when the bank failed in 2010?

18          **MR. REES:**  We did.

19          **MR. STEPHENS:**  And the prosecutors had them in 2011.

20          **MR. REES:**  And produced them.  We had them and

21     produced them.  And you've had them for a very long time.  We

22     went back and expanded the production to make sure that it was

23     full.

24          **MR. STEPHENS:**  And then, Your Honor, to go forward to

25     the question that you asked me, I would just point the Court

straight back to *Doggett* and the *Barker* factors.  It's the
length of delay.  It's 36 months here measured -- and this is
how the *McNeely* case in the Ninth Circuit measures the delay:
From the time of the original indictment to the date that's set
for trial.

    **THE COURT:**  That's not changed by the superseding
indictment.

    **MR. STEPHENS:**  No.  But my point is --

    **THE COURT:**  So my question to you is:  Does anything
change by the superseding indictment by the trial date?

    **MR. STEPHENS:**  Well, sure.  It's the factors that the
Court has already pointed to.  We've got to now go back through
all of the 3 million pages of emails and documents.  We've got
to go through this new stuff and figure out how it relates to
Petaluma Greenbriar and the lending limit allegations.  We also
have the witness memories who are fading on Petaluma
Greenbriar, issues which became clear when they went out and
conducted the interviews in October.

    So if you run it through the *Barker* factors, the first
factor falls for the defense, conceded by the government.

    **THE COURT:**  What about the trial date?

    **MR. STEPHENS:**  The trial date -- well, Mr. Balogh will
tell you he was pushing for the earliest possible trial date.
We would have preferred an earlier trial date.  One of the
defense attorneys had a conflict.  The Court had a conflict

with another date that got set, and it got pushed out.

But when you analyze this under *Barker*, you're now talking about the third factor, which they have conceded doesn't necessarily fall for them and doesn't necessarily fall for us.

**MR. BALOGH:** About the trial date, Your Honor, I think a couple of things.

I don't think the government gets to have it both ways. I was present for an early trail date. It's not, well, we can kick it to next September and October and all the problems are solved. We have a live motion. I think Mr. Stephens' analysis of *Barker* factors is right.

The second piece of that is, when Mr. Rees says a trial date doesn't make a difference on the loss of memory, I disagree.

On the indictment as charged there's no -- there's no loan committee testimony about Petaluma Greenbriar. Maybe it will come in under 404(b). I don't think so. But it's far from clear that it's part of this case. It was excised from this case in January when we struck surplusage and we cleaned up the indictment four corners and this case was a Houseco case.

And so those witnesses now -- and that's the 36-month delay Mr. Stephens was talking about. Those witnesses now don't really remember what happened with the loan committee. They can't recollect meeting with Mr. Cutting, Mr. Melland, and knowing that Bijan Madjlessi was involved.

1     A notion that they didn't know is kind of hard to stomach.

2    But that's their allegation, right.  But the people that could

3    disprove it or prove it, their memories are shot because they

4    waited.

5     And that's what the Speedy Trial test is.  Had they acted

6    with diligence and they not played shark practice.  And so

7    that's the danger we teach a young associate.  You know why you

8    don't go close to the line?  Because you might trip and fall

9    over it.  So stay far away from it, because if you trip there

10   might be consequences.

11     And shark practice can have consequences.  And that's --

12   so it should -- it's either going to have it on us or it's

13   going to have it on the government.  And when we talk about the

14   intentional choices they made, I think this is a case where the

15   consequences should fall on our adversaries.

16     **MR. STEPHENS:**  Your Honor, I apologize.

17     I need to make one more point.  It's in our papers, but on

18   the third *Barker* factor, right, the other thing that

19   Mr. Boisseau, on behalf of Mr. Melland, and Mr. Cutting still

20   don't have are the documents that the taint team for the

21   government has needed to process after they conducted the

22   search.

23     So there's still discovery out there that we haven't seen.

24   That's going to play into how long this trial got set.  And

25   that conduct falls on them, not on either Mr. Cutting or

Mr. Melland.

**THE COURT:** Well, let me ask you this question: If the case were to go to trial on the superseding indictment, would you need more time to prepare for trial?

**MR. STEPHENS:** On behalf of Mr. Cutting, we would go forward. Here's -- here's the catch-22 we're put in front of:

It either impinges on our due process rights to be able to get up to speed and get ready for trial, or they're going to say it's -- we're now waiving our Sixth Amendment right.

**THE COURT:** Well, I'll tell you what I've been thinking about. The first factor is delay; right? And the delay that the cases talk about is the delay from the indictment to the trial.

What we have is a 31-month delay until the superseding indictment. And we have a trial date set. Now, the trial date was already set pretty far out on account of the lawyers' schedules. We have a whole bunch of high-powered lawyers in this courtroom. And it's hard to get them in the same place at the same time without a conflict. So it was set at that point.

When I'm analyzing delay to trial, in theory, I guess, the superseding indictment could have been filed two weeks before the trial and you could still have the trial.

So it wouldn't be a Speedy Trial Act issue unless because the superseding indictment incorporated enough new material from the old indictment that the lawyers would not be prepared

to go to trial in two weeks and would have to kick it out.

And if that's the case, then the delay to the trial date is affected by the filing of the superseding indictment. But I don't know if that's how you would evaluate it or not.

**MR. STEPHENS:** Well, so I would look at it just the way that *Doggett* analyzes the *Barker* factors. And when you look at the Supreme Court's review of *Doggett*, it's clear -- or I would argue, Your Honor, that it's clear that there has been a Sixth Amendment violation here. A 36-month delay, witnesses memory fading --

**THE COURT:** Before the superceding indictment was filed there was a 36-month delay.

**MR. STEPHENS:** There was a 31-month delay. But the delay even in the case that they emphasis, the *Viera* case, runs from the date of the original indictment to the date of the trial. And in that case it was 22 months. It was a negligence case; not intentional case. But it's clear that the Ninth Circuit views it as a 22-month delay.

So here what I'm saying is that the period of delay under *Barker* and under *Doggett* is 36 months. And they've conceded, they have conceded in their papers that we're right. And we win on the first *Barker* factor.

**THE COURT:** But you would win on the first *Barker* factor without a superseding indictment, according to your analysis.

1          **MR. STEPHENS:**  No, I don't --

2          **MR. BALOGH:**  Can I clarify, Your Honor?

3          **THE COURT:**  Yeah.

4          **MR. BALOGH:**  I think what Mr. Stephens is talking

5     about is pre-indictment delay.

6          We haven't challenged the original indictment under any

7     Sixth Amendment theory.  And we were ready to go to trial in

8     March of 2017 --

9          **THE COURT:**  Right.

10          **MR. BALOGH:**  -- on we'll call it the Houseco case that

11     we all got to know so well.

12          What the fundamental challenge here for the defendants is,

13     we have a new indictment.  In the new indictment -- let's call

14     it the Petaluma Greenbriar indictment -- there is a

15     pre-indictment delay, that ended on October 28th, of bringing

16     the charges.

17          But there is also a Sixth Amendment and Fifth Amendment

18     violation for the delay leading up to those charges.  They

19     could have brought those charges in 2011.  They could have

20     brought those charges in 2012.  They could have brought those

21     charges in 2013, 2014, 2015.

22          And that there's a strand of this analysis which you can

23     dismiss cases for pre-indictment delay and you can count that

24     prejudice.  And what happens is you look at, even within the

25     statute of limitations, why did the government delay in

bringing charges?

And granted the statute of limitations is -- I think the case law says is one of the fundamental checks against delay. But it's not the only one. And the Constitution guards against this kind of shark practice.

So when the Court looks at why -- and that's the very first question I think the Court asked them: Why did you wait so long? Because that -- intuitively, there's a problem with the government waiting until the end to radically change the indictment.

And I think that's the delay Mr. Stephens is talking about. These charges could have been in the initial indictment. They could have been superseded much earlier. But the government intentionally delayed it for tactical advantage.

So we look at the rest of the factors and say, okay, how long is the delay? What was the basis of delay? Has there been prejudice? How should the Court balance these things?

I think *Doggett* says none -- none of these are dispositive. It's a totality of the circumstances. And I think the Court has to look holistically at how do we get to this new indictment and these new charges? Because I think when the Court dismisses the superseding indictment, we're still stuck with the first indictment. That doesn't get us out of the case.

THE COURT: Yeah.

1          **MR. BALOGH:**  That gets us to trial, the trial we've

2     been preparing.

3          And we'll all be prepared to go in March and find out

4     whether Houseco was the real deal or whether it was a crime.

5     The jury will give us the answer, and we'll go home.  That's

6     what I think we're talking about.

7          The only thing on the table was the delay in the

8     superseding indictment.  What were the reasons for it?  Was

9     there prejudice?  Was it intentional?  Was it negligence?  And

10    then the Court gives us the answer.

11         **MR. REES:**  I just don't -- that's not -- it's a Sixth

12    Amendment motion for delay of trial.

13         The relevant point for the filing of the superseding

14    indictment, there is a test for that.  And it's a statute of

15    limitations.  And it's ten years.  And we were within that.

16         This motion is about --

17         **THE COURT:**  According to you, you could have filed it

18    two weeks before the trial.

19         **MR. REES:**  Well, now, that might lead to a Sixth

20    Amendment violation of the manner that they're talking about.

21    Because presumably they would say two weeks is not enough to

22    process this.

23         But they have five months.  And they're not even asking to

24    move the trial.  So the superseding indictment literally did

25    not affect this trial date, by all parties' agreement.

So I don't -- the -- they want to focus on the time that the indictment was filed.  But that's what the statute of limitations is for.  And they have had to concede, despite their motion, that there has -- there has been no problem with that.  It's the trial that is the focus here, and it hasn't changed.

**MR. REEVES:**  Your Honor, they can't answer your question.  They have not been prejudiced by the filing -- by any alleged delay in filing of the superseding indictment precisely for the reasons the Court is inquiring about.  The trial date hasn't moved.  They have the time to prepare.

**THE COURT:**  I didn't say they had the time to prepare, but the trial date hasn't moved.

**MR. REEVES:**  I meant only that they have four months to prepare.

The Court is asking, also, a second set of highly relevant questions.  What's the reason for the delay?  And Mr. Stephens and some of the other defense attorneys, the emphasis is on intentionality of the government sandbagging them.  So that's a very weighty and serious question.

We disagree.  And I don't think the facts support that in any way.  Not when we've made the early production, we are compliant with basically the direction given by the Court. We've added four counts to an already big indictment on issues that have been part of the, sort of, related nature of this

bank that are consistent with the originally charged theory of the case which centers on Madjlessi's role.

So we disagree for those reasons. I think there are good reasons we proceeded exactly as we did. And not reasons that would support a finding of intentionality in any way. Shark or other wise.

And without that, they cannot satisfy the factors that are relevant for the Court because they cannot show that the filing of the superseding indictment and any delay associated with it has actually hurt them. They can't. And that is the record right now. And I don't think it really justifies the type of relief that they're asking.

MR. STEPHENS: Your Honor, I just point you straight back to the *Doggett* case. The way they just analyzed the law is inaccurate. It's wrong. The Solicitor General acknowledged to the Supreme Court in *Doggett*, if the government's delay was intentional and tactical which they've acknowledged here --

MR. REEVES: No, we haven't.

MR. STEPHENS: Which -- which through our papers and through their declaration provides strong evidence for the Court to conclude that the delay was intentional, they lose; we win.

It's an overwhelming case for dismissal. It's virtually automatic. The language of the Supreme Court. So if you look at *Doggett* and you look at *McNeely*, it's an overwhelming case

1   for dismissal.

2           THE COURT:  Based on the Sixth Amendment?

3           MR. STEPHENS:  Yeah.

4           THE COURT:  Trial delay.  That's the piece I keep

5   getting hung up on.

6           MR. STEPHENS:  But if you -- so I kind of expected

7   that, at some point in the hearing, they were going to try and

8   deflect the Court away from their conduct and try to put them

9   on the defense, right.  Put us on the defense.  And I think

10  it's happening again.

11      If you look at the second *Barker* factor and the evidence

12  that we've put forward in our motion, most of which is

13  uncontested, it's clear that the delay was intentional.

14      And it's clear, even if you look at this under a

15  negligence standard, that there's been prejudice based on the

16  loss of memory and the loss of exculpatory evidence.

17          THE COURT:  And, so, is Mr. Balogh correct that it's a

18  pre-indictment delay you're arguing?  Because that's kind of

19  news to me.

20          MR. STEPHENS:  Well, I mean, so it's -- part of our

21  motion demonstrates that they've known this stuff forever, and

22  they could have brought this case in 2014.

23          THE COURT:  I was learning so much reading your

24  papers, including the fact there was previous to this lawsuit a

25  civil lawsuit on other matters that are now being raised in the

1  many years later in this superseding indictment.

2      So a lot of that is going on.  But I have to figure out

3  whether your motion based on the case law and the Sixth

4  Amendment is well taken.

5      **MR. REES:**  I would also just make the point, I hadn't

6  thought about this until Mr. Balogh put this forward, but these

7  are so closely related with the same type of conduct, getting

8  loans through straws and nominees that -- and we've made all

9  the disclosures about it.  We could have just introduced it as

10  404(b) evidence of their lack of mistake and their pattern and

11  practice.

12      So to say that it's definitely not true that this material

13  would not have been in a 101 Houseco trial is just not

14  accurate.

15      This stuff has been out there.  It's been available.  The

16  fact that we have expressly incorporated it into our indictment

17  does not change the fact that it was potentially relevant and

18  admissible as 404(b) evidence all along.

19      **THE COURT:**  Well, relevant evidence is one thing.  And

20  a charged crime is quite another thing.

21      **MR. REES:**  Well, it only makes it that it's definitely

22  going to come in instead of possibly under 404(b).  But that

23  doesn't change the preparation that they need to do.  Because

24  until they somehow exclude it as valid 404(b), they've got to

25  prepare for it.

1    So as I'm sitting here thinking and Mr. Balogh has

2    basically acknowledged, if this could have been come in as

3    404(b) evidence all along -- and I believe it could -- they

4    better have been preparing for it.  They certainly have known

5    about it.

6        I think the fact that they are not asking for a delay from

7    the trial pretty much shows that they have had this on their

8    radar.

9        **THE COURT:**  Well, I don't think that's correct.  But I

10   think -- I don't think that's correct.

11       Let's talk a little bit about -- okay.  This is something

12   to which there wasn't a response by the government.

13       What is the government's response to the declaration of

14   Melanie White about the problems with the E discovery?

15       **MR. REES:**  I think I mentioned this, Your Honor.

16       We were made aware -- and this was some time ago, and I

17   think it's in my declaration -- that there was some issue that

18   the defense was having.

19       I won't say "the defense."  It was Mr. Stephens wrote to

20   us about it, that he wanted certain material to be reproduced

21   as single-page tiffs.  So we did.

22       And there's been a couple of other issues that they've

23   risen.  They said that there were some Bates numbers that were

24   duplicative, I want to say.  And we went back and fixed that as

25   well.

But the point that I think is -- the endpoint is, we have assisted them when they have asked.  When they asked about Alexis Tomsen emails, we got them for them.

**THE COURT:**  I want to know if the E discovery is searchable.

**MR. REES:**  Yes.  We search it every day.  They have it exactly the way that we have it.  There is no prejudice, in terms of this discovery, in terms of us having some better version than them.  They have exactly what we have.

**THE COURT:**  And you can search it?

**MR. REES:**  Yeah, I do it myself.

**THE COURT:**  So is that --

**MR. STEPHENS:**  It's the most challenging production that we've dealt with.  And that's why we brought forward the declaration from Ms. White, who basically said this is below industry standard.

It's difficult for us to search.  For example -- I'm getting too far into the weeds, Your Honor.  But we may search a term and it will hit on a document.  The document doesn't have the attachment to it.  Or you run a search for a particular term, and it doesn't necessarily flag it.  We've had -- it has been a struggle to say the least.

We have tried to work out all these issues outside of court.  We've been able to navigate some of them.  Alexis Tomsen was another example where it's, like, where are her

emails?  And every time we dig further into it, we find more issues.

MR. BALOGH:  Just to be clear, Your Honor, there may come a time someone raises their hand and asks to move that trial date.  I'm preferring to see how the Court resolves all these issues.

If there comes a time I don't believe I'm prepared for the March trial date, I may well raise my hand.  But I'm working as hard as I can to show up in this courtroom on the 7th of March for a pretrial and answer "ready" for a case --

MR. REES:  That certainly sounds like having your cake and eating it too, asking the Court to dismiss the charges and keep the trial, and then if the Court doesn't dismiss the charges then asking to move the trial.  I mean, that's -- that does not seem like a consistent position.

THE COURT:  I would be stunned if that wasn't exactly what happened though.

MR. REES:  How can that be proper?

THE COURT:  A request?

MR. REES:  Yeah.  To say, well, you know, this is prejudicial to us because we can't possibly prepare for a trial in March, and so you've got to throw them out, the charges, and then if the Court doesn't throw them out, say, okay, well, now we want all this extra time.

The very prejudice that they're saying is to keep the

trial date, and then try to move it if they don't get the

resolution that they want from the Court.

**MR. STEPHENS:** There's the catch-22, Your Honor.

**MR. REES:** There is no catch-22. Five months to

prepare for a trial that is -- I mean, that's been part of the

discovery all along.

We've all agreed that we can keep this trial date. We all

agreed. Nobody has ever moved to continue it. And now it

sounds like they're going to say that the very prejudice

they're going to flip around on and say, okay, we want to move

it after all -- anyway, I think I've made my point.

**THE COURT:** That whole thing is submitted now.

What about Mr. Lonich's issues on suppression? First, let

me say, this -- the standing issue on the office area in units

112 through 114, Mr. Lonich filed something. The government

responded. There's been no reply because the timing, I think,

was quite short.

I would like a written reply from you to the government's

response.

**MR. BALOGH:** Yes, Your Honor. Can I ask that in the

new year? I have about 24 hours left in the United States

before I get my year-end break. I can get it tomorrow if you

would --

**THE COURT:** 24 hours left in the United States?

**MR. BALOGH:** I get a break.

1          THE COURT:  That means you're leaving town tomorrow.

2          MR. BALOGH:  I'm taking my sister on holiday.

3          THE COURT:  Well, that's lovely.  But you won't get a

4   ruling until --

5          MR. BALOGH:  Do you want -- tell me exactly what you

6   want.  I can work tomorrow.  Tell me exactly what you want,

7   Your Honor.

8          THE COURT:  I just want you to tell me if you agree

9   with what the government has said or not.  And if there's a

10  factual difference between what the government asserts and what

11  you say, I need a declaration to that effect.

12         MR. BALOGH:  Okay.  If I don't get it to you by the

13  end of business tomorrow, I will get it the first week of the

14  new year, understanding you can't resolve without it.  But I'll

15  get that done.

16      Thank you.

17         THE CLERK:  Which motion --

18         THE COURT:  There's actually a number of issues here

19  that --

20         THE CLERK:  You said it on the record.

21         THE COURT:  I can go back and track down the numbers

22  of the motions.

23         MR. REES:  This one is 280.

24         THE COURT:  Abstract questions I have:

25      Why didn't Mr. Lonich file a declaration about standing in

connection with any of the prior motions to dismiss?

I'm not asking for a response right now, but these are questions I have.

Lonich seeks an order compelling the government to comply with the warrant's electronic evidence protocol.  And the government says that it did.

So what is Lonich's response to that?

**MR. BALOGH:**  Okay.  We have -- we take the declaration -- hold on.  I'll show you the document.

It was teed up in the declaration of Ethan A. Balogh on June 10th, 2016.  As we see in Exhibits D and F, there's thousands and thousands and thousands of pages listed where we made the claim either against the taint team or the trial team they're outside the scope.

Now we have here today, I think me and Mr. Rees, the trial team, let's say there's 50 documents in dispute.  I think that's a little large, but let's say there's 50 left.  And with the taint team we have 5 or 7.  So about 57 documents.

So there's thousands and thousands and thousands of documents here which the government agrees they're not challenging is within the scope of the warrant.

Under the warrant's protocol, they have to purge all of those.  And the government's position is no, we're going to hold on to them, and we're going to review them again at trial, and maybe we're going to pull stuff out later.

1    But the only reason they got Judge Spero to say you could

2    grab all that gear was whatever is not within the scope you

3    have to destroy.  And when they made the promise to

4    Judge Spero, they have to come into compliance with the

5    promise.  That's CDT.

6    And the government's position is, we're not going to

7    challenge almost everything on B and C.  If we're not agreeing

8    with Mr. Balogh, we're not contesting them.  Whatever

9    mealy-mouthed stuff we get.

10    So they're all outside the scope of the warrant.  Under

11    the warrant's protocol, they have to destroy them.  They have

12    to purge them.  And they have to certify that they've come into

13    compliance.

14    And it's -- what they're really saying is, we use the

15    keyword list.  Talk about names on the list way back when.

16    Agent Wilbur.  And whatever wasn't a name on the list, we

17    destroyed that.

18    But that's not full compliance.  That's partial

19    compliance.  And the only way they can be in compliance today

20    is if they took the position that every document on here is

21    within the scope of the warrant.  And we're willing to litigate

22    that because we want to keep all of them because they were

23    properly seized.

24    But they forewent that opportunity when they gave up the

25    ghost in our meet and confer and chose a select few to contest

as within the scope of the warrant.  So that's that point.

MR. REES:  Your Honor, the frustration with the government in this eternal suppression litigation is that Mr. Balogh just will not accept the orders of the Court.

That motion that he refers to, the second motion to suppress, was just denied by the Court.  And that's done.  We are done.  He made that contention back then.  And we responded to it.  The Court denied it.

Now he wants to come back to it, ignore that this has already been litigated.  But the key point is, is that he concedes that every single electronic device that we keep has responsive material on it.

THE COURT:  Say that again.

MR. REES:  There's only a subset of electronic devices that we kept.  Because we did find that some of the devices that we seized didn't have anything relevant on them.  So we erased it just like we were supposed to do.  The only devices left that we kept include --

THE COURT:  You mean copies of data off of devices?

MR. REES:  Exactly.  Exactly.

So we did that.  We erased the data that was nonresponsive.

Mr. Balogh concedes that on each of the devices that we have left there is relevant information.  And the Court had before it a declaration all the way back in that second motion

to suppress, which the Court denied, where the -- John Wilbur, the person who is maintaining these, says you can't pick and choose to delete certain information on a hard drive. You just can't do it. Otherwise, it's not a viable forensic image anymore. And he couldn't get up at trial and be able to say this is from a device that I seized that is forensically sound.

So what he's basically asking to do is to somehow access a core piece of evidence that he agrees has relevant evidence and to somehow, like, boot it up like a regular computer and delete certain files off of it, which is just impossible in the forensic context. You can't do that. And we had a declaration in the record saying you can't do that. Your Honor already denied this motion.

So we did exactly what we were supposed to do. If there's a device that we seized that has nonresponsive information, we deleted it. If there's a device that has concededly relevant information, we have to maintain it in a forensically sound state. Otherwise, we're making our own *Brady* by messing up the very data that we're trying to introduce and that they may want to take documents from.

So this is a dead letter that's been litigated months and months and months ago, and there's nothing to it.

**THE COURT:** My last question is: The trial team -- the trial team, which I guess is you, says that there are roughly 50 documents left at issue on the motion to suppress,

about which you don't agree, and then 5 or 7, or something like that, on the taint team.

And Mr. Lonich says, oh, no, there's more than that.  Is this the "more than that" that we're talking about?

**MR. BALOGH:**  In a way, yes.  It's two pieces.  One, there's the broad claim of whether what -- how they secured Judge Spero's approval, and did they meet the promises.  We'll call that protocol enforcement.

Regarding what you're talking about, I think, is a separate thing, which is, those 50 plus 7 -- we'll call them the 57 going forward -- are the only documents the government would agree to confer upon pending the assessment of the standing question.

So if the Court decided, based on my supplemental declaration, you know what, the storage offices where he had all his files, yeah, he has standing for those, you would have to direct both the trial team and the taint team to confer with me and identify those boxes, because we haven't had that discussion.

**THE COURT:**  All right.

**MR. BALOGH:**  I tried.  I failed.

**MR. REES:**  And, again, I would really prefer that he not be able to make a reply on this.  This has been over a year at this point.  He never bothered to try standing until the very last minute.

And the case law is a hundred percent clear, like a hundred percent clear, that it doesn't matter if he stored his files there.  I mean, it's a quote, a direct quote from -- that's what he's basing his standing claim on.  It's a direct quote from the binding case law.  I'll read it into the record.

"We have thus held that mere access to and even use of the office of a co-worker does not lead us to find an objectionably reasonable expectation of privacy."

His own declaration disclaims that he was an owner or operator of these premises.  The Court has already ruled that the only place he has got standing would be in his personal office and in his home.

And that's exactly in compliance with the relevant case law that clearly says unless you are talking about personal property that you're keeping basically in your custody, or you're talking about you're actually on the scene and personally acting as if you control that space, or that you took specific precautions to prevent anybody else from accessing that material, you don't have standing.  And he hasn't even alleged any of those.

And I would really ask the Court to -- because it's true, if he is going to somehow at the eleventh hour -- and this is beyond the eleventh hour; it's the eleventh year -- go ahead and somehow get this Court to reconsider its standing ruling, we're back to the drawing board with thousands of more

documents that suddenly he's going to get to say, "I have the ability to litigate," which is inconsistent with what you've ordered for months and months and months.

I really would ask -- it's not just a legal issue at this point. It's a serious amount of work for him to be able to go back. And it's inconsistent with the law; inconsistent with the facts; totally inconsistent with his, you know, prosecution of the matter.

He never even tried, in any of his motions, until the eleventh hour to even claim this. And he's expanding it beyond what any reasonable person would and what the Ninth Circuit says you can claim control over.

So I really hope the Court would rule on that, not allow him to take a fifth bite at the apple on standing, and just keep this Court's order.

Again, it doesn't matter the places he doesn't have standing. He doesn't have standing in the Eiffel Tower. It matters where he does. And this Court has said he had standing in his personal office and his home. And we treated that -- we've acted that way this entire time.

And it's not just me -- it's not just the trial team that's going to have to go back through thousands of documents if this can of worms is open again; it's the taint team as well.

I also say that the taint team has pointed out she

believes that there was actually a -- some sort of agreement or stipulation that there would not -- that Mr. Balogh would not bring up this issue of individual purging of material again as part of the negotiations regarding this search warrant.  I'll let her --

MR. BALOGH:  I must have missed that stipulation.  Can we get an ECF number on that?

MS. QUIROX:  Your Honor, in the meet-and-confer process with Mr. Balogh, we did discuss all these other documents that we did not meet and confer over because admittedly the list is very long.

We were only -- there are only seven documents left in dispute.  I told Mr. Balogh there is no point talking about hundreds of documents, going through every single document that we don't intend to turn over to the trial team.  If the trial team doesn't have it, it's not going to be introduced in the case-in-chief.

So we discussed that if -- we can enter into a stipulation that if the government agreed that it would not use these other undisputed documents, relevant documents, if it wouldn't introduce those documents in its case-in-chief, Mr. Lonich would forego the purging issue unless if Mr. Lonich takes the stand at trial, if he lies, and one of those documents can be used to impeach him, then that's why we would keep these documents to use it for impeachment purposes only.

         And there's cases that we -- actually, I do have the case
in front of me.  It's *U.S. vs. Haven*, 446 U.S. 620, pin cite
627 and 628.  And *Walder vs. U.S.*, 347 U.S. 62, pinpoint 65.

         So I specifically discussed these cases with Mr. Balogh
and -- and in the context that there would be a trial
stipulation.  There is no ECF number because the stipulation
hasn't been entered into.

         But this was actually Mr. Balogh's suggestion that we
enter into such a stipulation so that we could preserve those
documents; he would forego the issue of purging; and if
Mr. Lonich lies on the stand, then we could use those for
impeachment.

         **MR. BALOGH:**  I don't think that's quite right.  We did
discuss entering a stipulation.  The taint team said they don't
speak for the trial team.  I said I'd entertain any stipulation
presented to me.  And we never got one.  Instead, we got
further briefing.  And I've staked out my position.  And I'm
entitled to it, and I maintain it.

         **THE COURT:**  What I would like is by tomorrow -- get me
whatever you are going to get me by way of response by
tomorrow.

         **MR. BALOGH:**  Absolutely, Your Honor.

         **THE COURT:**  We will decide this issue and then it will
be done.

         **MR. BALOGH:**  Thank you.

**THE COURT:** And I agree with Mr. Rees that expanding things at the eleventh hour would be inappropriate in this case.

All right. Have we talked about all the motions?

**MR. BALOGH:** We have not. I have one other motion before I have some housekeeping issues.

**THE COURT:** Okay.

**MR. BALOGH:** And I don't think we have to spend a lot of time on it. And I think Mr. Reeves kind of gave up the ghost at the beginning, which will help. Which is, to the extent the Court doesn't dismiss the superseding indictment, I do think -- and to maintain that trial date, I think if the Court wants to have argument I think the *Grace* argument that there should be witness lists with summaries, witness summaries, exhibit lists, compliance with the summaries of the local Rule 16-1C. Mr. Reeves kind of was misleading that he's given those. He hasn't.

The local rule says he has to summarize all co-conspirator statements that he's going to introduce at trial with a summary that's sufficient for the Court to rule on admissibility. That's 16-1C(3) or C(2).

The government has to provide summaries of 404(b) evidence sufficient for the Court to assess admission under that rule. We don't have either of those summaries, despite some crafty language.

And that kind of trial matters.  If the Court doesn't give relief on either pre-indictment or post-indictment challenge of the superseding indictment, then I think the next mechanism for the Court to use is to use its trial management authority to require the government, by January 9th, to get us everything we're going to need to know what this trial looks like.

I am confident, and I know we've been through this before, Your Honor, that last 30 days where we litigate the lines of the trial and we fight for compliance of expert disclosures, and we do all those things that we do in this district, we're going to need that, as a defense, to be ready.  And I want to keep that date.

And one of the tools if you don't dismiss the superseding indictment, one of the levers you get to pull is requiring the government to give us that accurate presentation of what this trial is going to look like so we may be prepared to meet their allegations at trial.

That was part of my *Grace-Brady* motion.  I don't know if the Court has questions about it, but I wanted to flag it.

**THE COURT:**  Thank you.

**MR. STEPHENS:**  From my perspective, Your Honor, even if Your Honor goes ahead and grants the motion to dismiss the superseding indictment, I would still be arguing in favor of our *Brady* motion.

I'm willing to submit it on the papers.  It's been a long

hearing.  If you have any questions for me, I'm happy to answer them.

        **THE COURT:**  Thank you.

        **MR. REES:**  Can I address the substance?  One, obviously, some concern to me that I'd like to address is this idea that I somehow intentionally or negligently lied to the grand jury about the use of the word "ever."  And I just want to make sure that the Court has the benefit of at least some commentary on that.

        **THE COURT:**  All right.

        **MR. REES:**  Mr. Cutting has alleged in one of his motions that -- that -- let's see.  Let me get the quote.

        **THE COURT:**  Which motion was it; do you know?

        **MR. REES:**  It's Motion for Disclosure of Grand Jury Transcripts.

        **THE COURT:**  Okay.

        **MR. REES:**  It's 287.

So this is a portion of the grand jury when we were discussing the Petaluma Greenbriar loans.  And I directed the attention of the grand jurors to the participation of loan committee approval members in the, quote, approval of the three Petaluma Greenbriar investments loans.

        **THE COURT:**  Are you looking at page 3 of his motion?

        **MR. REES:**  Page 5.  It's the quoted grand jury transcript.

1    **THE COURT:**  Okay.

2    **MR. REES:**  So the first question there, directing the

3    grand jurors' attention to the members who participated in the

4    approval of the Petaluma Greenbriar investments loans, those

5    loans were approved in a time period.  It was about a four

6    month time period over which all six were approved, as stated

7    in the superseding indictment.

8    Asked generally about the level of recollection, they said

9    it varies.  Some had clear recollection; others had less.  But

10   one thing that they all recalled was that they were not told

11   Bijan Madjlessi was involved in the Petaluma Greenbriar

12   apartments.

13   And then my question:

14   "Okay.  So nobody recalled that they were ever told

15   that Bijan Madjlessi was involved with those Petaluma

16   Greenbriar five investment loans?

17   "That's correct."

18   Mr. Cutting, through Mr. Stephens, has argued that "ever"

19   because I used "ever" means that they were never told in the

20   history of time that they were told about these --

21   Mr. Madjlessi's involvement in the loans.  And that's just

22   clearly incorrect.

23   It's obviously a very serious allegation.  He's claiming

24   that I intentionally lied to the grand jury.  That's a very

25   clear time frame that's being referred to, which is this

approval process.  It's the only aspect of these Petaluma
Greenbriar loans that's discussed with any specificity in the
indictment.  It is the only aspect that was talked about in the
grand jury.  Because a fraud, a bank fraud specifically, is
obtaining money and property from a bank.  Obtaining.  Getting
the money, approving the loans.

It cannot mean ever for all time.  And I think
Mr. Stephens had to concede that in his reply because we were
talking about interviews with these loan committee members that
occurred in 2016, when they were told about Madjlessi's
involvement.

So what we have is a situation where "ever" in this
context is referring to a period of time that is not forever
and ever and ever, but a distinct period of time.

I think in the context of the question, everything is
related to the approval, everything is related -- the whole
crime, the gravamen of the crime is the obtaining of the loans,
that "ever" was in that process that -- that time period when
those loans were getting approved.

Now, Mr. Stephens says, well, there's something relevant
that happened two years later, in 2009, when the loan committee
members meet with Bijan Madjlessi about the Petaluma Greenbriar
loans.  And that's reflected in an email and reflected in
minutes.

He originally claimed that it was -- it was -- we

compounded our lie about this "ever" being never ever in the history of the world by not submitting those documents to the grand jury. But we did. We actually submitted to the grand jury, they had before them the very loan committee minutes that showed that the loan committee members met with Madjlessi about the Petaluma Greenbriar loans in 2009. So they cannot have been misled about that.

And I would -- you know, obviously, I take very seriously the allegation that I would lie. I think it is completely not true with any reasonable sense of the context of this.

Mr. Stephens seems to think it's important that the loans were, quote-unquote, renewed in 2009. But there's no disbursement of money that happens with that. It's just that they're not going to call for them to pay it back yet.

So I think that this is really, frankly, sort of irresponsible to have to concede that "ever" does not mean never in the history of time, and then -- but still claim that somehow "ever" means this time period between 2007 and 2010, when the only allegations about those Petaluma Greenbriar loans were back when they were disbursed and approved and I think the only thing we discussed with those loan committee members about because that was all that was relevant.

THE COURT: So are you saying that the documents, for example the interview notes and the loan committee notes, were presented to the grand jury?

1      MR. REES:  Not those particular interviews.  But there

2  was loan committee minutes that clearly state the loan

3  committee members met with Bijan Madjlessi about the Petaluma

4  Greenbriar loans.

5      THE COURT:  Those were given --

6      MR. REES:  Those were given to the grand jury.

7      And so they had before them -- to the extent this is

8  ambiguous at all, they had before them the exact information

9  that made it clear that this time period being referred to was

10  the time period of the approval of those loans.

11      So there really is -- I would really like to strongly

12  represent that there was no lie here, no misconduct.  He seized

13  upon one word in a dozens-and-dozens-and-dozens-page transcript

14  of the grand jury and tried to stretch it beyond what he has to

15  admit it -- it's not forever.  It just wasn't, because the

16  grand jury also knew that they were told in 2016.  So I would

17  submit that the time period was clear by all the allegations,

18  by the context of the questioning.

19      THE COURT:  That they were told in 2016?

20      MR. REES:  Yeah.  The very interviews that we were

21  talking about were interviews in 2016, with the loan committee

22  members, where we said, Did you know about that Madjlessi was

23  involved?

24      So the grand jurors knew that "ever" didn't mean forever

25  and ever because they knew that by the time this grand jury

testimony was occurring.  They already knew.  They had just
been told.  In other words --

       **THE COURT:**  But you said a minute ago, I think, that
the grand jury was presented with loan minutes from 2009 or
so --

       **MR. REES:**  Yes, exactly.

       **THE COURT:**  -- that would demonstrate that
Mr. Madjlessi came in and talked to them about --

       **MR. REES:**  Exactly.

   That's my point, is that the use of the word "ever" cannot
mean what it says.  It just can't.  It cannot mean forever and
ever and ever, because there was evidence before the grand jury
about the 2009 disclosures.  There was evidence to the grand
jury about the 2016.

   So I would submit it's clear from the context and what's
being discussed and allegations in the superseding indictment
that this time period is the December 2007 to April 2008 time
period that these loans are being.

       **THE COURT:**  Thank you.

       **MR. STEPHENS:**  Your Honor, I can respond to that in a
minute.  I know it's been a long hearing.  And I can tell that
the Court was struggling with that argument like I was, because
what he's saying is the term "ever" can't mean ever based on --

       **THE COURT:**  It's sloppy wording, is what he's saying.

       **MR. STEPHENS:**  Based on something the government did

1  in 2016, when they went back and -- the grand jury wasn't --

2  here's the point:

3      He defines the time frame to be 2007 and 2008 based on his

4  use of the word "approval."  But what's clear is that those

5  loans, the loan committee voted to approve them again, to renew

6  them.  They voted to approve to renew them in 2009.

7      The indictment charges that Mr. Cutting concealed evidence

8  from the loan committee members about Mr. Madjlessi's role in

9  loans, including the Petaluma Greenbriar loans from 2007 to

10  2010.

11      **THE COURT:**  You're saying he's got a document that

12  shows they were told about it in 2009?

13      **MR. STEPHENS:**  2009.

14      **MR. REES:**  Which the grand jury had.

15      **MR. STEPHENS:**  And one other point.  He said that the

16  documents we cite in our papers were presented to the grand

17  jury.  That's not true.  We cited three documents.  One of them

18  was.  It was buried in Exhibit 7, which is 177 pages long.

19  It's the last five pages in that exhibit.

20      Those five pages, in my review of all the testimony in the

21  grand jury, were never spoken about, were never referred to.

22  There is no indication that the witness testifying in front of

23  the grand jury pointed to those five pages and said, see, Bijan

24  Madjlessi met with the loan committee in 2009, before they

25  approved the renewal of the loans.

So my point is, as the grand jury is sitting there looking at the indictment that charges concealment and misrepresentation about Mr. Madjlessi from the period of 2007 to 2010, it is highly relevant what happened in 2009.

MR. REES: Again, Your Honor, the time period alleged in the indictment is just the time period of the overall scheme.

Nothing is alleged about the Petaluma Greenbriar loans beyond 2007 and 2008 because the only thing that matters is that the money was disbursed. The renewal didn't come with any additional money.

And the reason that the indictment covers that time period is because they went with the Houseco loan and got that money, too, later in 2009.

So the time period is just of the overall scheme. But the allegations about Petaluma Greenbriar all relate back to that approval time period.

MR. STEPHENS: And the colloquy between the prosecutor and the grand jurors might shed light on this.

THE COURT: Yes, I think I got the point.

MR. STEPHENS: Yes, Your Honor. I will submit.

MR. BALOGH: With regard to some housekeeping, I have one concern since we started, I think, the case with sealing.

There's been a welter of sealed documents lately, which is fine, that come across the transom; 299, 301, 306, 308, 323,

1    and 324.

2        I know from me and I know from Ms. Quirox and I know from

3    Mr. Stephens that there's been administrative motions to seal,

4    so we have a publicly identified basis in compliance with the

5    local rules.

6        I just want to confirm from all counsel on the record that

7    there's been nothing filed under seal, publicly filed

8    administrative motion identifying the filing party, whether

9    disclosing their bases or not, so we're making sure we're

10   seeing everything on all sides that we're entitled to.  And

11   so --

12       **THE COURT:**  I thought you couldn't file under seal

13   without an administrative motion.

14       **MR. BALOGH:**  Sometimes some stuff gets through all the

15   time.  That's why I'm inquiring, to make sure all counsel can

16   on the record say they haven't submitted anything under seal --

17       **THE COURT:**  I don't think Ms. Kasimoto would let that

18   happen.

19       **MR. REES:**  This issue first came up a couple of years

20   ago when Mr. Balogh was doing that, and the Court said please

21   don't do that anymore.  So I think everybody wants to proceed

22   that way.

23       **THE COURT:**  As far as I know.  Of course, I wouldn't

24   know, I guess.

25       **THE CLERK:**  I don't know I'd know necessarily.  If

they file it with the Clerk's Office and it gets filed, I wouldn't know it either.

THE COURT:  Has anybody filed anything under seal without doing the administrative order business?

MR. REES:  I had to get the, sort of, retroactive sealing of that Exhibit B, which I did publicly.

THE CLERK:  Okay.

MR. REES:  And then I had to file under seal some grand jury-related material.  But that was public.

MR. BALOGH:  I just want to make sure.  That's the question.  Whoever -- just going to say, I filed the public administrative motion for everything under seal.  That's what I'm getting at.  I might have done something I don't recollect.

THE CLERK:  There's nothing I've noticed regarding that issue of things being filed without notice.  I don't think that's happened.

THE COURT:  To your knowledge, have you done that?

MR. REES:  No.  My recollection is my administrative motion to seal under the horror of popping up on the docket.

THE COURT:  Well, would you just go back and check --

MR. REES:  I can doublecheck.

THE COURT:  -- and either correct it or tell Mr. Balogh.

MR. BALOGH:  Thank you.

The last thing, a sticky wicket.  I don't know how we want

to deal with it.

The government has made production of voluminous agent notes available to us. But they won't let us get a copy set so we can prepare them for cross-examination at trial. We can't make exhibits to impeach witnesses. We have to visit their office and take notes, which my notes are not going to be used for impeachment in this trial.

So can we get a directive that we should get a copy set of those? If they want to put them under protective order, I'm fine.

But I don't know how I can cross-examine a witness with a document that's in his office. It's a real challenge --

**THE COURT:** -- protective order.

**MR. REES:** The agencies that I work with are extremely concerned through their counsel that we've even allowed the defense access to the rough notes. They have not authorized me to be able to make any further copies.

What I would suggest is -- I don't think that there's -- I think it's highly unlikely there's anything impeachable in those notes. And they could only be used to impeach the agent themselves who would testify. It couldn't be used to impeach somebody else because they're the agent's notes.

So I would suggest that to the extent that they believe that they have material that actually -- actually would be usable, I would suggest that we would lodge the agents' notes

with the Court, and they can identify with a -- specify which
ones they want and they need for trial and make sure that
there's a real record of that.  And the Court can release those
so I wouldn't know which ones they have.

**MR. REEVES:**  Your Honor, what has worked well on this
issue in other cases with vastly more notes than even this, and
which the government would be willing to do in this case, is on
a case-by-case basis, if there's a specific set of notes within
reason, a small amount, we're happy as a courtesy to let them
make a photocopy at the U.S. Attorney's Office.

But I do agree with Mr. Rees that the agencies view this
as work product.  And the wholesale production and copying of
the notes is inconsistent with the position they've asked us to
take.

So I think there is a middle ground, and we're happy to
pursue that if that would help.

**THE COURT:**  Well, showing them to the other side is
inconsistent with their being work product, isn't it?

**MR. REEVES:**  I accept that.  That's a debate -- I've
had to advance that position with the counsel for some of the
law enforcement agencies that we work with.

So there's been a negotiation.  I agree with Your Honor.
And I have pushed hard to make this disclosure.  And, again,
I'm drawing on my experience in not a small number of other
cases with this same issue where we proceeded in exactly this

1  fashion.  They've had an opportunity to review the notes.  And

2  where a particular set of notes is relevant for whatever

3  reason, we can facilitate their ability to get a copy.

4          **THE COURT:**  Is this FDIC you're talking about?

5          **MR. REES:**  It's all the agents.

6          **MR. REEVES:**  Yes.  It would be all the law enforcement

7  agents that conducted or participated in the interviews and

8  wrote the underlying notes for the reports of the interviews.

9          **THE COURT:**  Which would be FDIC and who else?

10         **MR. REES:**  IRS.

11         **MR. REEVES:**  SIGTARP.

12         **MR. REES:**  FBI.  SIGTARP.  FHFAOIG.

13         **THE COURT:**  Well, how about that then?  Ask for copies

14 of stuff you think you really need.  And then if there are

15 further issues -- what were you suggesting?  That you put them

16 in the court and then I can --

17         **MR. REES:**  Well, if they say it's going to reveal

18 their defense to tell us what of the notes are going to be

19 relevant, maybe they could just --

20         **MR. BALOGH:**  The problem with that, it's a banker's

21 box.

22         **MR. REES:**  I just talked with the taint team, Your

23 Honor.  Ms. Quirox has agreed that if they specify Bates

24 numbers, that they can go through her, say, okay, these are

25 relevant for whatever reasons, as long as it's within reason,

and she can make the copies and give them to them.  And we

won't know which ones they access.

    **MR. BALOGH:**  The notion that my impeachment of

evidence is subject to Mr. Rees's assessment of what's

reasonable, I take issue with.

    This is impeachment evidence.  I want to be able to

highlight it and take notes.  They've agreed we can see it.

The only reason not to give it to us -- and you can just issue

an order which solves their general counsel problem, and direct

us not to share them with anyone except our trial teams and at

trial.  That solves the problem.

    I'm trying to prepare a case.  And the notion that I have

to sit on the 11th floor or the 9th floor of this building and

make handwritten notes about some of these things, to go back

and to negotiation with Ms. Quirox to run through Mr. Rees,

doesn't strike me as a compromise.  That strikes me as the

whole point, which is, we make it available, but we make it as

hard for the defense to use, as opposed to we give it to them

and make the defense easy because we're going to have a fair

trial.

    **THE COURT:**  All right.  What we'll start with is

Ms. Quirox is volunteering to be the intermediary.  She has

been, in my experience, an excellent intermediary.

    **MR. BALOGH:**  I couldn't agree more.

    **THE COURT:**  I think that will work.

1    And if it turns out this is just creating a big logjam,

2  let me know and we'll take another approach.

3    I'm unimpressed by the claim of privilege.  But for now

4  let's just do it that way since it's under those circumstances

5  that you've received these materials.

6    MR. BALOGH:  Thank you, Your Honor.  That's all I have

7  on my agenda.

8    MR. REES:  Housekeeping from us is, I realize because

9  the way that the superseding indictment came out right when we

10  had -- right before a court appearance, they have not been

11  arraigned on it yet.

12    So I would ask this Court to set an appearance before a

13  magistrate judge at a convenient time for all defendants to be

14  arraigned on the superseding indictment.

15    MR. BALOGH:  I think the superseding, we can waive

16  personal presence of those, and I think just direct each lawyer

17  to make time and go down to the magistrate judge.

18    THE COURT:  Are all three of the defendants here?

19    MR. BALOGH:  Yes, all three are here.

20    MR. BOISSEAU:  Do it now?

21    THE COURT:  I can do it if somebody tells me precisely

22  what needs to be done.

23    MR. BALOGH:  Rule 10, Federal Rule of Criminal

24  Procedure 10 will tell us.

25    (Reporter interrupts.)

**MR. BALOGH:** Mr. Lonich agrees that he's been served a copy of the superseding indictment. And he waives reading of the indictment. He understands the nature of the charges against him, including the statutory maxima. And there are no statutory minima of each count.

And if Mr. Rees wants to add anything, at the end of it I'll ask the Court to respectfully enter pleas of not guilty unto all counts.

**MR. REES:** I think if Your Honor will ensure that all three defendants have access to the superseding information, if they want a formal reading of the superseding indictment or if they will waive a formal reading, and then it's not in Rule 10, but the tradition in this district is for me to summarize each count and the maximum penalties. And I'll do that.

**MR. BOISSEAU:** I'd waive that.

**MR. BALOGH:** So waived.

**MR. STEPHENS:** I would as well, Your Honor.

**THE COURT:** So that part I think we can.

**MR. REES:** Okay.

**THE COURT:** All right. So let me ask each of you, Mr. Cutting, Mr. Melland, and Mr. Lonich, have you received copies of the superseding indictment?

**DEFENDANT MELLAND:** Yes.

**DEFENDANT CUTTING:** Yes.

**DEFENDANT LONICH:** Yes.

1          THE COURT:  And you've read them?

2          DEFENDANT MELLAND:  Yes.

3          DEFENDANT CUTTING:  Yes.

4          DEFENDANT LONICH:  Yes.

5          THE COURT:  Do you waive the re-reading of those to

6     you here at this time?

7          DEFENDANT MELLAND:  I do.

8          DEFENDANT CUTTING:  Yes.

9          DEFENDANT LONICH:  Yes.

10         THE COURT:  Mr. Rees has volunteered to summarize for

11    each of you the counts in the indictment and then to outline

12    the maximum punishments available to each of those counts.  Do

13    you waive the reading of that?

14         DEFENDANT MELLAND:  Yes.

15         DEFENDANT CUTTING:  Yes.

16         DEFENDANT LONICH:  Yes.

17         THE COURT:  And you've each had an opportunity to

18    consult with your lawyers about this, have you not?

19         DEFENDANT MELLAND:  Yes.

20         DEFENDANT CUTTING:  Yes.

21         DEFENDANT LONICH:  Yes.

22         THE COURT:  Okay.

23         MR. REES:  If you could just ask them how they plead

24    to all counts.

25         MR. BOISSEAU:  On behalf of Mr. Melland, I'll enter a

not guilty plea to all the counts of the superseding indictment.

    **MR. STEPHENS:** On behalf of Mr. Cutting, I'll do the same, Your Honor.

    **MR. BALOGH:** And on behalf of Mr. Lonich, we do the same. Not guilty.

    **MR. REES:** I think that's it.

    **THE COURT:** Congratulations.

    **MR. REES:** Thank you, Your Honor.

    **MR. BALOGH:** Happy holidays.

    Your Honor, we don't have a date. Do you want to set a control date to see our happy faces again in the near term? Or do you want to issue that after orders come out? And I think the next time we're supposed to get together is for the pretrial on the 7th.

    **THE COURT:** Well, I suspect something will come up. So I'm not going to set another date just yet.

    **MR. BALOGH:** Thank you, Your Honor.

    **MR. REES:** Thank you, Your Honor.

    For the record, I believe we've already done this, but when we set the trial we waived the Speedy Trial through March 20th.

    I do have written stipulations summarizing all the Speedy Trial exclusions since the last time. And I will circulate that to the defense.

1          **THE COURT:**  All right.

2          **MR. BALOGH:**  Thank you, Your Honor.

3          **MR. REEVES:**  Thank you, Your Honor.

4      (At 12:01 p.m. the proceedings were adjourned.)

5                          -  -  -  -

6

7                    <u>CERTIFICATE OF REPORTER</u>

8          I certify that the foregoing is a correct transcript

9  from the record of proceedings in the above-entitled matter.

10

11  DATE:   Wednesday, January 4, 2017

12

13

14

15  _____

16      Katherine Powell Sullivan, CSR #5812, RMR, CRR
                    U.S. Court Reporter
17

18

19

20

21

22

23

24

25