

1  Neal J. Stephens (State Bar No. 152071)
   Jeffrey Rabkin (State Bar No. 189798)
2  Allison J. Cheung (State Bar No. 244651)
   JONES DAY
3  1755 Embarcadero Road
   Palo Alto, CA 94303
4  Telephone:    +1.650.739.3939
   Facsimile:    +1.650.739.3900
5  nstephens@jonesday.com
   jrabkin@jonesday.com
6  acheung@jonesday.com
7
   Attorneys for Defendant
8  SEAN C. CUTTING

9              UNITED STATES DISTRICT COURT

10            NORTHERN DISTRICT OF CALIFORNIA

11               SAN FRANCISCO DIVISION

12

13  **UNITED STATES OF AMERICA,**          **Case No. 14-CR-00139 SI**

14            **Plaintiff,**               **DECLARATION OF NEAL J.
                                           STEPHENS IN SUPPORT OF REPLY
15       **v.**                            MEMORANDUM REGARDING
                                           MOTION TO DISMISS
16  **SEAN CUTTING, BRIAN MELLAND**        SUPERSEDING INDICTMENT**
    **AND DAVID LONICH,**
17                                         Hearing Date:   December 20, 2016
            **Defendants.**                Hearing Time:   10:00 a.m.
18                                         Judge:          Hon. Susan Illston
                                           Courtroom:      1, 17th Floor
19

20

21

22

23        **DOCUMENTS SUBMITTED UNDER SEAL**

24

25

26

27

28

## DECLARATION OF NEAL J. STEPHENS

I, Neal J. Stephens, hereby declare as follows:

1.     I am a partner in the law firm of Jones Day and counsel of record for Defendant Sean Cutting in *United States of America v. Sean Cutting, et al.*, Case No. 14-cr-00139 SI. I am a member of the Bar of the State of California and of this Court. I submit this declaration in support of Mr. Cutting's Reply in Support of Motion to Dismiss the Superseding Indictment. I have personal knowledge of the matters stated in this declaration and would testify truthfully to them if called upon to do so.

2.     On December 5, 2016 and December 9, 2016, I went to the U.S. Attorney's Office and reviewed some discovery, including agents' notes and communications with prosecutors, which the prosecutors made available for physical inspection but would not permit defense counsel to photocopy. I informed AUSA Robert Rees that I would like photocopies of these materials but he was unwilling to provide copies of the documents. As a result, some of the documents described in this declaration are not attached because the U.S. Attorney's Office has not provided me with copies of these documents.

3.     On November 30, 2011, Shirley Huang, the Senior Regional Counsel in the Enforcement Division of the FDIC in San Francisco, sent FDIC-OIG Special Agent John Carillo, the prosecutor's lead case agent, witness interview summaries that her FDIC enforcement team had conducted of SVB employees Kelly Bruns and Alexis Tomsen and SVB consultant John Barr. Ms. Huang's emails (which include the witness summaries) are attached as Exhibits A–C. Mr. Cutting is concurrently filing an administrative motion, requesting that Exhibits A–C be filed under seal.

4.     On July 10, 2012, investigating case agents Terry Neely (SIGTARP), John Carillo (FDIC-OIG) and Jim Thiede (FHFA), and SIGTARP Deputy Chief Investigative Counsel John Sellers and Jeff Finigan, sent a memo to AUSA Tracie Brown summarizing their investigation and recommending certain charges. The memo alleged that Mr. Cutting attempted to conceal Mr. Madjlessi's relationship from SVB's regulators. The memo also included a section that summarized an alleged "Conspiracy to Defraud FDIC." The memo also alleged that the FDIC

1  found the total loans by SVB to Mr. Madjlessi exceeding the SVB's lending limit. The document
2  began with bates number ZZ010510. The government has not provided a copy of this document
3  to defense counsel so it is not attached here.

4      5.      Attached as Exhibit D is a copy of the transcript from the status conference on
5  May 17, 2016 when the Court set the March 2017 trial date.

6      6.      On October 27, 2011, Jeff Finigan, Deputy Chief Counsel at SIGTARP, sent an
7  email to AUSA Adam Reeves, confirming a conversation where Mr. Finigan told Mr. Reeves that
8  the FDIC, as receiver for SVB (the FDIC-R), had provided SIGTARP with emails of SVB
9  employees that the FDIC-R had obtained when it imaged computers at SVB. AUSA Reeves
10  confirmed that Mr. Finigan should begin to review the emails that the FDIC-R had provided to
11  Mr. Finigan. The email is bates number ZZ0010571. The government has not provided a copy of
12  this document to defense counsel so it is not attached here.

13     7.      Attached as Exhibit E is a copy of the transcript from the status conference on
14  November 18, 2016.

15     8.      On July 30, 2012, FDIC-OIG Special Agent John Carillo conducted a telephonic
16  interview of David Krause-Leemon, outside counsel to the FDIC-R. Mr. Krause-Leemon
17  provided information to Agent Carillo that the FDIC-R had developed regarding the 101 Houseco
18  transaction, including the work Mr. Krause-Leemon had done to try to identify the guarantor on
19  the 101 Houseco loan and his interactions with Mr. Madjlessi's attorney. The memo of this
20  interview is bates number ZZ0000552. The government has not provided a copy of this
21  document to defense counsel so it is not attached here.

22     9.      On May 31, 2013, SIGTARP agent Terry Neeley sent an email to AUSA Rees and
23  AUSA Reeves that included a summary of potential charges to bring against Mr. Cutting. Mr.
24  Neeley's cover email stated, "John Sellers [Deputy Chief Investigative Counsel at SIGTARP]
25  will be out here June 25 to 28 at which time we will write up the Petaluma Greenbriar charge."
26  The email is bates number ZZ0010502. The government has not provided a copy of this
27  document to defense counsel so it is not attached here.

28     10.     Attached as Exhibit F is an email exchange between Jeff Rabkin and AUSA Rees,

1  dated December 8, 2016, confirming that the U.S. Attorney's Office still has not produced a
2  processed copy of the Outlook .pst files it produced on December 1, 2016, which contain emails
3  from Mr. Cutting that the FDIC-R obtained when SVB closed in August 2010.

4       11.    On December 6, 2016, the government filed the declaration of AUSA Rees. ECF
5  No. 297. Attached as Exhibit B to AUSA Rees' declaration was a letter, dated March 7, 2012,
6  from Mr. Cutting's counsel to the enforcement division at the FDIC. Attached to counsel's
7  response to the FDIC was Mr. Cutting's personal financial statement and his tax return for 2010,
8  documents that the FDIC requested from Mr. Cutting. Those documents included confidential
9  financial information, including the social security numbers for Mr. Cutting, his wife, and two
10  young children. *See* Exhibit B to Rees Declaration at SVB 3830181 and SVB3830188 (ECF No.
11  298-1). Mr. Cutting requested that his personal financial information be treated confidentially
12  and that the government notify defense counsel if there was any potential disclosure of this
13  information. AUSA Rees did not notify me that he intended to disclose Mr. Cutting's personal
14  financial information.

15       12.    On December 7, 2016, I reviewed Mr. Rees' declaration and immediately
16  requested that he seal this information so the Mr. Cutting and his family would not have their
17  identities stolen. I also asked AUSA Rees what he intended to do to determine who may have
18  accessed his declaration on ECF. AUSA Rees indicated that he could not do anything beyond
19  sealing the document. Attached as Exhibit G is my email to AUSA Rees and his response.

20       I declare under penalty of perjury under the laws of the United States of America that the
21  foregoing is true and correct. Executed on this 13th day of December 2016, in Palo Alto,
22  California.

23                      JONES DAY

24

25       By:    */s/ Neal J. Stephens*
                     Neal J. Stephens
26
              Counsel for Defendant
27            SEAN C. CUTTING

28

**EXHIBIT D**

Pages 1 - 23

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE SUSAN ILLSTON

UNITED STATES OF AMERICA,      )
                               )
          Plaintiff,           )
                               )
     vs.                       )  No. CR 14-0139 SI
                               )
DAVID LONICH, et al,           )
                               )  San Francisco, California
          Defendants.          )  Tuesday
                               )  May 17, 2016
_____)  11:00 a.m.

### TRANSCRIPT OF PROCEEDINGS

APPEARANCES:

For Plaintiff:          BRIAN STRETCH
                        United States Attorney
                        450 Golden Gate Avenue
                        San Francisco, California  94102
                   BY:  ROBERT DAVID REES
                        ASSISTANT UNITED STATES ATTORNEY


For Defendant           COLEMAN & BALOGH, LLP
David Lonich:           235 Montgomery Street
                        Suite 1070
                        San Francisco, California 94104
                   BY:  ETHAN ATTICUS BALOGH, ESQ.


For Defendant           JONES DAY
Sean Cutting:           1755 Embarcadero Road
                        Palo Alto, California 94303
                   BY:  NEAL JAMES STEPHENS, ESQ.


          (APPEARANCES CONTINUED ON FOLLOWING PAGE)

Reported By:   Debra L. Pas, CSR 11916, CRR, RMR, RPR
               Official Reporter - US District Court
               Computerized Transcription By Eclipse

```
 1  APPEARANCES:    (CONTINUED)

 2
    For Defendant              GEORGE C. BOISSEAU, ESQ.
 3  Brian Melland:             740 4th Street
                               Second Floor
 4                             Santa Rosa, California 95404

 5

 6                          -    -    -

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
1                    P R O C E E D I N G S
2   MAY 17, 2016                              11:27 A.M.
3           THE CLERK:  Calling Criminal 14-139, United States
4   versus David Lonich.
5           MR. REES:  Good morning, your Honor.  Rob Rees for
6   the United States.
7           MR. BALOGH:  Good morning, your Honor.  Ethan Balogh
8   on behalf of David Lonich.  He is present before the Court on
9   pretrial release.
10          THE COURT:  Good morning.
11          MR. BOISSEAU:  Good morning, your Honor.  George
12  Boisseau on behalf of Mr. Melland, who is present before the
13  Court.
14          MR. STEPHENS:  And good morning, your Honor.  Neal
15  Stephens on behalf of Sean Cutting, who is also present before
16  the Court.
17          THE COURT:  Good morning.
18      So what is the status?  I will tell what you my status is.
19  We are close to, but not finished with a review of the
20  documents.  So I had hoped to get that for you today, but I'm
21  not going to be able to do that.  So that will come presently,
22  but not today.
23          MR. BALOGH:  That's fine.  What I think the status is
24  we're going to set a trial date and motions and some deadlines
25  related to that.
```

1            The only other thing I think that's on to set is, as we
2    discussed during the sealed proceedings, we're going to be
3    filing a motion regarding the execution of the warrant based on
4    the order the Court issued.  And I'm happy to set those dates
5    today as well in the near term.  Whenever the trial gets set,
6    we can tee that up.

7            So I think the big question is trial.  I think there is a
8    dispute between what the parties want.  I'm advocating for the
9    earliest possible trial date.  I understand all defendants can
10   be made available in November of this year, about six months
11   from now.  And I understand the United States wants to proceed
12   sometime next spring.  And as the case has been pending for
13   more than two years, it's our position that that is too long to
14   set it out.

15           And so what we would want to do is set a trial date and
16   obviously address as part of that a deadline for the
17   superseding indictment, if one is going to be brought, and how
18   we address that as well.

19           MR. BOISSEAU:  And speaking for Mr. Melland, I'm
20   going to be in trial in this department in January.  I would
21   prefer not to be in trial in December in this department also.
22   So I'm advocating for a spring 2017 trial date where I am
23   definitely available without the stress of --

24           THE COURT:  Mr. Boisseau, are you involved in the
25   Halali/Magat case?

```
1              MR. BOISSEAU:  Yes, I am.

2              MR. REES:  As am I, your Honor.

3              THE COURT:  Oh, okay.  I have that set down for eight

4   weeks, right?

5              MR. REES:  I think six to eight, yeah.  And what I

6   attempted to explain to Mr. Balogh yesterday when we had a

7   conference, is I also have a trial set in late October in front

8   of Judge Chesney that is very likely to go forward.  It's been

9   set for some time now.  So that one is also supposed to be six

10  to eight weeks.  And I just -- I am not available for a

11  November, December trial, which is why I'm suggesting the

12  spring trial date.

13             MR. BALOGH:  My problem with that, I don't mean any

14  disrespect Mr. Rees' trial schedules.  I understand his

15  personal trial schedule is not a factor to be considered.  I

16  understand the United States Attorney's Office, the prosecutors

17  who work there are fungible as far as setting dates.

18             THE COURT:  Is Mr. Boisseau also fungible?

19             MR. BALOGH:  Not in any way, shape or form.  I think

20  -- even though he's appointed, he is counsel of choice and he

21  has a Sixth Amendment right to go to trial and he can be heard

22  on that point.

23             MR. BOISSEAU:  Like a fungus?

24             MR. BALOGH:  I mean, I think it means interchangeable

25  and is not derogatory in any way, shape or form.
```

1        MR. REES:  That's actually not correct.  Under the

2   Speedy Trial Act it specifically enumerates the availability of

3   Government counsel as a basis for a Speedy Trial Act

4   continuance.  So under the law my availability can be taken

5   into account.

6        I think putting aside the law, the practicalities are such

7   that given the request of Mr. Boisseau, that I think that it

8   does need to be a spring trial date.

9        MR. STEPHENS:  Your Honor, on behalf of Mr. Cutting,

10  who is the last defendant before the Court, we are okay with a

11  spring date.  We could be available in December.  Either one is

12  appropriate for us.

13       THE COURT:  I'm already triple set in December and

14  single set in November.  So it would -- I could do it, but it

15  would be inconvenient for me to do it.

16       MR. BALOGH:  I'm happy to do it in October.  I would

17  rather move forward.  It's been a lengthy time and being under

18  indictment is not only challenging for my client for the

19  standard reasons.

20       As the Court should also note, at the same time this case

21  is being delayed, the Government is pursuing forfeiture of the

22  subject property in the dead house case that was related to

23  this case.  So they are advancing the forfeiture proceedings in

24  a way I've not seen before and simultaneously taking the

25  position that Mr. Lonich should wait more than another year for

1  a trial for a case that was indicted in March of 2014.

2       And we've, obviously, worked incredibly hard over the last

3  two years.  There has been a lot of work on motions and I think

4  the taint thing.  The Court has dealt with a welter of paper.

5  But there does come a time where I think the defendant's

6  interest in a speedy resolution when he is suffering

7  debilitating effects of this case really should come into the

8  fore.

9       And the one thing I'll say, I think when the rule says

10 Government counsel, it means Government counsel, not the

11 individual attorney.  And I'm confident that this Attorney's

12 Office -- another attorney has made a notice of appearance in

13 this case, Adam Reeves, who is a talented attorney, as this

14 Court well knows.  He has made a notice of appearance to be

15 trial counsel in this case with Mr. Rees.  This case was

16 transferred before that from Tracie Brown.  She got it from

17 Jeff Finnegan.

18      As this Court well knows, this Office of the United States

19 Attorney has a white collar unit that transfers cases among

20 themselves based on caseload and the rest.  When it comes out

21 to the balance, I think, you know, if there is a tie, it should

22 go to the runner.  I think the interest in a more speedy

23 resolution should come out on top and that's what I'm

24 advocating for today.

25           THE COURT:  Well, I hear your argument and I

1   understand it, but it seems to me since I've got three out of

2   the four lawyers who would prefer the -- I can't do it in

3   December, who would prefer the spring date.  And I know that

4   there is still information that the Court needs to get to you

5   and there are still motions that you have to have heard.  So

6   it's not as if it would be totally wasted time.

7       So I think -- and I will be out of pocket during the first

8   six to eight weeks of the spring on account of this other

9   criminal matter that evidently Mr. Boisseau and Mr. Rees are

10  in.  So I could set this starting March 20th.

11              MR. BALOGH:  I will accept the earliest date the

12  Court will provide.

13              THE COURT:  Mr. Rees?

14              MR. REES:  I'm checking my calendar.  I'm sure that's

15  okay, but let me double check.

16              MR. BOISSEAU:  That's fine for Mr. Melland.

17              MR. STEPHENS:  And for Mr. Cutting as well, your

18  Honor.

19              MR. REES:  Yeah.

20              THE COURT:  All right.  We will set this for Monday,

21  March 20th.  The pretrial conference would be Tuesday,

22  March 7th at 3:30 in the afternoon.

23              THE CLERK:  Did they say how many days?

24              MR. BALOGH:  We have not.

25              MR. REES:  It seems like another six to eight-week

1   type affair, I would guess.

2           MR. BALOGH:  The record can reflect all defense

3   counsel raised their eyebrows over that robust assessment of

4   the trial, but I guess the plaintiff will decide how long.

5           MR. REES:  Well, maybe four to six.  I think it will

6   be more than a week or two.  And I was trying to estimate, if

7   they were going to put on a case, to tack on maybe another

8   couple weeks for that.  I think for us it would be two to three

9   weeks.

10          MR. BALOGH:  It sounds like a four-week trial to me.

11          THE COURT:  Should I put it down for four weeks?

12          MR. BALOGH:  That's fine.

13          MR. STEPHENS:  That's fine, your Honor.  It seems

14  long, but...

15          THE COURT:  And so, as I say, the pretrial conference

16  would be March 7th.  So do you think we will be needing to make

17  special arrangements with the jury office because this is a

18  long trial?  It may not be eight weeks, but it's longer than

19  normal.  If we do, we need to get them going on it well in

20  advance.

21          MR. BOISSEAU:  My suggestion is we have a status date

22  sometime in the fall and then we can thrash that issue out and

23  maybe we'll -- because the Government has let us know that they

24  might be filing a superseding indictment.  There might be a

25  round of motions coming along with that.  And then we'll -- if

1  we have a status conference, let's say, late October, we may be

2  able to resolve some of these issues regarding jury and things

3  like that.

4         THE COURT:  And if you want a questionnaire, for

5  example -- and I don't know that you will want one, but if you

6  feel like there are special needs for that in this case, we

7  need to make arrangements for that in advance also.

8      So we can talk about all those things as the date

9  approaches, but you should think -- putting that in the back of

10  your mind -- that we will need to address that.

11     So when are you going to file your motions, Mr. Balogh?

12         MR. BALOGH:  Given the schedule, can I get four weeks

13  from today?

14         MR. REES:  And, your Honor, I did want to -- I assume

15  we're talking about the motion -- I guess it's a further motion

16  to suppress regarding some of the documents that your Honor

17  found are not privileged.  I believe that's the motion.

18         THE COURT:  Well, based on the way I said something

19  is what he's --

20         MR. BALOGH:  No.  It has nothing to do with the

21  privilege.  The Court made a ruling that the Government's

22  interpretation of the search warrant is correct and despite the

23  inartful use of the word "all documents," what it meant to

24  convey and what it did convey, in fact and law, was that the

25  agents were authorized to seize documents evidencing the

1  alleged Houseco fraud.  There is a protocol on the warrant that
2  says the Government, especially because of the privilege issue,
3  can only retain documents authorized by seizure.

4      So many of the documents seized by the Government are not
5  about the alleged Houseco fraud.  They relate to numerous other
6  businesses and activities going back as early as the 1970's.
7  They include issues with SABT and BTOA in Reno.  They include
8  issues with Greenbriar Petaluma Apartments in Petaluma,
9  California.

10     So the argument in a nutshell is accepting the Court's
11 ruling, as I'm required to do, the Government was authorized to
12 seize a set of documents and required under that same art to
13 purge everything that wasn't authorized for seizure.  So
14 it's -- and either a motion about the execution of the warrant
15 or a demand for compliance with the warrant, but under the
16 warrant they have to purge everything that wasn't authorized
17 for seizure and we're going to seek that purge.  And that -- I
18 think that kind of sums it up.

19         MR. REES:  So, your Honor, I would expect that that
20 would be a trial team type motion.  It's in the nature of a
21 motion to return property or to suppress and so what I --

22         THE COURT:  You mean, as opposed to a taint team.

23         MR. REES:  Exactly.  And so what I wanted to raise
24 was that I read the Court's order regarding sort of the first
25 waive of the taint and the Court found a number of documents to

1  be not privileged, but it withheld the conveyance of those
2  documents to the trial team in abeyance for this motion. And
3  what I'd like to ask is that those be released to the trial
4  team since your Honor has found they are not privileged. At
5  this point, given that they are not privileged, my review of
6  them is not going to be problematic. If they end up getting
7  suppressed, they end up getting suppressed like any other
8  evidence that might get suppressed, because that way I can do
9  the motion in its entirety.

10      Because if I don't have access to the material and he's
11  arguing that some of these documents that the Court says is no
12  longer privileged are -- fall outside the scope, you obviously
13  need to read the documents to determine whether they do fall
14  outside the scope.

15      So I would just ask for that -- those that the Court has
16  already found are not privileged be -- go ahead and be released
17  to the trial team.

18          MR. BALOGH: My response is two-fold.

19      One, the motion we're going to bring is going to be based
20  on the language of the warrant and it's going to include
21  examples of well over a thousand, if not 5,000 or 6,000
22  documents that are outside the scope of the warrant as defined
23  by the Court.

24      Mr. Rees is referring to 14 documents, which I don't think
25  are going to add to the inquiry. My position is they should be

1   withheld from the Government because as it stands right now, we
2   have obviously lost the issue of privilege on those.

3        But to the extent they get released to the Government and
4   we win the supression, we're going to have a Castigar taint
5   problem for him and his trial team of his own creation, over my
6   objection, because now he has been tainted.  Even if you deny
7   that, that becomes a live issue.  And as I understand, one of
8   the core functions is to make sure we don't create live issues.
9   We resolve them --

10            THE COURT:  How are they tainted if they are not
11  privileged?

12            MR. BALOGH:  Well, that can be challenged on appeal
13  and that is an issue that remains live.  And that problem for
14  14 documents gets absolved or gets resolved if those 14
15  documents are withheld pending the resolution of the execution
16  of the warrant motion.

17       If he does get them and ultimately Mr. Lonich suffers a
18  conviction, that becomes a live issue, and I would contend, for
19  no reason other than the Government's out of curiousness or
20  impatience, but those are not good enough reasons.

21       There are 14 document out of thousands that were presented
22  in this motion.  To the extent the taint team wants to make a
23  different argument regarding those 14 documents, that there is
24  a material difference, they can do it that way.  There is other
25  mechanisms to protect this record and to proceed, I think, in a

1  careful fashion.

2      And we think the Court made the right decision by
3  deferring production.  We would ask the Court to maintain that
4  order.

5          MR. REES:  Well, your Honor, by that logic I'll never
6  get any of it, no matter what the Court rules, because there is
7  always going to be an appeal.  You've made your ruling.  It's a
8  carefully and considered ruling and those documents are not
9  privileged.

10     If he wants to make his appeal after a conviction, the
11 Ninth Circuit can take a look that, but you've made your
12 ruling.  And I think that at this point being afraid of what
13 the Ninth Circuit might do, that's somebody else's problem a
14 long time from now.

15         THE COURT:  Well, there was a reference in my prior
16 order holding them back.

17         MR. REES:  For this motion.

18         THE COURT:  For this motion.  And so I'll take a look
19 at that.  I'll take a look when I go back in chambers.

20     As long as they are not privileged, I'm inclined to agree
21 with Mr. Rees, but I'll get back to you.

22     So you wanted four weeks to file?

23         MR. BALOGH:  Yeah.  Four weeks from today, that's
24 June 14th.  Whatever Mr. Rees wants for opposition, I have no
25 objection to.

```
 1                MR. REES:  I'm sorry.  What date would the filing be?

 2                MR. BALOGH:  File June 14th, four weeks from today.

 3                THE COURT:  So can you do your opposition in two

 4   weeks?

 5                MR. REES:  Could I have three, if there is going to

 6   be thousands of documents that are identified?  Maybe the 5th

 7   of July?

 8                THE COURT:  How about July 1st?

 9                MR. REES:  Okay.

10                THE COURT:  And then, Mr. Balogh, you want until

11   July 8th to respond?

12                MR. BALOGH:  That's fine.  Thank you.

13                MR. REES:  I'm sorry.  What was the reply, July 8th?

14                MR. BALOGH:  Yes, Friday.

15                THE COURT:  I think I'm going to be here on

16   July 22nd.  Am I hear on July 22nd.  Do you have me hear on

17   July 22nd?

18                THE CLERK:  I do.

19                THE COURT:  We could set a hearing for July 22nd.

20   Does that work?

21                MR. REES:  I will actually be out that week and the

22   week after.

23                THE COURT:  Well, how about July 8th?  Let's see.

24   You're going to file --

25                MR. BALOGH:  June 14.
```

```
 1              THE COURT:  Mr. Balogh, how about you file the 10th.
 2              MR. BALOGH:  That's fine, your Honor.
 3              THE COURT:  And, Mr. Rees, how about you file the
 4   28th of June.
 5         And, Mr. Balogh, you file your reply by July 1st and then
 6   we'll hear it July 8th.  How is that?
 7              MR. REES:  That sounds good.
 8              THE COURT:  Otherwise, it's going to go off --
 9              MR. BALOGH:  That's three days for reply.  Can I have
10   the option of filing my reply on the 5th?
11              THE COURT:  Yes.
12              MR. BALOGH:  Thank you.  I'll try to get it done on
13   the 1st to give you more time, but that's a tight week before a
14   three-day weekend.
15              THE COURT:  Okay.  Then we'll have the hearing on
16   Friday, July 8th.
17              MR. BALOGH:  July 8th.
18              THE COURT:  At 11:00.
19         And you have been remind me at that point, Mr. Boisseau,
20   that we need to set at least one status to figure out some of
21   the trial issues.
22              MR. BOISSEAU:  You want all of us here on this?
23   Because this is not our motion.
24              THE COURT:  This is not yours.
25              MR. BOISSEAU:  No.  And I don't know if we'll be
```

1  excluded, but I think if it's a motion to suppress, we won't be

2  excluded.  But I can be here on the 8th.

3          MR. REES:  Maybe we can excuse the presence of their

4  two clients, but just have them here and they can -- so we'll

5  all be here to set a status in the fall.

6          MR. BALOGH:  That's fine.

7          THE COURT:  Is that all right?

8          MR. BALOGH:  Yes.  As long as Mr. Melland's presence

9  is excused, I'm okay with.

10          THE COURT:  And that's okay.  So, Mr. Melland, you

11  could be excused for this next coming hearing, although you're

12  welcome to come if you want to.

13      And likewise for you, sir.

14      So the only person who is actively moving would be

15  Mr. Lonich at that point.  But if the lawyers are here, then we

16  can set further dates, okay.

17          MR. BALOGH:  Excellent.

18          THE COURT:  And what about the time between now and

19  whenever he files his motion?

20          MR. BALOGH:  We have a pending motion, your Honor.  I

21  think time has already been tolled based on the taint motion --

22          MR. REES:  And anything in the --

23          MR. BALOGH:  -- that's pending before the Court.

24          MR. REES:  Anything in the meantime, the Court has

25  previously designated the case as complex.

1          THE COURT:  I certainly feel that it continues in

2    that.  So one way or another, I would expect that time between

3    now and July 8th to be excluded.

4       Is that agreeable to defendants?

5          MR. BOISSEAU:  Yes, agreeable.

6          MR. STEPHENS:  Yes, your Honor.

7          MR. BALOGH:  Yes, your Honor.

8          THE COURT:  Okay.  I do so rule.  Probably you should

9    get me a written order to that effect.

10      Okay.  See you on the 8th.

11         MR. BALOGH:  Could we -- I think there is other stuff

12   I'd like to set regarding trial.

13         THE COURT:  Oh, okay.

14         MR. BALOGH:  One, I would like an expert disclosure

15   deadline.  I would ask for 30 days before the pretrial

16   conference.

17         THE COURT:  Mr. Rees?

18         MR. REES:  As long as that's good for all of us,

19   that's fine with me.

20         MR. BALOGH:  No, no.  It's the opposite.  It's not

21   reciprocal in any, way shape or form.  Under the Rules when the

22   Government is obligated to give an expert report, once it

23   becomes compliant with 16(a)(1)(F) that triggers a

24   responsibility for the defendants to assess their report and

25   determine whether they are going to have experts.

1          So it's not the same date.  We're not called upon under

2    Rule 16 to assess experts until they come into compliance with

3    Rule 16.

4          So that's the Rule 16 deadline.  If you want to give us

5    two weeks after that so the Government can also litigate it

6    before the pretrial conference, that's fine.

7                THE COURT:  How about we do that?

8                MR. REES:  I'm not aware of any such law.  Rule 16

9    applies to both parties equally.

10               MR. BALOGH:  But 16(a)(1)(F) reads what the

11   Government's responsibility is and (a)(1)(G) says upon the

12   Government's compliance, we then get a responsibility.  So

13   there is a triggering event.  That's the Government's

14   triggering event.

15               MR. REES:  Well.  The two weeks is not a big deal to

16   me.

17               THE COURT:  So 30 days before the pretrial, then, the

18   Government will provide its expert reports.  That would be...

19               MR. BALOGH:  February 7th.

20               THE COURT:  Well, it would really be February 3rd.

21   February 3rd.

22               MR. BALOGH:  Okay.  And then we have ours on

23   February 17th.

24               THE COURT:  And then you have yours on the 17th.

25               MR. BALOGH:  Okay.  The next thing I would ask for,

1  your Honor, I would ask for a Rule 16 discovery deadline.  I
2  don't see any reason why that shouldn't be by the first of this
3  year -- or the first of next year.

4      The Government should be able to come in compliance with
5  Rule 16 within seven months from today, but I do think there
6  needs to be a discovery deadline.

7      I've now tried a number of cases in this courthouse and
8  you always seem to get a welter of new evidence the week before
9  trial and it debilitates the defense and it's unfair.  And the
10 best way to avoid that, I would expect, is to have a firm
11 deadline of Rule 16 discovery.

12          MR. REES:  Your Honor, I have been very open with my
13 discovery in this case.  I don't expect there is going to be
14 any problems.

15     I resist discovery deadlines because things come up all
16 the time in trial prep interviews and things that I feel it's
17 my obligation to turn over.

18     And so it puts me in a weird position where things that I
19 feel like I need to get turned over suddenly can become the
20 point of litigiousness because, well, okay, I didn't have this
21 before, but you should have and there's the deadline.  To me, I
22 just think that it frustrates things.

23     I think I have been very good about discovery in this
24 case.  I have kept it open.  I have been working with
25 Mr. Stephens on a lot of discovery issues to fix those.  And I

1   think we're -- we have that ball almost all the way over the
2   finish line.  So I don't see this as being an issue, except it
3   just seems to create more issues.

4           THE COURT:  Well, we can talk about this again in
5   July.

6           MR. BALOGH:  In the same nature, maybe you want to
7   table as well, I would like to set a deadline for disclosure of
8   exculpatory information.

9       Again, it sometimes comes very, very late.  The Government
10  defines materiality, as they well can, which is in advance of
11  trial or before the trial is over when the defendant can use
12  it.  And so you -- a lot of stuff gets held to the very last
13  second because we can technically use it.  A more orderly trial
14  and more orderly approaches.

15      If they have a deadline for exculpatory evidence, they
16  cannot use that argument to withhold stuff.  If they have it,
17  they have to give it by a date certain.

18      The other thing.  If they come into stuff, that's good
19  cause because they didn't have it beforehand.  But what they
20  have should have a strict deadline to get it to us as opposed
21  to, you know, what happened recently.  In a sur reply to a
22  supression motion I get all the *Brady* after the briefing is
23  closed.  Thankfully, it worked out.  But it's:  Oh, we were on
24  time.  Yeah, but it would have helped me and the judge if I got
25  to brief it, as opposed to argue it and then have the hearing.

1     So I think a firm deadline for exculpatory evidence will

2  foster --

3         THE COURT:  All right.  You can raise that again at

4  the next conference.

5         MR. BALOGH:  And the last thing I want the Court to

6  consider is -- and maybe we can address it at the October

7  setting because maybe they'll need it by then -- is a deadline

8  for the superseding indictment.

9     I would note the process adopted by Judge Rakoff in New

10  York, which I found interesting, where when you have a trial,

11  when he sets a trial, he sets a superseding indictment deadline

12  and if the Government wants to supersede after that, they are

13  entitled to, but he tries the first indictment first and

14  whatever, you know, bypasses or gets beyond blocked, which is

15  usually nothing, would be in a second trial.  But it fosters

16  the Government to get the defendant the notice of the

17  allegations they are going to be defending against, as opposed

18  to holding them back.  Like we saw in *Cooper* where for months

19  and months they sit on it and then when a trial date is set,

20  they file it 30 days before the trial, which, again, threatens

21  to debilitate the defense.

22         MR. REES:  I think we should table that partly

23  because just because I -- I wouldn't feel responsible returning

24  a superseding indictment, which we have to do, in part, because

25  of the Court's orders, until at least I get access or potential

1   access when the litigation is done.  It just -- it wouldn't

2   make sense.

3        And I'm not saying I expect anything earth shattering, but

4   if something is in there that we would want to use, it would be

5   a waste of everybody's time to supersede soon and then have to

6   potentially do it again.

7            **THE COURT:**  We can address this in October.  I am

8   not -- I have not run into the same kind of problems that Judge

9   Rakoff must have to have inspired his -- his local, local,

10  local rule.  But I'll take a look it for sure.

11           **MR. BALOGH:**  Thank you, your Honor.  We look forward

12  to seeing you in July.

13           **THE COURT:**  Anything else for today?

14           **MR. BALOGH:**  No, your Honor.

15           **THE COURT:**  All right.  Thank you.

16           **MR. BALOGH:**  Thank you, your Honor.

17           **MR. STEPHENS:**  Thank you, your Honor.

18           **MR. REES:**  Thank you, your Honor.

19       (Proceedings adjourned.)

20

21

22

23

24

25

## CERTIFICATE OF OFFICIAL REPORTER

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

*Debra L. Pas*

_____

Debra L. Pas, CSR 11916, CRR, RMR, RPR

Monday, June 27, 2016

# EXHIBIT E

Pages 1 - 30

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Illson, Judge

UNITED STATES OF AMERICA,       )
                                )
            Plaintiff,           )
                                )
   VS.                           )        NO. CR 14-00139-SI
                                )
David John Lonich, et al.,       )
                                )
            Defendants           )
_____)

                        San Francisco, California
                        Friday, November 18, 2016

                   TRANSCRIPT OF PROCEEDINGS

APPEARANCES:

For Plaintiff:
                        BRIAN STRETCH
                        United States Attorney
                        450 Golden Gate Avenue
                        San Francisco, California  94102
                   BY:  ROB REES
                        ADAM REEVES
                        ARVON PERTEET
                        ASSISTANT UNITED STATES ATTORNEYS

For Defendant David John Lonich:
                        COLEMAN & BALOGH LLP
                        235 Montgomery Street
                        Suite 1070
                        San Francisco, CA 94104
                   BY:  ETHAN BALOGH, ESQUIRE
                        DEPUTY FEDERAL PUBLIC DEFENDER


          (Appearances continued on the next page)

Reported By:  Pamela A. Batalo, CSR No. 3953, RMR, FCRR
              Official Reporter

APPEARANCES CONTINUED:

For Defendant Sean Clark Cutting:
                        JONES DAY
                        1755 Embarcadero Road
                        Palo Alto, CA  94303
                BY:  NEAL J. STEPHENS, ESQUIRE
                     JEFFREY RABKIN, ESQUIRE


For Defendant Brian Scott Melland:
                        GEORGE C. BOISSEAU
                        740 4th Street, Second Floor
                        Santa Rosa, CA  95404
                BY:  GEORGE BOISSEAU, ESQUIRE

```
 1    Friday - November 18, 2016                    11:32 a.m.

 2                        P R O C E E D I N G S

 3                           ---oOo---

 4         THE CLERK:  Calling CR 14-139, USA vs. David John

 5    Lonich, Sean Cutting, and Brian Melland.

 6         MR. REES:  Good morning, Your Honor.  Rob Rees for the

 7    United States.

 8         THE COURT:  Good morning.

 9         MR. STEPHENS:  Good morning, Your Honor.  Neal

10    Stephens on behalf of Mr. Cutting, who is not present today.

11         THE COURT:  His appearance was waived?

12         MR. STEPHENS:  Yes.  We covered that at the last

13    hearing.

14       With me also is Mr. Jeff Rabkin.

15         MR. RABKIN:  Nice to see you.

16         THE COURT:  Good morning.  Nice to see you.

17         MR. BOISSEAU:  Good morning, Your Honor, George

18    Boisseau on behalf of Mr. Melland, who is present before the

19    Court.

20         MR. BALOGH:  Good morning, Your Honor.  Ethan Balogh

21    on behalf of Mr. David Lonich.  He is present on pretrial

22    release.

23       May I ask that the clients be permitted to be seated?

24         THE COURT:  Yes.

25         MR. REES:  Your Honor, just to add, it's also Adam
```

1    Reeves and Arvon Perteet for the United States.

2            THE COURT:  I'm sorry. I couldn't hear you, Mr. Rees.

3            MR. REES:  I'm sorry.  It's also Adam Reeves and Arvon

4    Perteet for the United States.

5            THE COURT:  So we have all the big guns here.  Geez.

6            MR. STEPHENS:  Your Honor, we're back before you today

7    following a status conference on October 28th when the

8    Government brought forward a Superseding Indictment.  And,

9    Your Honor --

10            THE COURT:  Is there a file?

11            MR. STEPHENS:  -- I asked the defense counsel to go

12   ahead and review the Superseding Indictment and come back today

13   and describe to the Court what our intentions are in relation

14   to the Indictment, and I'm prepared to do that.  Obviously

15   defense counsel may have some additional comments.

16        There are three key points, Your Honor, and then I can go

17   through them in a little bit more detail.

18        We are prepared to file a motion to dismiss the

19   Superseding Indictment based on Sixth Amendment grounds, and I

20   can have that filed on behalf of Mr. Cutting next Tuesday.

21        There are a couple other smaller motions that we would

22   bring, including a motion to strike some language based on the

23   Court's prior ruling on the initial Indictment.  There are two

24   counts which we think are outside the statute of limitations

25   which we would file on, and then there is also a couple counts

1    where Mr. Balogh had raised an issue in the prior Indictment

2    regarding pleading an omissions theory.  They have corrected

3    that as to some of the counts, but haven't included the duty to

4    disclose language in some of the new counts so we would

5    challenge that as well.  That's number one.  Number two --

6            THE COURT:  Would all of this be filed by next week?

7            MR. STEPHENS:  I am prepared to file our motions on

8    those issues on Tuesday.

9            THE COURT:  Which is November --

10           MR. STEPHENS:  22nd.

11           THE CLERK:  Monday?

12           MR. STEPHENS:  No.  Tuesday.

13           THE COURT:  Okay.

14           MR. BOISSEAU:  Before you write that, that may not be

15   something that we can do -- on behalf of Mr. Melland, that I

16   can do by Tuesday.  But I agree with all counsel's comments

17   regarding the motions.  It's just the timing.

18           THE COURT:  Okay.  Mr. Boisseau, you represent

19   Mr. Melland?

20           MR. BOISSEAU:  Mr. Melland.

21           THE COURT:  So you intend to either file or join in

22   motions to that same effect?

23           MR. BOISSEAU:  Well, I would join in the motions, and

24   I intend to file my own motions.  It's just I can't comply with

25   the Tuesday filing date because I'm right in the middle of a

1   preliminary hearing in state court, and with the holidays and

2   everything else --

3           THE COURT:  When could you file?

4           MR. BOISSEAU:  Pardon me?

5           THE COURT:  When could you file?

6           MR. BOISSEAU:  I was looking at my calendar.  I would

7   file by December 6th.

8           THE COURT:  I'm just writing this down.  I'm not

9   saying anything yet.

10      And what Mr. Balogh?

11          MR. BALOGH:  My intent would be to stay on the

12  aggressive schedule that is being suggested by Mr. Stephens.

13  Just in the broad sense, the breadth of the new charges and the

14  breadth of the new discovery that's being suggested we need to

15  have suggests to me that part of what's going on here and why

16  the delay in the change is to try to avoid our March trial, and

17  I want very much to maintain our March trial, but as you'll see

18  and I think Mr. Stephens will continue on sort of identifying

19  what is going on, there is a tremendous amount of new work to

20  do.

21      And I think normally what the Government might expect is

22  well, we should just vacate that trial date and have it down

23  the road sometime, and we're not going to do that.  And so that

24  means we're going to have a tremendous amount of work between

25  now and March 9th on top of the work we already had, but that

1    means we have to roll up our sleeves and start working hard,

2    and I'm prepared to do that.

3         But I think Mr. Stephens has more detailed points to alert

4    the Court to what has happened with the Superseding Indictment.

5              THE COURT:  But, in any event, Mr. Stephens outlined

6    some motions he plans to file.  Do you plan to file similar --

7              MR. BALOGH:  I'm going to join his motions.  We will

8    talk about them.  To the extent I have a drafting role, I'll

9    have a drafting role.  But the schedule and the motions he has

10   identified, we have discussed, and I'm in agreement with

11   Mr. Stephens.

12             THE COURT:  I don't know if you want to respond now,

13   Mr. Rees, or should we wait for the whole list of issues they

14   want to raise?

15             MR. REES:  Whatever the Court would prefer.  With

16   respect to those motions, we will get a schedule and we will

17   respond to them and we'll hear them.

18             MR. STEPHENS:  Two other points I would want to raise,

19   Your Honor, and then I can give you a little more context on

20   the motions.

21        One is at the last hearing, the Court set a December 1st

22   date by which the Government needs to provide all exculpatory

23   information to defense counsel, as well as identify their trial

24   exhibits.  It is critical to us that that date stick.  And then

25   as to the trial date, I agree with Mr. Lonich's counsel that

1    I'm not --

2              THE COURT:   Balogh.

3              MR. STEPHENS:   Yeah.   I'm not prepared on behalf of

4    Mr. Cutting yet to seek an extension.   I think it's important

5    to see what we get from the Government on December 1st and then

6    also give Your Honor an opportunity to review our motion,

7    including the motion to dismiss.

8         And to give you just a little bit of a flavor, Your Honor,

9    for the -- what the motion to dismiss is going to be, it's

10   going to be based on three statements that the Government made

11   to the Court on October 28th which I don't think are accurate.

12        They said that they brought the Superseding Indictment --

13   the motion is going to be based on the Sixth Amendment

14   depravation of their right to a speedy trial based on unfair

15   prejudice given the timing by which they brought this

16   Indictment, and it's going to be supported by three things:

17        One, they informed the Court that they brought the motion

18   as soon as they possibly could.   What Your Honor is going to

19   see is that --

20             THE COURT:   They brought the motion?

21             MR. STEPHENS:   I'm sorry.   They brought their

22   Superseding Indictment as soon as they possibly could.

23        We have now had a chance to digest the Superseding

24   Indictment.   It is a broad expansion of their original

25   Indictment which was filed in March of 2014.

1      In the Superseding Indictment, they have now brought

2   allegations related to a different real estate development

3   called Petaluma Greenbriar, which did not exist in the first

4   Indictment.

5      The first Indictment was focused on a development in

6   Santa Rosa, not Petaluma, related to the 101 Houseco

7   transactions, which we have spoken about a little bit in

8   motions.

9      They also have brought new allegations, new charges, that

10  Mr. Melland and Mr. Cutting misrepresented or concealed

11  information from the FDIC.  That not did exist in the initial

12  Indictment.  And they have also now brought allegations that

13  Mr. Melland and Mr. Cutting took actions that brought down the

14  failure of Sonoma Valley Bank.  None of that existed in the

15  initial Indictment, which was filed back in 2014.

16      The facts that underlie all these new allegations have

17  been known to the Government since 2010.  So there's

18  significant concern on our part that it's a six-year delay, now

19  bringing in allegations that date back 10 years, and then that

20  is going to impinge on their Sixth Amendment rights.

21          THE COURT:  Is the Santa Rosa -- or the Petaluma

22  transaction older than the 101 Houseco?

23          MR. STEPHENS:  Yes.  It goes back to 2007 and 2008.

24      The other two concerns that we have Mr. Balogh flagged a

25  little bit.  One relates to the current status of discovery.

1    At of the last status conference, the Government represented
2    that there was only approximately five boxes of discovery left
3    to provide to defense counsel.  That's not true.

4         What we have learned since then is we have pressed the
5    Government to try and figure out how much of the mountain we
6    still have to climb on discovery.  We learned -- that day they
7    handed us some discovery.  In the cover letter of that
8    discovery, it indicated that they still had 23 boxes, not 5,
9    left to produce to us, plus 15 disks, and we have inquired how
10   much volume is on these disks, and we still don't have any kind
11   of page estimate as to how much is on these 15 disks.

12        On top of that, between the last hearing and this hearing,
13   we received a letter from Mr. Rees as I was pressing him trying
14   to figure out how much volume is out there and learned that
15   they have email files that they haven't processed or reviewed
16   from Sonoma Valley Bank, including emails from my client and
17   other key bank personnel that were involved in the loan
18   transactions at issue, both in the original Indictment and in
19   the Superseding Indictment.  And we don't have an estimate as
20   to what the page count is on that.

21        Third, they've told us that there is a whole other
22   category of documents in the Government's possession with the
23   FDIC, a member of the prosecution team, that they haven't even
24   reviewed yet and they can't give us an estimate on how much is
25   there.  So we've got --

1          **THE COURT:**   Could you say that sentence again?   I
2    didn't follow you.

3          **MR. STEPHENS:**   There are a series of other bank
4    documents that the FDIC seized from the bank when it closed in
5    2010 which the Government has not reviewed, even though they're
6    with the prosecution team.   They haven't reviewed them.   They
7    don't know what's in them.   There could be *Brady* in them.   And
8    we think it's critical that all that material gets reviewed
9    before December 1st so we know if there are emails in there,
10   including -- or bank files, loan committee approvals, emails
11   from my client which are in these PST files which we haven't
12   seen, that exonerate our client, dating all the way back to the
13   first Indictment.   All that stuff should have been done years
14   ago, and we're just finding out about it now.   We are gravely
15   concerned about it.

16        On top of that, the third point would be the *Brady* point,
17   which is at the last hearing, the Government represented to the
18   Court that as soon as they have *Brady* information or
19   exculpatory information, they turn it over to us.   What we've
20   learned and which we will present to the Court in our motion on
21   Tuesday is they are sitting on a mountain of material that they
22   have not even reviewed.   And it's clear in the Ninth Circuit
23   that information, whether it's held in Mr. Rees' office or it's
24   held at the FDIC, the Government -- the prosecutors have an
25   obligation to review that information for *Brady* to see if there

1    is something in there that would exonerate the three defendants

2    in this case and bring it forward.  We haven't seen it yet.

3        I'm concerned about -- my experience as an AUSA is in

4    another district, but when I was an AUSA, one -- our pros

5    memos, as we were getting ready to charge, had to include

6    anything that would go to credibility of Government witnesses,

7    anything that would go to *Brady* issues, so the chiefs could

8    appreciate whether or not you are going to go forward with the

9    Indictment.

10        In this district, I have had a case where I had a client

11   who was pushing very hard -- white collar case, parallel

12   prosecution with the SEC -- pushing very hard because he was

13   convinced that there were emails that showed that he didn't do

14   what he was being alleged to have done on a particular stock

15   option backdating trial.  The prosecution in that case, to her

16   credit, tried very hard to get that information out, but it

17   wasn't until three days before trial that those emails came out

18   that exonerated my client.  He was acquitted at trial, and the

19   SEC had to dismiss their case.  Went through a seven-year

20   ordeal, completely exonerated, still can't find a job as a

21   lawyer.

22        So we have significant concerns about the state of

23   discovery, the state of *Brady*, and why it took so long for them

24   to indict.  Again, dating back to my time as an AUSA, you'd

25   figure out your best case and you would bring it forward.  They

1    could have brought this case forward in 2014.  We have now

2    spent almost three years preparing to defend a case on 101

3    Houseco, and then this bombshell gets dropped on us, greatly

4    expanding everything.  We have to re-climb the 1.5 to 2 million

5    pages of documents we have already reviewed to look at them for

6    these new counts and now also have to deal with this other

7    mountain of evidence that hasn't been produced to us yet.

8        We have serious concerns that we want to bring forward to

9    the Court.

10              THE COURT:  Mr. Rees?

11              MR. REES:  Your Honor, you gave us a December 1st

12   deadline to make sure that we have everything from *Brady* and

13   everything that we would possibly use in our case in chief.

14       I didn't know about that deadline when I made the

15   representations about the five additional boxes, so we, of

16   course, went back and burned the barn down, and we are getting

17   every discovery we can possibly imagine that they could

18   possibly need.  We continue to do that.

19       I have a discovery production today that I'm happy to hand

20   over if you will give me an order to release grand jury

21   transcripts.

22              THE COURT:  So ordered.

23              MR. REES:  Thank you.

24       This production includes that.  I don't think I have ever

25   given that type of material so far in advance of trial.

1    There is one set of information out there that is very

2    distinct from anything that would be in the trial team's

3    possession.  I very much disagree with Mr. Stephens on the

4    subject of what he's referring to as being within the trial

5    team.

6    We do have an FDIC/OIG agent on our case.  The FDIC, to an

7    extent, is on our trial team.  We don't dispute that and we

8    have been gathering documents from them.  But recognized at the

9    creation of the FDIC and recognized at least in other contexts

10   in the Ninth Circuit, the FDIC-R, the FDIC as receiver, is a

11   distinct entity of -- created by the Government.  What it does

12   is when a bank fails, it goes and it has to, to my

13   understanding -- it has to just keep the bank going as it makes

14   a transfer to another bank that is -- takes over.

15   In that capacity, they do two things.  The first is that

16   they have a team that goes in and tries to collect every

17   possible document that could have any relevance to a civil

18   lawsuit involving the failure of the bank.  These are documents

19   that in their widest imagination could have anything to do with

20   some expected suit having to do with the failure of the bank.

21   Now, that they have -- that's the 23 boxes.  We said if

22   you would like to take a look at these boxes, I think we can

23   make that available to you.  Our subset is things that the

24   FDIC, as the -- in their investigative capacity thought had to

25   do with this case.  That's what we have turned over.

1    Everything that we have been able to find of relevance to this.

2    But we said there's a sort of expanded thing that the receiving

3    institution, the FDIC-R collected.  If you would like that, we

4    can make that available.  So, we now --

5              THE COURT:  That was true in 2014?

6              MR. REES:  That happened at the closure of the bank.

7    This receiver comes in.  They get those boxes --

8              THE COURT:  Right.  And that -- it went under in 2010;

9    right?

10             MR. REES:  That's always been there.

11             THE COURT:  So it's always been there.

12             MR. REES:  It's not available to us.  I could not get

13   that material without a subpoena and a protective order.  They

14   just won't give it to me.  The FDIC-R is separate.  We have

15   case law saying that we're a distinct entity --

16             THE COURT:  But if you asked me, I'd give you a

17   subpoena.

18             MR. REES:  I did get a subpoena because they asked to

19   get these 23 boxes.

20             THE COURT:  So you got it?

21             MR. REES:  I just need one more signature on the

22   protective order, and I will produce it by December 1st.

23        Beyond that, the receiver does a massive data dump of the

24   bank because that's what they have to do to keep it running.

25   That's part of their records.  I'm talking teller emails, every

1    single depositor's bank records, all the money that's going

2    through the bank, all the signature cards, just a massive data

3    dump of the whole thing.

4        I don't think that has any possibility of relevance in

5    this case, and I can't access it anyway.  But we have told them

6    that that is out there, and if they would like to subpoena

7    that, they are welcome to it.

8        But that kind of data is very sensitive data, for one

9    thing, because of the financial privacy issues involved.  And I

10   really don't think there is any chance that can be considered

11   part of the prosecution team; otherwise, in any case, no matter

12   how big or small, even a check kiting case, if the bank fails,

13   suddenly the discovery obligation is to the multi-terabytes,

14   and I just don't think that that can be the answer.

15       But if they want it, they can have it.  We are more than

16   four months before trial.  I have talked to the FDIC-R.  They

17   will respond to a subpoena.  My subpoena was a trial subpoena

18   so they didn't even have to give us the stuff four months in

19   advance of trial.  They did.  They are willing to work.  If

20   somebody wants to look at all these teller records, they're

21   going to need a distinct protective order because of the

22   privacy issues.  It's going to take work by them, but we said

23   listen, if you want to leave no stone unturned, including

24   looking through a teller's emails, you can do that.  We want

25   you to know that's out there.

1    But in terms of our December 1st deadline, we don't have

2    any interest in trying to comb through that material.  We don't

3    think it's relevant.  We have no interest in introducing any of

4    that material in our case in chief, and so anything that we

5    thought could even possibly -- that was a larger scope than

6    what we had, we said we make it available, and we have once we

7    get this last signature.

8         That is really what is going on here.  The discovery, yes,

9    was bigger than the five boxes, but, again, we're trying to

10   make sure, so we can keep our trial date, that we are getting

11   them everything they could possibly need and more to make sure

12   that everything is running shipshape.

13            THE COURT:  Including *Brady*?

14            MR. REES:  Including *Brady*.  We are going to make even

15   rough notes available from all of the interviews that we have

16   available for them to review.  Again, something I do not

17   typically do.  But if we're going to have a trial and this is a

18   larger and complex case, I will take some of those additional

19   steps.

20        One of the things that we have got as part of this is --

21   an FDIC subpoena, some time ago, had even gotten the -- one of

22   the lawyer's for the bank rough notes.  I will -- I'm going to

23   make those available.  All these notes that this lawyer took

24   when he was looking at suing -- some suit involving 101

25   Houseco.  Take a look at those notes.  We are being as open as

1    we possibly can here.

2         Again, the only thing that we are not at this time going

3    to -- we don't have possession of, we are not planning to

4    subpoena, is these terabytes of bank records that have to do

5    with customers of Sonoma Valley Bank and teller emails and that

6    type of information.  In fact, of all the emails accounts --

7    they get them all, every one that they can find, when they

8    receive the bank.

9         We went through the proposed jury questionnaire of the

10   defense, and every single person that was on their jury

11   questionnaire as a potential witness in this case, we just went

12   and said okay, give us those email accounts, and we can't

13   imagine that any other emails account would be relevant.

14        But they know about them.  They're there.  If they want

15   them, they can get access to them.  We are working our hardest

16   to meet the Court's deadline of December 1st.  I think we're

17   going to make it.  It's going to be about as comprehensive as

18   we can do.

19             MR. STEPHENS:  Your Honor, if I can respond briefly,

20   and I greatly appreciate the time that you have devoted to us

21   today.  I think it's important that you know two things.

22        One, I received -- I sent an email to Mr. Rees back in

23   September of 2015 where I asked him -- I was asking him about

24   the scope of *Brady*.  "The issues I would like to resolve are

25   the scope of the agencies involved," because I was trying to

1   figure out -- just confirm before we filed the motion who was

2   within the scope of the prosecution team.

3        His response back to me, "With respect to your first

4   question," this is October 16, 2015, "I agree that the federal

5   agencies you cite -- SIGTARP, the FDIC, FBI, FHFA and IRS --

6   were part of our team, at least in the larger overall

7   investigation that led to these charges."

8        I was asking him then.  The FDIC's part of the

9   investigation team.  You have to scrub that stuff.  You, the

10  prosecutors, have to scrub information held by the FDIC who sat

11  in on their witness interviews for *Brady* and for exculpatory

12  information.  So this goes back over a year.

13           THE COURT:  There is nothing before me right now, but

14  what he said is the FDIC has two hats, and we did it in the hat

15  that is the prosecutorial hat, but we didn't do it in the hat

16  that is the receiving hat.  I'm not deciding anything today,

17  but that's what he said, so I did hear that.

18           MR. STEPHENS:  So I appreciate and respect that,

19  Your Honor.

20       Just one more point, and I know I'm at the end of my rope

21  here.  I get it.

22       Another letter from Mr. Rees to all defense counsel,

23  January 30, 2015, indicating, "We are in possession of a

24  forensically-copied hard drive of materials taken by the FDIC

25  the night Sonoma Valley Bank failed.  We believe that all the

1    materials have been produced to you."

2          MR. REES:  Again, this is -- we have for years been

3    trying to get them every single information that we have.  The

4    FDIC-R piece was actually -- when you gave me that deadline,

5    we -- and I burned down the barn to find it, that's really the

6    first that I knew that there was this whole separate entity out

7    there, and so we immediately took the steps to say hey, this is

8    there.  We will get you things that we think could possibly

9    have relevance, and the rest of it, go ahead and subpoena.

10   They make it available for you if you think there is anything

11   there that you could possibly want or need.

12          MR. BALOGH:  I'm going to take a little different take

13   on it --

14          THE COURT:  Okay.  But just briefly, Mr. Balogh.

15          MR. BALOGH:  Just for discovery, I don't want this

16   material.  It's in his possession.  He will find the *Brady* in

17   there and give it to me or he will be in violation of the law.

18   I'm not going to do his job for him.  He's got it in his

19   possession.  I don't want it.  Take me off the order.  Don't

20   give it to me.  Get me my *Brady*, please, Mr. Rees.  I

21   understood him to say that's his responsibility.  I expect him

22   to meet it, but I don't want those boxes.

23          MR. REES:  No, Your Honor.  I will be producing it to

24   all defense counsel.  It's not appropriate to give some

25   material to some and not to others.  It will be produced to all

1    defense counsel.

2        I do need Mr. Balogh's signature on the order.  If he's

3    going to refuse to sign it, I will submit it and hope that

4    Your Honor signs it anyway.

5            MR. BALOGH:  See, that's the problem.  I don't want

6    this.  He is using this as a sword against us.  Take me off

7    the protective order.  Don't give it to me.

8            THE COURT:  Mr. Balogh, I am going to order him to

9    give it to you, and I'm going to order you to take it.  If you

10   need to sign a protective order to take it, then do so.  If you

11   want to not read it, that's entirely up to you.

12           MR. BALOGH:  Here is the problem with that, Your

13   Honor.  He is, by doing so, by forcing this on me, he forces

14   his *Brady* obligation on me --

15           THE COURT:  He still has the *Brady* obligation.

16           MR. BALOGH:  Once he gives it to me, he says, "It's in

17   there.  I disclosed all the *Brady*.  You find it, Mr. Balogh.  I

18   have given it to you, and I, by giving you the mountain, by

19   giving you the Pacific ocean, I have given you all the fishnet

20   to find the fish."  And by me refusing it and saying, "No, no,

21   no.  At this late date, I don't want the ocean, it remains your

22   responsibility, you go through it and you find" --

23           THE COURT:  Is that right, Mr. Rees?

24           MR. REES:  It's -- is what right?

25           THE COURT:  Well, I guess I was thinking of *Brady*

1  differently.  I thought you to had to go through and find the
2  *Brady* and give them the *Brady*.
3          MR. REES:  I have to give them anything that could
4  possibly be *Brady* --
5          THE COURT:  So then you say you drive up three or four
6  moving vans full of documents and say, "there might be
7  something in there"?  That's what you think?
8          MR. REES:  I don't know what they think *Brady* is.
9  Because --
10          THE COURT:  You always say the Government knows what
11  the *Brady* obligations are.  The Government always say that.
12          MR. REES:  I know the Government's *Brady* obligation is
13  to get them the materials so they can find any possible scrap
14  that they think might be helpful to their clients.
15      I don't represent their clients.  I don't know their
16  defenses.  They are allowed to keep that secret from me and
17  they do.  I have no idea what they think is going to be *Brady*.
18  So that's the way it works in every case in this district, is
19  that we give them every material that they could possibly think
20  could have *Brady* so they can put on the very best case for
21  their client.
22      So, yeah, I go through that material to put my case on,
23  and then they go through that material to put their case on.
24  And that's -- we want to make sure that we have exactly equal
25  access so that I'm not holding anything back.  And I think

1    that's always been in the spirit --

2         THE COURT:  I understand what you are saying.  I'm

3    still going to -- I'm going to tell him to give the boxes to

4    everybody.  I'm going to tell you to take the boxes.  What you

5    do with it after that is entirely up to you.  But you can't

6    just say "I don't have it because I didn't take the box."

7         MR. BALOGH:  But that's the point --

8         THE COURT:  And whether that is a *Brady* -- whether

9    that is compliance with *Brady* or not, it seems to me, is a

10   separate question.  But you're going to have to take your box.

11   So don't say, "Well, they have the boxes and I don't have the

12   boxes.  So I don't have your" --

13        MR. BALOGH:  He said he's not introducing the evidence

14   in his case in chief --

15        THE COURT:  I don't have anything before me,

16   Mr. Balogh, that is a discovery dispute.

17        MR. BALOGH:  Before I get them, can I litigate why I

18   should not be required to --

19        THE COURT:  If you want to file a motion on how he

20   ought not give you something, why sure, you can do that.

21        MR. BALOGH:  Thank you.  I will.

22        THE COURT:  Okay.

23        MR. REES:  Your Honor, I would ask then that the --

24   okay.  These are the 23 boxes that I -- I don't have in my

25   possession yet because the FDIC has told me that they won't

```
1   give them to me until the protective order is signed.  So I
2   would ask that we vacate the December 1st --
3              THE COURT:  No.  I'm not going to do that.
4              MR. REES:  If he is going to file a motion and it's
5   not heard before then, what am I supposed to do?
6              THE COURT:  I'm going to -- I'm going to order -- I
7   don't know what your motion is going to say.  But I -- as far
8   as I'm concerned, you are giving him the boxes.
9              MR. REES:  Okay.
10             THE COURT:  As far as I'm concerned, you better sign
11  that protective order or else I will just issue some kind of an
12  order that will deal with that.  But if you say it's not fair,
13  the consequences are incorrect and it's a violation of my
14  constitutional rights or something, you can tell me that.
15  That's what I thought your motion was going to be about.
16             MR. BALOGH:  That's fine.
17             THE COURT:  But we won't have it that you just won't
18  take the box.  That's not going to work.  So you need to sign
19  if that's what it takes the FDIC to be happy to give you the
20  box.
21             MR. BALOGH:  I think -- the FDIC needs you to issue an
22  order telling -- issuing a protective order telling us what the
23  protection is.  The FDIC doesn't require anything of me per se.
24  He would like to do it by stipulated order, but he doesn't need
25  a stipulated order.  He needs the --
```

1      THE COURT:  Okay.  Then I will sign an order.  I don't

2  care how that works.  I just want you to know, as far as I'm

3  concerned, he is going to give you the box, and then you can

4  tell me later on why that was dirty pool, but he is going to

5  give you the box.  And I'm not going to extend the December 1st

6  deadline.

7      MR. REES:  That's fine.  As long as I can get the

8  order, I can get that out.

9      Again, just so the Court understands the procedure here,

10  we gave over an index and we said, "This is stuff we have

11  learned is at this FDIC-R.  If you want it, we can work to get

12  it to you."

13      THE COURT:  FDIC-R?

14      MR. REES:  The receiver.  Sorry.  The FDIC receiver.

15      And so I wasn't trying to foist the boxes on them.  This

16  was actually a request by -- the defense said, "Yes, we would

17  like to have access to that," so I worked to give them that

18  access.

19      I've never heard an objection from Mr. Balogh to get these

20  documents.  So this is at the defense request.

21      MR. BALOGH:  I have never spoke on the subject, so

22  it's not at my request.

23      MR. REES:  There was an email --

24      THE COURT:  In any event, you are going to get the

25  boxes, Mr. Balogh.  I just want you to understand that.

1    MR. BALOGH:  I understand the Court's position.  I

2  will address it in writing at the appropriate time.

3    THE COURT:  So now let's go back to the motions.  We

4  know that you want to file motions right away.  If you filed by

5  November 22nd --

6    MR. STEPHENS:  I had a suggested briefing schedule,

7  Your Honor, because Your Honor has a hearing already set on

8  December 20th on the taint material.  So --

9    THE COURT:  Okay.

10    MR. STEPHENS:  -- my suggestion was I file on Tuesday.

11  The Government gets two weeks to oppose, which would be

12  Tuesday, December 6th.  We would have a week until

13  December 13th to file a reply, and then the hearing is on the

14  20th.

15    MR. REES:  That, I think, probably works out well

16  since we already have the --

17    THE COURT:  Okay.

18    MR. REES:  -- suppression hearing that day.  So our

19  opp is --

20    THE COURT:  So then your oppo would be December 6th.

21    MR. REES:  Okay.

22    THE COURT:  And the reply would be December 13?

23    MR. STEPHENS:  Yes, Your Honor.

24    THE COURT:  So that's fine with me.

25    Now, Mr. Boisseau, what about you?

1    MR. BOISSEAU:  I didn't control the timing on the

2    Superseding Indictment.  I have had a lot of matters I've had

3    to take care of, prepare for, and everything else.

4        I can get my brief and my motion on December 6th.  That

5    realistically gives me enough time to do all the legal

6    research, preparation, everything else.

7        I cannot comply with the Tuesday filing date because I'm

8    going to be in court hearings on Monday and probably on

9    Tuesday.  So I won't be able to do that.  But my motion won't

10   look a lot different from Mr. Stephens.

11        THE COURT:  Why don't you go ahead and file it, and if

12   it won't work out to have it heard on the 20th, we will have it

13   heard some other time later.  But if it turns out to be

14   sufficiently similar that people are comfortable, we can just

15   go ahead and hear it on the 20th.  How is that?

16        MR. BOISSEAU:  That's fine.

17        THE COURT:  Mr. Rees, if you can, you can file an oppo

18   on December 13th or you can tell me why we need to put it out

19   later than that.

20        MR. REES:  So wait. I'm sorry --

21        THE COURT:  He would file on December 6th.

22        MR. REES:  He's going to file on December 6th?

23        THE COURT:  Yes.

24        MR. REES:  And then I'll respond on the 13th?

25        THE COURT:  By a week later, if you can.  If it turns

1    out to be similar to what Mr. Stephens has filed, you can tell

2    me that.  Or if you feel like it needs a whole bunch of other

3    things, you can tell that, too.

4              MR. REES:  Okay.

5              THE COURT:  And so then we will all be together again

6    on December 20th.

7         Anything else for now?

8              MR. STEPHENS:  No, Your Honor.

9              MR. BOISSEAU:  Thank you, Your Honor.

10             MR. BALOGH:  I just want to confirm, we get the trial

11   exhibits on the 1st of December?

12             MR. REES:  No.  That was not the order.  The order of

13   the Court was that we produce -- it was a discovery cutoff.

14   Anything that we would intend --

15             THE COURT:  The Government is ordered to produce all

16   exculpatory evidence and all evidence that will be used during

17   trial by December 1st.

18             MR. REES:  We already have a deadline for the exhibit

19   list.

20             MR. BALOGH:  I want to address -- I do want to keep

21   this March trial date beyond belief, Your Honor.  So given --

22   and maybe we -- should we brief it in this thing and discuss it

23   on the 20th?  But I think this is the case, given the nature of

24   the expansion of the Indictment -- and just, you know, for the

25   last year after the Court granted my motion in part, every time

1    we came to court, the three of us -- me, Mr. Boisseau and

2    Mr. Stephens -- would talk to Mr. Rees and say, "What's going

3    on with the Superseding Indictment?" He said the same thing

4    every time.  "I'm just buffing out the factual allegations

5    about the bankers.  I'm just buffing out the allegations.  I'm

6    getting more detail.  More detail."

7         And at the last minute, the eleventh hour, to get 15 new

8    counts and new theory is inconsistent with new detail.  It's

9    diametrically opposed.  That's fine.  We're going to litigate

10   it.

11        But I do think this is a case where I'm going to want all

12   the witness exhibits at least 60 days out, which would be

13   January 9th.  I think we have this March 7th pretrial, and so

14   we can discuss that now if you want or --

15             THE COURT:  No, we don't need to discuss that now.

16             MR. BALOGH:  Is that something I can bring up paper on

17   on the 22nd, on Tuesday, for discussion of when we are going to

18   have trial exhibits and more trial organizational things

19   because the expansion of the case, if it doesn't get dismissed,

20   is going to require, I think, a little more management to make

21   sure we are all in a position to try this case --

22             THE COURT:  We can talk about that.

23             MR. BALOGH:  I will bring a motion on the same

24   schedule that you set for Mr. Stephens' motions.

25             THE COURT:  Tracy, do we have other stuff on on the

1    20th?

2              THE CLERK:   Not until the afternoon.   We have some

3    stuff on in the afternoon, but this is scheduled for 11:00.   We

4    can move it up, if you wanted, to like 10:00, to give more

5    time.

6              MR. STEPHENS:   That's fine, Your Honor.

7              THE COURT:   All right.   Then 10:00.

8              MR. BALOGH:   Thank you, Your Honor.

9                   (Proceedings adjourned at 12:05 p.m.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2

3                        CERTIFICATE OF REPORTER

4              I certify that the foregoing is a correct transcript

5       from the record of proceedings in the above-entitled matter.

6

7       DATE:    Tuesday, November 22, 2016

8

9       *Pamela A. Batalo*

10      _____
        Pamela A. Batalo, CSR No. 3593, RMR, FCRR
11      U.S. Court Reporter

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**EXHIBIT F**



**Re: Discovery guide question**

"Rees, Robert (USACAN)" <Robert.Rees@usdoj.gov>   to:  Jeff Rabkin   12/08/2016 11:21 AM

Cc:  "Reeves, Adam (USACAN)", "Beros, Maryam (USACAN)"  , Neal J Stephens

Jeff,

With respect to a more detailed description of the discovery, we just don't have a document like that we could share with you.

With regard to your first question, we do not have an estimate at this time. With regard to your second, we should be able to produce those this week. And with regard to your third, the declaration of Ray Rivard that was filed as Exhibit A to one of our oppositions Tuesday said that the FDIC-R seized 11 million records from Sonoma Valley Bank when it closed, which amounted to approximately 660 gigabytes of data. I think that is the size and scope of the material maintained that was seized, but I am not exactly sure what could be produced in response to a subpoena. If you do intend to subpoena material from the FDIC-R, if you email it to a lawyer from their legal division named Bryce Quine at bquine@fdic.gov<mailto:bquine@fdic.gov>, I believe he can start to work with you on that.

Thanks,

R

On Dec 7, 2016, at 1:05 PM, Jeff Rabkin <jrabkin@jonesday.com< mailto:jrabkin@jonesday.com>> wrote:

Rob --- while we're discussing discovery issues, we wanted to check in with you regarding the following issues with the government's productions on November 30 and December 1, 2016. Specifically:

(1) Your production on November 30 included a hard drive of .psts for a number of document custodians, but none of the .psts had been processed. Your November 30th letter says that you will produce these .psts in a processed format "as soon as possible." When can we expect to receive the processed .psts?

(2) Your production on December 1 included data from the FDIC's Summation system (Bates-numbered FDICPRODS_00000001 through FDICPRODS_00020348), which were produced as Adobe PDF files. Your December 1st letter says that you will provide a processed version of these files, with load files, "in the near future." When can we expect to receive the processed versions of these files?

(3) Your December 1st letter also says that the FDIC has various hard copy and ESI documents that it held as receiver for Sonoma Valley Bank, which defendants can obtain from the FDIC via subpoena. What is the approximate page count of the materials that are available to defendants at the FDIC, to whom exactly should such a subpoena be directed? Who at the FDIC is most knowledgeable as to the nature, scope, organization and format of these records?

Thanks again for your help with these issues.

-- Jeff

Jeff Rabkin<http://www.jonesday.com/jctang/>
Partner
JONES DAY<http://www.jonesday.com/>
555 California Street, 26th Floor
San Francisco, CA 94104
Office +1.415.875.5850
Mobile +1.415.299.3150
jrabkin@jonesday.com<mailto:jrabkin@jonesday.com>

From:       Jeff Rabkin/JonesDay
To:         "Rees, Robert (USACAN)" <Robert.Rees@usdoj.gov<
mailto:Robert.Rees@usdoj.gov>>
Cc:         "Reeves, Adam (USACAN)" <Adam.Reeves@usdoj.gov<
mailto:Adam.Reeves@usdoj.gov>>, "Beros, Maryam (USACAN)"
<Maryam.Beros@usdoj.gov<mailto:Maryam.Beros@usdoj.gov>>, "Neal J Stephens"
<nstephens@jonesday.com<mailto:nstephens@jonesday.com>>
Date:         12/07/2016 01:01 PM
Subject:      RE: Discovery guide question

Ok, I went back and checked the letter and saw that you are refusing to
provide us with a discovery guide that actually describes what the documents
are, rather than just their source.  Is there a reason for that?  If so,
please let us know what that is.  It seems to me an appropriate measure given
the many issues with the ESI that you've provided us.  Many thanks and feel
free to call to discuss --- I think sometimes phone calls are more productive
than formal letters when it comes to working through discovery issues.

--- Jeff

Jeff Rabkin<http://www.jonesday.com/jctang/>
Partner
JONES DAY<http://www.jonesday.com/>
555 California Street, 26th Floor
San Francisco, CA 94104
Office +1.415.875.5850
Mobile +1.415.299.3150
jrabkin@jonesday.com<mailto:jrabkin@jonesday.com>

From:       Jeff Rabkin/JonesDay
To:         "Rees, Robert (USACAN)" <Robert.Rees@usdoj.gov<
mailto:Robert.Rees@usdoj.gov>>, "Reeves, Adam (USACAN)"
<Adam.Reeves@usdoj.gov<mailto:Adam.Reeves@usdoj.gov>>
Cc:         "Beros, Maryam (USACAN)" <Maryam.Beros@usdoj.gov<
mailto:Maryam.Beros@usdoj.gov>>, "Neal J Stephens" <nstephens@jonesday.com<
mailto:nstephens@jonesday.com>>
Date:         12/07/2016 12:44 PM

Subject:         RE: Discovery guide question
_____

Not really. Can you get us a more detailed guide to the discovery or not?


***This e-mail (including any attachments) may contain information that is private, confidential, or protected by attorney-client or other privilege. If you received this e-mail in error, please delete it from your system without copying it and notify sender by reply e-mail, so that our records can be corrected.***


----- Message from "Rees, Robert (USACAN)" <Robert.Rees@usdoj.gov< mailto:Robert.Rees@usdoj.gov>> on Wed, 07 Dec 2016 20:38:14 GMT -----

From:    "Rees, Robert (USACAN)" <Robert.Rees@usdoj.gov<
mailto:Robert.Rees@usdoj.gov>>
To:      "Jeff Rabkin" , "Reeves, Adam (USACAN)"
CC:      "Beros, Maryam (USACAN)" , "Neal J Stephens"
Subject:        RE: Discovery guide question


Jeff,

We responded to your inquiry in our letter of December 1, 2016.

Thanks,

R

From: Jeff Rabkin [mailto:jrabkin@jonesday.com]
Sent: Wednesday, December 07, 2016 10:58 AM
To: Rees, Robert (USACAN) <RRees@usa.doj.gov<mailto:RRees@usa.doj.gov>>;
Reeves, Adam (USACAN) <AReeves@usa.doj.gov<mailto:AReeves@usa.doj.gov>>
Cc: Beros, Maryam (USACAN) <MBeros@usa.doj.gov<mailto:MBeros@usa.doj.gov>>;
Neal J Stephens <nstephens@jonesday.com<mailto:nstephens@jonesday.com>>
Subject: Re: Discovery guide question

Rob and Adam --- just following up.  I didn't see any reply to this email (if I missed it, forgive me).  Can you please respond or call to discuss?  Thanks.

Adam -- thanks for your call on Sunday.  I hope you weren't in the office!

--- Jeff

Jeff Rabkin
Partner
JONES DAY<http://www.jonesday.com/>
555 California Street, 26th Floor
San Francisco, CA 94104
Office +1.415.875.5850
Mobile +1.415.299.3150
jrabkin@jonesday.com<mailto:jrabkin@jonesday.com>

From:        Jeff Rabkin/JonesDay
To:          "Rees, Robert (USACAN)" <Robert.Rees@usdoj.gov<
mailto:Robert.Rees@usdoj.gov>>
Cc:          maryam.beros@usdoj.gov<mailto:maryam.beros@usdoj.gov>, Neal J
Stephens/JonesDay@JONESDAY
Date:        12/01/2016 07:21 AM
Subject:     Discovery guide question

Rob --- Good morning! I'm wondering whether you have a discovery guide that
not only describes the Bates ranges and source of the various documents the
government has produced but also what these documents are with at least some
specificity. That would be very helpful, especially because the ESI
productions have been so glitched that we can't really search effectively.

Maryam --- just wanted to say hi! Hope all's well with you and yours and that
we get to catch up soon.

--- Jeff

Jeff Rabkin
Partner
JONES DAY<http://www.jonesday.com/>
555 California Street, 26th Floor
San Francisco, CA 94104
Office +1.415.875.5850
Mobile +1.415.299.3150
jrabkin@jonesday.com<mailto:jrabkin@jonesday.com>

==========
This e-mail (including any attachments) may contain information that is
private, confidential, or protected by attorney-client or other privilege. If
you received this e-mail in error, please delete it from your system without
copying it and notify sender by reply e-mail, so that our records can be
corrected.
==========


==========
This e-mail (including any attachments) may contain information that is
private, confidential, or protected by attorney-client or other privilege. If
you received this e-mail in error, please delete it from your system without
copying it and notify sender by reply e-mail, so that our records can be
corrected.
==========


==========
This e-mail (including any attachments) may contain information that is
private, confidential, or protected by attorney-client or other privilege. If
you received this e-mail in error, please delete it from your system without

copying it and notify sender by reply e-mail, so that our records can be
corrected.
==========


==========
This e-mail (including any attachments) may contain information that is
private, confidential, or protected by attorney-client or other privilege. If
you received this e-mail in error, please delete it from your system without
copying it and notify sender by reply e-mail, so that our records can be
corrected.
==========

# EXHIBIT G



**Re: Filing Sean's tax returns with his SSN publicly** 📄

Neal J Stephens/JonesDay   to: Rees, Robert (USACAN)                    12/08/2016 11:30 AM
3-4135

Cc: "Reeves, Adam (USACAN)", Jeff Rabkin
Bcc: Neal J Stephens

History:                This message has been forwarded.

On the privacy breach, do I understand you to say that you intend to do nothing else to try and remedy this situation? I'm concerned by the lack of accountability. It seems like a real cavalier attitude from people who hold others accountable every day.

On the sealed document, docket entry 301 on Dec 6 shows that a sealed document was filed right when all of your opposition papers were being filed. Was that filed by your office and does it relate to your opposition papers? That's why we raised the issue.

Finally, I sent you another email yesterday to let you know that I'll be at your office tomorrow at 9 am to continue reviewing the documents you made available earlier this week. So I'll see you or your designate tomorrow at 9.

Regards,
Neal


Neal Stephens
Partner
JONES DAY® - One Firm Worldwide℠
1755 Embarcadero Road
Palo Alto, CA 94303
Office +1.650.687.4135
nstephens@jonesday.com


| "Rees, Robert (USACAN)" | Neal, We did not file any documents un... | 12/08/2016 10:45:25 AM |
|---|---|---|

From:        "Rees, Robert (USACAN)" <Robert.Rees@usdoj.gov>
To:          Neal J Stephens <nstephens@jonesday.com>
Cc:          "Reeves, Adam (USACAN)" <Adam.Reeves@usdoj.gov>, Jeff Rabkin <jrabkin@jonesday.com>
Date:        12/08/2016 10:45 AM
Subject:     Re: Filing Sean's tax returns with his SSN publicly


Neal,

We did not file any documents under seal on Tuesday.  Assuming you have access
to Exhibit B to my declaration, which is now under seal, you should have
everything that we filed on Tuesday.

With respect to that Exhibit B, I apologize again that it was temporarily
available to the public, but we took prompt action to resolve that, and any
records regarding access to it would be in the sole custody of the Court.

Thanks,

R

On Dec 8, 2016, at 10:04 AM, Neal J Stephens <nstephens@jonesday.com<
mailto:nstephens@jonesday.com>> wrote:

Rob -- we need a response to this email this morning. We still have not
received the documents you filed under seal on Tuesday. What is the status?
We hand delivered our sealed docs to you so you would have them while you were
drafting your opposition memos. We expect the same courtesy. Please send
those to us asap. And please let us know what you are doing regarding your
publication of the SSN's of our client and his family.

Neal


Neal Stephens
Partner
JONES DAY® - One Firm Worldwide□<http://www.jonesday.com/>
1755 Embarcadero Road
Palo Alto, CA 94303
Office +1.650.687.4135
nstephens@jonesday.com<mailto:nstephens@jonesday.com>



From:       Neal J Stephens/JonesDay
To:         "Rees, Robert (USACAN)" <Robert.Rees@usdoj.gov<
mailto:Robert.Rees@usdoj.gov>>, adam.reeves@usdoj.gov<
mailto:adam.reeves@usdoj.gov>
Cc:         Jeff Rabkin/JonesDay@JONESDAY
Date:       12/07/2016 06:12 PM
Subject:    RE: Filing Sean's tax returns with his SSN publicly
_____

Rob -- Sean is understandably concerned that you released the social security
numbers of his wife and children to the public by failing to seal an exhibit
that contained his tax return. As you know, ECF has a specific question that
you must have checked before you filed that exhibit where you confirmed that
you redacted SSN's, DOB's, names of financial account numbers and home
addresses. So I don't really understand how this happened.

We need to know what you will do to determine who may have accessed that
document while it was available to the public. I'd also like to know if you
sent that pleading to anyone other than defense counsel. As I hope you can
appreciate, Sean needs to be able to protect his family and we need to help
him assess the danger here. Please let me know as soon as possible so I can
advise Sean and Perrin.

Regards,
Neal


Neal Stephens
Partner
JONES DAY® - One Firm Worldwide□<http://www.jonesday.com/>
1755 Embarcadero Road

Palo Alto, CA 94303
Office +1.650.687.4135
nstephens@jonesday.com<mailto:nstephens@jonesday.com>

From:        Neal J Stephens/JonesDay
To:          "Rees, Robert (USACAN)" <Robert.Rees@usdoj.gov<
mailto:Robert.Rees@usdoj.gov>>, adam.reeves@usdoj.gov<
mailto:adam.reeves@usdoj.gov>
Cc:          Jeff Rabkin/JonesDay@JONESDAY
Date:        12/07/2016 09:52 AM
Subject:     RE: Filing Sean's tax returns with his SSN publicly

---

Rob -- yes, please file asap and follow through to get that info out of the
public domain.  Are we getting copies of the other sealed docs hand delivered
to us this morning?  We need them now so we can work on the reply briefs.

Neal

Neal Stephens
Partner
JONES DAY® - One Firm Worldwide☐<http://www.jonesday.com/>
1755 Embarcadero Road
Palo Alto, CA 94303
Office +1.650.687.4135
nstephens@jonesday.com<mailto:nstephens@jonesday.com>

From:        "Rees, Robert (USACAN)" <Robert.Rees@usdoj.gov<
mailto:Robert.Rees@usdoj.gov>>
To:          Neal J Stephens <nstephens@jonesday.com<
mailto:nstephens@jonesday.com>>
Cc:          Jeff Rabkin <jrabkin@jonesday.com<mailto:jrabkin@jonesday.com>>,
"Reeves, Adam (USACAN)" <Adam.Reeves@usdoj.gov<mailto:Adam.Reeves@usdoj.gov>>
Date:        12/07/2016 09:37 AM
Subject:     RE: Filing Sean's tax returns with his SSN publicly

---

Neal,

My apologies.  I had focused on the response itself, not the attachments.
Attached is a stipulation and proposed order to place and maintain the
document under seal.  Let me know if it is OK to file it.

Thanks,

R

From: Neal J Stephens [mailto:nstephens@jonesday.com]
Sent: Wednesday, December 07, 2016 9:25 AM
To: Rees, Robert (USACAN) <RRees@usa.doj.gov<mailto:RRees@usa.doj.gov>>
Cc: Jeff Rabkin <jrabkin@jonesday.com<mailto:jrabkin@jonesday.com>>
Subject: Filing Sean's tax returns with his SSN publicly
Importance: High

Rob -- it does not appear that you filed Exhibit B to your declaration under
seal.  That document includes Sean's tax return, his social security number
and Perrin's social security number.  Can you please explain what you were
thinking here?  You need to take this off the public website immediately.

Neal

Neal Stephens
Partner
JONES DAY® - One Firm Worldwide□<http://www.jonesday.com/>
1755 Embarcadero Road
Palo Alto, CA 94303
Office +1.650.687.4135
nstephens@jonesday.com<mailto:nstephens@jonesday.com>

–

R

==========
This e-mail (including any attachments) may contain information that is
private, confidential, or protected by attorney-client or other privilege.  If
you received this e-mail in error, please delete it from your system without
copying it and notify sender by reply e-mail, so that our records can be
corrected.
==========

==========
This e-mail (including any attachments) may contain information that is
private, confidential, or protected by attorney-client or other privilege.  If
you received this e-mail in error, please delete it from your system without
copying it and notify sender by reply e-mail, so that our records can be
corrected.
==========[attachment "SVB Stip Seal Exhibit.pdf" deleted by Neal J
Stephens/JonesDay]

==========
This e-mail (including any attachments) may contain information that is
private, confidential, or protected by attorney-client or other privilege.  If
you received this e-mail in error, please delete it from your system without
copying it and notify sender by reply e-mail, so that our records can be