UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Illston, Judge

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| VS. ) | **NO. CR 14-00139-SI** |
| ) | |
| SEAN CUTTING, ET AL., ) | |
| ) | |
| Defendants ) | |
| _____) | |

San Francisco, California
Friday, February 24, 2017

**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES:**

For Plaintiff:

        BRIAN STRETCH
        United States Attorney
        450 Golden Gate Avenue
        San Francisco, California  94102
    BY:  **ROB REES**
        **ADAM REEVES**
        **ASSISTANT UNITED STATES ATTORNEYS**

For Defendant David John Lonich:

        COLEMAN & BALOGH LLP
        235 Montgomery Street
        Suite 1070
        San Francisco, CA 94104
    BY:  **ETHAN BALOGH, ESQUIRE**

(Appearances continued on the next page)

Reported By:  Pamela A. Batalo, CSR No. 3953, RMR, FCRR
        Official Reporter

APPEARANCES CONTINUED:

For Defendant Sean Clark Cutting:
                          JONES DAY
                          1755 Embarcadero Road
                          Palo Alto, CA  94303
            **BY:  NEAL J. STEPHENS, ESQUIRE**
                    **JEFFREY RABKIN, ESQUIRE**


For Defendant Brian Scott Melland:
                          GEORGE C. BOISSEAU
                          740 4th Street, Second Floor
                          Santa Rosa, CA  95404
            **BY:  GEORGE BOISSEAU, ESQUIRE**

1 | <u>**Friday - February 24, 2017**</u>                    <u>**11:32 a.m.**</u>

2 |                    **P R O C E E D I N G S**

3 |                         ---oOo---

4 |         **THE CLERK:**  Calling Criminal 14-139, United States vs.

5 | Cutting.

6 |         **MR. REES:**  Good morning, Your Honor.  Rob Rees, Adam

7 | Reeves for the United States.

8 |         **MR. REEVES:**  Good morning, Your Honor.

9 |         **THE COURT:**  Good morning.

10 |        **MR. STEPHENS:**  Good morning, Your Honor.  Neal

11 | Stephens on behalf of Mr. Cutting, who is present.  Also with

12 | Mr. Rabkin.

13 |        **THE COURT:**  Good morning.

14 |        **MR. RABKIN:**  Good morning, Your Honor.

15 |        **MR. BALOGH:**  Good morning, Your Honor.  Ethan Balogh

16 | on behalf of David Lonich.  He is present before the Court on

17 | pretrial release.  I would ask that he be seated at counsel

18 | table.

19 |        **THE COURT:**  Sure.

20 |        **MR. BALOGH:**  Thank you.

21 |        **MR. BOISSEAU:**   George Boisseau on behalf of

22 | Mr. Melland, who is present before the Court.

23 |        **THE COURT:**  Good morning.  So I have two matters on

24 | this morning, one involving Defendant Cutting's motion to

25 | dismiss the original Indictment, which actually has quite a lot

of other issues embedded in it.

And then the other having to do with the Government's compliance with the E-discovery protocol and the search warrant.

So first let me ask you all, do I have any jurisdiction to hear anything today?

**MR. REES:** I think, Your Honor, the very technical answer to that is probably no, but I think --

**THE COURT:** Well, you know, when jurisdiction is involved, if the technical answer is *no*, then the answer tends to be *no*.

**MR. REES:** Well, we have moved to dismiss our appeal. It just simply has not yet been granted by the Ninth Circuit. So I think that when -- this is the type of technicality I think that in terms of moving the case forward, since we have moved to dismiss the appeal, I have no reason to believe the Ninth Circuit would deny that request. And I expect it could come through at any time. And that's what I really meant about the technicality there --

**THE COURT:** There is another technicality, which is that you filed an appeal, too; right?

**MR. STEPHENS:** Your Honor, we filed a cross-appeal, and if the Government is going to withdraw their appeal and it's granted by the Ninth Circuit, then I think the change for us is, as the defendant -- is a directly appealable order, so I

think that would come off as well.  And then you would have

jurisdiction to rule on this matter today.

**THE COURT:**  So assuming they grant your motion to

dismiss your appeal, which I say is a pretty one-hundred

percent sure thing --

**MR. REES:**  I don't think I've ever heard of them not

doing that, and I think counsel is right.  I think that would

extinguish any cross-appeal.  And so, you know, technically I

think, yes, the Court doesn't have jurisdiction, but I don't

see how anybody could complain about -- the other thing is that

I am aware of case law -- and this is case law in a slightly

different type of appeal when we appeal suppressions, but the

Ninth Circuit has said, at least in that context, that the

Court does retain its jurisdiction to at least manage its

docket, and I think that that concept ought to apply equally

here.

And given that we have a motion by the Government to

dismiss the appeal, a trial set for March 20th, that the Court

should at least have a core ability to maintain its docket, to

keep its docket going forward.

So I have no objection for this going forward, and I -- as

I say that, I think I may even withdraw the technicality.  It

may be that the Court does retain that core jurisdiction in

this circumstance.

I apologize.  I sort of thought we wouldn't be in this

1    situation since we moved to dismiss the appeal.  I thought

2    maybe that would be a quicker thing, but I haven't seen the

3    docket come up yet.

4          **MR. BALOGH:**  I think Mr. Rees is incorrect, and I will

5    harken back to the *Cooper* case.

6          When the Government takes an appeal, as they did in

7    *Cooper*, what -- it divests the Court of jurisdiction over the

8    subject of the appeal.  There is no automatic stay of any other

9    proceedings.  The Government would have to or the appealing

10   party would have to move for a stay.

11         What the Government appealed was a dismissal with

12   prejudice of the Superseding Indictment.  After reconsideration

13   was heard, that stayed that.  The Court has now ruled on that

14   motion, granted reconsideration.

15         If that's on appeal, which technically it is now, the

16   Court could not do anything to reform that judgment now that

17   reconsideration has been had.  Everything else in this case is

18   live and that's why you could order trial in the underlying

19   Indictment.  Why in *Cooper*, after the conspiracy charge was

20   dismissed and they took an appeal of that, we were able to

21   litigate suppression, other matters regarding the possession

22   with intent.

23         **THE COURT:**  So you agree with Mr. Rees that I have

24   jurisdiction?

25         **MR. BALOGH:**  You absolutely have jurisdiction over all

matters except the question of the Superseding Indictment

dismissal.  That's been decided.  That's technically on appeal

right now, but that's not before you today.

**THE COURT:**  So you couldn't start the sentence with

saying, "I agree with Mr. Rees."  Was that the problem?

**MR. BALOGH:**  Well, he started with technically

saying --

**THE COURT:**  But he changed his mind by the end of it.

Anyway, so that's two votes that I can go forward.

Do you think I can go forward?

**MR. STEPHENS:**  I do, Your Honor, yes.

**THE COURT:**  Mr. Boisseau?

**MR. BOISSEAU:**  I agree.

**THE COURT:**  So I will go forward.

I will tell you at large what I think, and then I'll be

happy to hear -- or I will hear anything further you want to

add to the submissions.

And starting first with Mr. Cutting's motion to dismiss

the original Indictment, I'm not inclined to dismiss the

original Indictment.  I am, however, concerned about the

documents.

In my view, the Government is going to have to go through

those documents somehow and figure out whether there is

relevant material in them and whether there is *Brady* in them.

And what I propose to do is tell you that and then ask you how

1  you're going to do it and how much time it will take.

2      But I think under all the circumstances that have brought

3  to us today, those documents have to be reviewed.

4          **MR. REES:**  Which documents is the Court referring to?

5          **THE COURT:**  I'm talking about what you are calling the

6  FDIC-R documents.

7          **MR. REES:**  Let me make sure that -- I think we're on

8  the same page with the various documents.

9      We have obtained millions -- I don't know if *millions* is

10  right, but many, many documents from the FDIC-R.  We submitted

11  a declaration from Special Agent Carrillo over a course of a

12  couple years.  They obtained -- in their very best efforts

13  through many submissions to obtain anything that they could

14  possibly believe was relevant from the FDIC-R.

15          **THE COURT:**  I understand all that.  And then at the

16  end of the process, you subpoenaed and identified all these

17  other documents which you said you don't want to look at.

18          **MR. REES:**  No.  So that was from that universe.

19  Whatever the FDIC-R had, we made numerous requests for -- in

20  totality to get all potentially relevant information.  So a

21  very large -- a large portion of that 11 million documents have

22  been provided to the defense as part of that multi-year effort

23  to obtain anything relevant to this case.

24          **THE COURT:**  And, indeed, you said you had given them

25  everything.  You said that years ago.

1      **MR. REES:**  Well, there was a drive that was

2   represented to me to have everything that -- upon the bank's

3   closing.  It turns out that there was even more, but, again,

4   what they captured is so broad that it would be like asking the

5   Government to go and -- after we had issued multiple subpoenas

6   to a bank that, let's say, hadn't failed, that well, we don't

7   really know if your subpoenas were truly complied with so you

8   just have to climb into the bank and search all the documents.

9   I think that would be a notion nobody would ever agree with.

10      And I think in this case through multi years and all our

11   requests of going through that material, we pulled everything

12   that really could be relevant, and that's what I think is

13   important to point out about --

14      **THE COURT:**  Well, but the -- what about the emails to

15   Mr. Cutting?  Those weren't even pulled out until counsel kept

16   bugging you about them and then they came out, as I understand

17   it, from this most recent tranche of FDIC-R documents.

18      **MR. REES:**  From what we understand, there were two

19   sets of data pulled from emails.  One was a fully -- oh, what's

20   the word -- forensic image of what the bank investigators at

21   the time thought would be relevant email accounts.  Those were

22   pulled at or near the day the bank closed.  And that included a

23   full subset of emails of Sean Cutting that we produced a long

24   time ago.  I don't remember, as I sit here today, but a long

25   time ago.

1    The FDIC then, as part of its process, goes back and does

2    what they have told me they call a Robocopying of every single

3    email of every single account, not just targeted ones, but

4    every single one.

5    Because there were so many bank closures at the time, that

6    took place some months after the closure of the bank where the

7    server, the email server, had been mothballed, not in use

8    because the emails had been migrated to the successor bank in

9    interest, Westamerica Bank.

10    When they did that, they pulled the whole set of emails.

11    We had always disclosed what had been considered the targeted

12    emails.  We went back and we found out about that there were

13    these extra mothballed server emails that included an account

14    of Sean Cutting.  When we did that, we provided that.

15    When we did our *Brady* review, that material -- we found it

16    to have not a lot of responsive material because I think the

17    majority of the relevant material had already been harvested

18    the day of the bank closing.

19    In fact, we found, from what I understand -- I didn't

20    personally look at it for relevance, but we found a lot of

21    emails that were just coming in because the server was

22    mothballed, but people would still email in in the nature of

23    junk mail.

24    So the idea -- and it's something that the defense just

25    keeps harping *Oh, my God, for the first time I just saw these*

*emails recently* is not accurate as to what happened. It was a later, the best we could tell, primarily duplicate copying a couple months after the bank closing of the forensic one that they provided from the bank closures.

So, yes, it's true that as we've gotten closer to trial, we have done everything we can to ensure that when we tell the Court we did our best efforts to harvest every relevant document from the FDIC-R, that we did do everything we could to collect every relevant document.

And so in addition to the two years' worth of investigation that our agents did, interfacing with Cynthia Spatz, who we have a declaration, an FDIC-R employee who says, "I gave them everything they asked for."

In addition to that, we have corroborated that we seem to have found everything of relevance because we've issued subpoenas to multiple third parties that don't suggest there's any gaps in what could be relevant to this case.

What I think is very worth pointing out about the defendant's motion is it's all broadside. It's all, you know, well, there's materials over there, so you've got to -- you've got to -- there must be *Brady*. But he has all these documents. And if he could point out factually that hey, listen, I have this email or I have this piece of document, but over here, that doesn't seem to -- I don't seem to have that from the Government's production from the agents or from the FDIC-R,

some evidence that there was a gap in our information, that
would be of concern to the Government and I think to the Court
that, well, maybe this process didn't get us everything we
needed.

But in addition to harvesting from that 11 million
documents, the two years' worth of investigation, corroborating
that with the other subpoenas to other organizations, what we
did is we also provided the FDIC's complete accounting of what
they thought was their best efforts at anything that could be
relevant to the failure of the bank.  And to them, the whole
Bijan Madjlessi relationship that this case centers on was at
the heart of it.  They asked for 27 different loans.  I think
that is the right number.  Full loan files related to Bijan
Madjlessi, which is more than we've alleged.  It includes
everything we've alleged.

So I really believe that pointing that there is this
material over there, it's not 11 million because we've
harvested many documents from that.  It's leftover material
that there's been no showing that it has any relevance, and,
again, I think it would be like asking well, we just don't
believe you that when your subpoena to -- let's imagine Sonoma
Valley Bank didn't fail.  You've issued multiple subpoenas to
Sonoma Valley Bank.  We just don't trust you that we have
everything relevant because, my God, there is still people that
work there and they have emails.

1    Well, no, you don't go and just have a prosecutor put eyes

2  on a bunch of material that has already been harvested for

3  relevance.  And I would point out the defendant submits the

4  Ogden Memo, which was relied on many times, which is the

5  Government's guidance for discovery, and that's exactly what

6  the Ogden Memo says to do, is do a -- you have to look for

7  relevant material first.  Harvest the relevant material.  Then

8  you do the *Brady* review.  And according to the Ogden Memo, the

9  process of harvesting the relevant material can involve agents,

10  paralegals, counsel, even computerized searches because we can

11  only make our best efforts from huge document piles to harvest

12  what's relevant.

13    And we believe we've demonstrated that we've made every

14  best effort to get everything that could be of relevance to

15  this case provided to the defense and many, many productions.

16    And then the last thing I would say is the defense acts as

17  if this has been withheld from him when nothing could be

18  further from the truth.  The defense has Rule 17 subpoena power

19  to go get documents that the Government doesn't think is

20  relevant but if, for whatever reason, he thinks is relevant.

21    He hasn't established any factual basis to demonstrate

22  that there is anything relevant left over there, but he's

23  certainly entitled -- we've indicated many times that the

24  FDIC-R will work with him on any reasonable subpoena to get any

25  further documents.

1      **THE COURT:**  Has anybody from the prosecution team

2  reviewed or done any kind of computer analysis of all the

3  FDIC-R materials?

4      **MR. REES:**  What we have done is harvested through

5  numerous requests, everything that we think could possibly be

6  relevant.

7      **THE COURT:**  So the answer would be *no*?

8      **MR. REES:**  The answer would be that, no, there has not

9  been a *Brady* review of irrelevant material, but there has been

10  a *Brady* review of everything that we have been able to gather

11  that appears to be of any relevance or significance to this

12  case, and that's the approximately four million total pages of

13  data that we have harvested from that and other sources.  We

14  did do, as the Court ordered, the *Brady* review of that

15  material.

16      **THE COURT:**  Has anybody looked at all the material?

17      **MR. REES:**  That material has been harvested so people

18  have gone -- when requests came to the FDIC-R -- and Cynthia

19  Spatz declares that she received these requests.  She was the

20  lead investigator for the FDIC-R.  That she complied with all

21  requests, so anytime they asked for something, that's her

22  material, as I understand.

23      They say, *We need this*.  She goes to that pot of material

24  at the FDIC-R, she goes, *Here, here, here you go*.  And

25  responded, as the Court saw, to dozens and dozens of requests

from the agents as their investigation continued, as they

learned facts, to get more and more information to make sure

that there was no stone left unturned.

And it wasn't, as the defense sort of implies, that we're

picking and choosing material. These are full loan files.

These are full email accounts. There is no reason to believe

and the defense has provided no evidence that there is anything

left over at the FDIC-R that hasn't been -- that all reasonable

efforts haven't been made to harvest all that data.

And, again, I would say that I don't think that even the

Ogden Memo -- there is no precedent, there is no -- any

suggestion that prosecutors need to review irrelevant material

for --

            **THE COURT:** How do you know it's irrelevant?

        **MR. REES:** Because we've made numerous requests to

take everything relevant from that data set and provided it,

and there is no evidence that there is anything left over

there.

They asked for Alexis Tomsen's emails. We got it. They

thought that there would be relevant stuff in there.

Excellent. We produced it.

            **THE COURT:** But they weren't produced in the first

instance.

        **MR. REES:** They weren't produced in the very first

instance because -- I'm not sure why. But that's the whole

point, is that any time -- any time that they have flagged for
us any reason to believe that there has been anything left over
there that we did not -- that our best efforts may have
overlooked or may not have accomplished, we have complied with
that and more.

We provided the entirety of this FDIC -- this closure
process where they go and they -- all loan files, as we have in
the declarations, something on the order of 27 separate loan
files believed to be potentially associated with Bijan
Madjlessi. Again, these aren't picking and choosing. These
are full documents.

And what I understand about this material is that it
would -- what would be left over would of course be irrelevant.
It would be low-level employees' emails. It would be depositor
records. It would be things that there would be no reasonable
reason to believe would have anything relevant in there.

And so I really -- I hope the Court understands that there
is a subset of relevant material that we have obtained from
that 11 million documents and provided to the defense and have
personally reviewed for *Brady*.

THE COURT: And you subpoenaed the documents; right?

MR. REES: Well --

THE COURT: With a trial subpoena?

MR. REES: At the time -- there is a couple different
sets. At the time of the investigation --

1    **THE COURT:** I want to know what you subpoenaed at the

2    end of last year with the trial subpoena.

3    **MR. REES:** For the trial subpoena, we got -- there

4    were email accounts of names --

5    **THE COURT:** What did you subpoena? Not what did you

6    get. What did you subpoena?

7    **MR. REES:** I think we just issued a broad subpoena for

8    material that had been --

9    **THE COURT:** Everything.

10   **MR. REES:** I think it was broad, but we narrowed it to

11   make sure to get everything relevant, as we would. I mean, it

12   needs to be relevant and responsive material. Again, I can't

13   remember the wording. It may have said *everything* to make sure

14   we had access to everything.

15   But we -- for example, the defense proposed a jury

16   questionnaire that included -- any employee that we found on

17   there, we produced their entire email accounts. We produced an

18   index that was -- detailed everything that the closure

19   personnel had collected, again, including, I think, the number

20   is something like 27 potential loans with Bijan Madjlessi,

21   email accounts. Some of that had already been produced, but

22   we, at the defense request, produced the entirety of that, set

23   aside what the FDIC had done.

24   So once I had learned that there was even more potential

25   material and that I hadn't produced literally all of it, I did

every effort to make sure, okay, now that I know there is

potentially more -- I had thought I had just given everything.

There is potentially more.  I did a further review to ensure

that anything potentially relevant had been collected and sent

over.

Again, anytime you have a large organization, you have

to -- you have to harvest the relevant stuff first, and it

doesn't follow that if the defense says, well, maybe there's

something left over, *maybe* is not evidence.  You don't have to

go back and then just say, *Okay, we don't trust you, the*

*organization, to have adequately complied with the subpoena.*

*We are going to climb into you, you know, into your inner*

*workings and check every single document just to make sure.*

The Ogden Memo doesn't say that.  Nothing says that.  That's

just pure speculation.

And that's the thing I really want to emphasize about this

motion, is where are the facts, where is the evidence we are

missing something?  Where is the comparison of something we

received from a third party with something that we received

from our relevant documents and say hey, look, there was this

whole other loan file that you got from Westamerica Bank that,

you know -- only pieces of which were over here.  No evidence

that there is anything there that's responsive or relevant.

Just a big speculation.

And, again, it's available.  We think we've done

everything we can to harvest all relevant information.  Then we
did the *Brady* review of that, and we have indicated that it's
available -- the leftover stuff is still available.

       **THE COURT:**  How much do you think is the leftover --

       **MR. REES:**  That's hard to say because the process was
that the prosecution would make the request, the defense would
provide it.  So that I do not know off the top of my head.  I
haven't looked into it.  But I would expect it would be a fair
amount because, like I said, a lot of it is voluminous
depositor information, as I understand it, entire email
accounts --

       **THE COURT:**  But less than 11 million?

       **MR. REES:**  Yes.  It certainly has to be less than
11 million.

       **THE COURT:**  Okay.  Thank you.

       **MR. STEPHENS:**  Your Honor, if I may?

       **THE COURT:**  You may.

       **MR. STEPHENS:**  Opposing counsel is wrong on both the
facts and the law.  And through that whole litany that he just
went through, he can't provide the Court one case that says
it's not the law of the land that it's the defendant's burden
in a criminal case to go out and find *Brady* and point the
Government to it so they can then review it.

    *Kyles vs. Whitley* drops that burden squarely on the
shoulder of the prosecutors, and they have tried throughout

1   this whole process to shift that back to us.  They're wrong on

2   that corner of the law.

3       They are also wrong -- they are wrong on Ninth Circuit law

4   and this Court's order which held that the FDIC-R is on the

5   prosecution team.  So you've got the *Wood* case and the *Bryan*

6   case and the *Blanco* case and the Ninth Circuit that says that

7   it is improper for the Government to basically park something

8   at an agency and then refuse to make that part of their *Brady*

9   review.

10      These FDIC-R materials need to be part of their *Brady*

11  review, and they have purposely kept them out there because

12  it's a lot of work for them.

13      The problem with that is they then say that we haven't

14  demonstrated there's something in there that's relevant.  Well,

15  sure we have because, as the Court's pointed out, that's where

16  Sean's emails came from.  In my declaration supporting the

17  motion, we lay out here is the trickle of Cutting emails that

18  we had in 2014 and then here is this flood of emails that come

19  in in 2016 just recently after we started saying there's gaps

20  in your production.

21      Alexis Tomsen's emails, relevant in this case, in the

22  FDIC-R materials and would have been banished forever had we

23  not raised it.

24      If you also look at the *Salyer* case, which we led our

25  reply brief with, it basically says it's oxymoronic for the

prosecutors to say that they have conducted their *Brady* review by not reviewing documents. And the Ogden Memo lays out that they have got to scour the records and go with -- the prosecutors have to make the ultimate call on what's *Brady* and what's not. They can't delegate that.

So you can't take that obligation, that constitutional obligation, and say *we've performed it by not performing it.* And that's the circular logic that is enmeshed in all of their arguments.

So that's the law. The fact that I tried in our reply brief just to lay out the long chronology here and -- the constitutional issues that we find ourselves in in the *Chapman* case is they are -- the defendants here, Mr. Cutting and the defendants, are forced to elect -- or let me back up.

The Government is forcing the Court to force the defendants to pick between their Fifth Amendment right to due process or their Sixth Amendment right to a speedy trial.

The Sixth Amendment right is implicated, and the concern is that witnesses' memories are starting to erode. There is a loan committee member -- and this won't be contested by the Government. There is a loan committee member who is getting into some medical issues, and he cannot remember what the term *lending limit* means. He cannot look at some of the credit memos and even know what they are.

And there are other -- there's another board member who

1  says that he's vaguely familiar with the name Bijan Madjlessi.

2      So as that time passes and erodes, it impacts the

3  defendants' ability to defend the case.  That's the Sixth

4  Amendment.

5      The Fifth Amendment is trying to have us go forward in a

6  trial without this *Brady* material when we've already

7  established that material out of that FDIC-R stack is *Brady*

8  because when we filed our motion, we pointed out to the

9  Government *Hey, Government, by the way, how come there is*

10 *nothing on your Brady list that relates to these new emails*

11 *from Sean*?  And then they had to go back and say, *You're right*,

12 and submit something in addition to that.

13     Those are the FDIC-R materials that -- a small number that

14 they've actually reviewed.  There is millions of documents that

15 they haven't reviewed that include, according to their letters

16 to us -- not what I'm saying, but what they've told us is that

17 it's emails and that it's loan origination files and it's

18 PowerPoint presentations and it's spreadsheets.  It's all the

19 stuff that what we see in the documents that have been

20 produced, that's relevant stuff, and there is *Brady* in that

21 stuff.

22     But I think they have put the defendants -- they've put

23 the Court in the worst possible position which is forcing us to

24 pick between our rights, and it's not the way the framers laid

25 it out.  The concept of the Bill of Rights is not something the

government -- the Executive Branch can look to the courts and say *Here, give this many to the defendants and they get to pick one, but only one.*

The Bill of Rights is there, every right, every case, every defendant all the time.  And they're jamming us here, and it's unfair.

**THE COURT:**  Let me say something while I'm thinking about it because you've brought up this business of the members of the board losing their acute recollections and time affecting that.  And of course people can also get sick and that can affect their memories as well.

If anyone feels -- and right now we have a trial date in March.  But if somebody feels that between -- in the near term any of these folks is either ill or forgetting, you can always ask me to take depositions to preserve their testimony.  So I would urge you to do that if there is any serious concern that people are becoming unable to testify in the near trial.

**MR. REES:**  Your Honor, if I could just respond very briefly?

**THE COURT:**  Sure.

**MR. REES:**  The real issue is that counsel is just utterly conflating the two processes, and the Ogden Memo makes clear -- and if I could read it.  There is a first-level review.

"Prosecutors must ensure that the material is reviewed to

1    identify discoverable information."

2        We've done that.  We had a two-year investigation where we

3    harvested material from this to find all discoverable

4    information.

5        THE COURT:  Does it say reviewed by whom?

6        MR. REES:  It says, "It will be preferable if

7    prosecutors could review the information themselves in every

8    case, but such review is not always feasible or necessary.

9    However, the prosecutor is ultimately responsible for

10   compliance with discovery obligations.  Accordingly, the

11   prosecutor should develop a process for review of pertinent

12   information to ensure that discoverable information is

13   identified.  This process may involve agents, paralegals,

14   counsel, and computerized searches."

15       That's the first line of review.  Figure out what's

16   relevant.  Figure out what's discoverable.  Figure out what's

17   pertinent.  We have done that.  Two years working with the

18   FDIC-R; when the Court set a discovery deadline, making sure.

19   And I really want to express to the Court that --

20       THE COURT:  Many of the requests that you made to

21   those folks were made back in 2010 and 2011 and 2012.

22       MR. REES:  Yes.  When we were investigating the case

23   because that was the whole point, we were trying to find

24   everything relevant about this case, and that has all been

25   discovered when the Court set the discovery deadline, and I

want to say, I know there have been issues with some of this
discovery, and I am not excusing it.  We are doing our level
best to make sure this gets done, but I really think that
that's evidence of our really good-faith compliance with this.
We're not hiding the ball.  We're not saying I'm not sure about
Alexis Tomsen --

    **THE COURT:**  I think it's appalling, frankly, that if
you've been dealing with these folks since 2010 and 2011 and
2012, making all these targeted requests and getting all the
relevant evidence there could possibly be, that it wasn't until
the end of 2016 that you discovered there was all this FDIC-R.
You told the Court, "Oh, golly, knocked me over when I found
all that stuff was there."  That just doesn't make sense to me.

    **MR. REES:**  I always knew that there was stuff that was
seized at the bank.  My confusion was I thought -- I thought I
had just given them everything.  So the confusion was not -- I
knew that we had been working with FDIC documents.  I knew we
had been harvesting those, having to do with the bank closure.

    What was news to me was that we hadn't provided literally
everything.  I did not realize just how gigantic the scope of
the material they received.  As soon as I figured that out, I
said, *okay, is there anything left over there?*

    The only thing really that was new was an Alexis Tomsen
email that if they want it, we got it.  The rest of it is stuff
that when we provided an index, they said they wanted that.  Go

ahead.  It's yours, because that -- that is sort of a backstop.
Here is stuff that the FDIC thought could be anything relevant
to the closure of this bank.  Please have it.  We've reviewed
that for *Brady*.

　　　And so that's the first part of the process, is to get the
discoverable stuff, get the pertinent stuff.  Again, I --

　　　**THE COURT:**  Let me ask you this.  This is a different
question.

　　　The FDIC-R documents that -- the leftovers, as you were
calling them, the leftovers that have not been reviewed by your
office, what is their form?

　　　**MR. REES:**  I believe that they are maintained
electronically.

　　　**THE COURT:**  So are they reviewable electronically?

　　　**MR. REES:**  I know the Court has found the FDIC-R is
part of the prosecution team, but they do not consider
themselves to be, and so I have to go through a couple
different people, so I don't -- and I don't want to make a
misstatement, so I don't know the answer to that question.

　　　I assume that in some form or another -- and I don't know
if it's globally revealed or if you have to review by data set.
I would assume that in some form or process of another, it's
reviewable, but I also assume that's exactly how we were
provided with these documents.

　　　**THE COURT:**  Well, that's what you are assuming.

1     **MR. REES:**  Well, she says, "Every request that I was

2     given I -- I gave it over."  And it has to come from somewhere.

3     And she's is the FDIC-R.  It came from her.  So --

4          **MR. REEVES:**  Your Honor, could I have a moment just to

5     confer with Mr. Rees, maybe for a minute or two, please?

6               **THE COURT:**  Sure.

7          (Government counsel confer off the record.)

8          **MR. STEPHENS:**  I do have a couple rebuttal points

9     there, Your Honor.

10         (Government counsel confer off the record.)

11         **MR. REEVES:**  Your Honor, thank you very much.  I have

12    two comments, if I may.  And a question.

13       I'd like to put this as an alternative.  Okay?

14       I agree with everything Mr. Rees has said.  I agree with

15    those arguments, and I stand by the position that the

16    Government has conducted its reviews properly in all senses

17    here.

18       As an alternative, I offer the following two comments and

19    a suggestion and a question.

20       The first comment is I think this is a very important

21    point and part of the what, in my view, is some of the

22    misunderstanding that is sort of coursing through this dialogue

23    right now.

24       If SVB were still operative and still functioning, the

25    Government would have obtained relevant information by subpoena

1    directly from the bank.  We would have gathered relevant

2    materials in response to subpoenas, and we would review them in

3    our normal course, produced them, found *Brady*, etc.  There

4    would be a whole reservoir of irrelevant information remaining

5    at the bank.  That's the nature of virtually every fraud case

6    that does not involve a failed bank.

7         And I think it is the fact that the bank failed and was

8    taken over by FDIC-R that has created some of the concepts that

9    we're now working through.

10        **THE COURT:**  Well, that plus the fact that at the end

11   of the process and a few months before trial, a trial subpoena

12   was issued that, as I understand it, requested all the

13   documents from FDIC-R, which included a whole trove of

14   documents of which the prosecutors were not previously aware,

15   and they subpoenaed them, which is a representation that these

16   are relevant materials.  They then decided not to look at them.

17   That's where I'm having a hard time.

18        **MR. REEVES:**  I do not understand the facts in that

19   manner, but, Your Honor, I would want to really double check

20   that, the scope of our subpoena, to respond to you.

21        **THE COURT:**  Is that incorrect, Mr. Rees?

22        **MR. REES:**  What I understand is that we -- just so we

23   could have access to everything, we asked for everything, but

24   then we orally limited it to what was relevant.

25        **THE COURT:**  The way you get access to everything is

1   you ask for everything in a representation that these are

2   relevant materials for a trial subpoena.  That's what you do;

3   right?

4            MR. REES:  Well, in order to make sure that it covered

5   the entirety of their database, we said -- the subpoena, if I

6   recall, says *everything*, but then we worked with them saying

7   what -- it's --

8            THE COURT:  And I'm just saying to me that's where the

9   problem comes in.

10           MR. REES:  Okay.  I accept that.

11           MR. REEVES:  My second comment -- and I mean this -- I

12  mean this with the greatest sincerity.  I, on behalf of the

13  Government, appreciate the Court's attention to this.  And I --

14  we take our obligations seriously.  I want to protect this

15  record.  I believe these discovery issues need to be properly

16  heard and we want to be responsive.  Okay?  That is an absolute

17  commitment.

18       And it's in that spirit that I ask the following question,

19  because I'm sensing where the Court might like to land here and

20  the concerns that you have, and I want to embrace those,

21  honestly.

22       If the Government today were to subpoena and enforce a

23  subpoena for virtually -- for all records relating to SVB from

24  FDIC-R and we were to grab those and take possession of those,

25  would the Court view that as a concession in any sense of the

1    arguments we've made about the propriety, the appropriateness

2    of the process that we have followed?  That would be -- because

3    I would not want to make such a concession.  I'm happy to

4    adjust, I'm happy to be responsive to --

5         **THE COURT:**  I kind of thought you already did that.

6    But if you're saying if you did it again, can you do that

7    without conceding any kind of error?

8         **MR. REEVES:**  The lurking word may be *enforce*.  I think

9    as Mr. Rees explained, we served a broad subpoena --

10        **MR. REES:**  We narrowed it.

11        **MR. REEVES:**  -- and then narrowed it as we went

12   through items and, in that way, gathered relevant information,

13   and there is still a remainder at FDIC-R.  If we were to

14   abandon that process, simply say, *We need everything, please,*

15   *and we need it as quickly as possible,* I would not want that to

16   be deemed as a concession in any sense --

17        **THE COURT:**  Let's say I said you weren't conceding

18   anything.  What would your next step be?

19        **MR. REEVES:**  Okay.  Our next step would be to process

20   it and produce it in the normal course.  I don't know how long

21   that would take.

22        So my next question becomes would that -- any delay that

23   results from this be attributed to the Government, which I

24   would consider unfair given, again, what I think are

25   appropriate arguments for the way we've conducted ourselves,

but I'm happy to explore that as a possibility.  I want to

protect the record.  I think that discovery is essential for

the defendants and we want to comply in every possible respect

and we believe that we've done that.

But given the concerns, given where we are, that is

something that I'm prepared to explore as long as it doesn't

come at the cost of undermining the contentions we've already

made.

**THE COURT:**  Thank you.

You had some other points?

**MR. STEPHENS:**  Your Honor, yes, if I may.

You issued a 21-day order to them based on our *Brady*

motion.  In your order, you told them that they needed to go

and identify all *Brady* and *Giglio* information in discovery

produced and not yet produced.

The discovery that is not yet produced is the material at

the FDIC-R that we are fighting about right now.  So they have

already -- they're now saying order us to do it again and this

time we'll really go do it.  And I struggle with that because

the Court couldn't have been clearer.

The FDIC-R is on the prosecution team.  All the Ninth

Circuit case law dictates what has to happen from there, and

they're trying to pass the buck.  They're doing everything they

can to avoid having to go and spend the time and look through

those materials for *Brady*, even though they've already been

1     ordered to do it.  That, to me, makes no sense.

2        Mr. Reeves mentioned something about Alexis Tomsen's

3     emails.  We raised that, yes, and what came out of that?

4     Mr. Cutting's emails came out of that.  I didn't know that was

5     out there.  They are trying to hold us responsible for that

6     knowledge or hold the Court responsible for that knowledge and

7     it's unfair.  It's just flat-out unfair.  It's a violation of

8     due process.

9        They should have complied with your order.  In fact, it

10     shouldn't have even come to the point where we had to file the

11     motion.  If they had simply just taken the case seriously

12     enough to uphold their constitutional obligations, there never

13     would have been a motion.

14        There shouldn't have had to be a follow-up motion and

15     there shouldn't have to be a second order from the Court.  They

16     can't point you to any Ninth Circuit case that suggests that

17     what they've done here is appropriate.  All the case law is

18     against them.

19        So I don't understand Mr. Reeves' proposal because it

20     continues to take time off the clock.

21        **THE COURT:**  Okay.  Well, I think I understand all of

22     your points of view, but what I would like to find out is this.

23        Let's assume for a moment that, with or without casting

24     any aspersions on prior conduct, the Court said to the

25     Government you need to review all of the material that we've

1    been discussing, by which I mean the leftovers and however you

2    identify that, but all of the material for relevant material

3    and for *Brady* and produce that to the defense.  Let's say I

4    were to say that.

5        Do you know how long that would take?

6            MR. REES:  I do not.  We had explored the option of

7    simply producing all the material by the December 1st deadline,

8    which was the original Court's cutoff --

9            THE COURT:  I'm saying the Government needs to review

10    it for *Brady*.

11            MR. REES:  I understand that.  What I'm saying is that

12    we had considered producing all the 11 million around the time

13    of December 1st and were told that that's so overbroad compared

14    to what's relevant and would take some significant time that

15    we, the FDIC, don't think that's reasonable.

16        So all I'm getting at is the perspective of we're willing

17    to enforce the subpoena, but from what I understand, it's not

18    like a one-week turn around.  It would take some computer

19    processing time for the -- just the sheer amount of electronic

20    data, and I wish I had a better estimate other than I

21    understand it's not a one-week thing.  It's something more

22    involved than that.

23            THE COURT:  Let's say it's more than a week and

24    something more involved than that.  What would your --

25            MR. STEPHENS:  My initial reaction is I'm stunned that

1  they don't have that information for you today.  I'm stunned.

2       **THE COURT:**  Okay.  Well, stop being stunned and now

3  tell me this.  We have a trial date.  I am going to be free

4  because Mr. Boisseau is going to make me free for trial on

5  March 20th, just like we've said.  So this Court can do that.

6       But I don't know how long it's going to take them to do

7  that if I order them to do that.  So I guess that's what I'm

8  floating to you, what do you want to do?

9       **MR. STEPHENS:**  Right.  So our concern is I don't think

10  we can provide effective representation to Mr. Cutting if we

11  don't have the *Brady* and *Giglio* materials which we're not going

12  to have before the 20th.

13       **THE COURT:**  If not.  I don't know yet how long it will

14  take.

15       **MR. STEPHENS:**  Your Honor, there is going to be

16  millions of documents they're going to have to go through.

17  Understanding what the click rates are, depending how big their

18  team is, this has to take a while, which is why they should

19  have done it a while ago.

20       So I don't think we're in a position to effectively

21  represent Mr. Cutting on the 20th.  My concern is that that is

22  somehow going to be viewed as somehow a waiver of our Sixth

23  Amendment arguments, which I'm not willing to waive.

24       **THE COURT:**  Okay.  All right.  Thank you.

25       Well, that whole matter will be submitted and I will get

1   back to you shortly on it.

2       Now, the second matter is the failure to eliminate the

3   documents on the electronic disks that were beyond the scope of

4   the subpoena based on forensic integrity, and I kind of get

5   what all the folks have said about that.

6       And at the end of the day, I think there's a way to deal

7   with this more or less in the way that Mr. Lonich's counsel

8   suggested.

9       But my question is the forensic integrity issues that

10  you've outlined in your memoranda, did you know about that when

11  you got the search warrant?

12      MR. REES:  I am generally aware that -- of if what we

13  had obtained -- we had no idea whether there would be

14  electronic material or what the nature of it would be -- that

15  certain material, like if it's just a hard drive, that, yes, if

16  you find responsive data within that, you can't selectively go

17  and chop up that drive.  That --

18      THE COURT:  So did you tell that to Judge Spero then?

19      MR. REES:  No.  But I think that that's --

20      THE COURT:  Do you still ask for the same thing now in

21  the same way, knowing --

22      MR. REES:  That's a standard -- I think -- I --

23      THE COURT:  Because I just think that's wrong.  And

24  I'm not -- that's not a solution to the current problem that

25  we're facing, but it seems to me that if you're representing to

the Court and the Court is ordering you look, you can scoop all
this stuff up, but you have to give back, right away within
some short period of time because it's important, things that
weren't meant to be scooped up, you should tell that judge,
*Yeah, well, except we can't do that.*

MR. REES: Well, we can for drives that don't have
anything and we did.  We erased --

THE COURT: How about drives that have something,
because almost all drives have something?

MR. REES: Well, that's -- that's not true.  We
deleted more than one drive, to my understanding, in this very
case.

But I don't know what we're going to seize.  I don't know
where technology will go.  I don't think that this -- I don't
think the magistrates would be surprised to know that you can't
partially delete a hard drive.  It's not a file cabinet.  And
so I don't --

THE COURT: Well, they have ordered you to do it so
would they be surprised to know you can't comply with their
orders?

MR. REES: They say to the extent that you can comply.
I can't remember the wording, but they don't just -- it says --
I can't -- I'm sorry.  I don't have it in front of me, the
actual wording, but it doesn't just say, you know, go up and
treat it like a file cabinet, because I don't think you can.

1    And, again, I'm not part of the committee that came up
2  with this, but this is a document that is a standard document
3  that was worked with, to my understanding, between our office
4  and the magistrates, so I'm not privy to those discussions, but
5  I would be surprised if this would be a surprise to the
6  magistrate.

7    **THE COURT:** Well, the -- this was the -- I guess this
8  is in the application. It says, "Within a reasonable period of
9  time, but not to exceed 60 calendar days after completing the
10  forensic review of the device or image, the Government must use
11  reasonable efforts to return, delete, or destroy any data
12  outside the scope of the warrant unless the Government is
13  otherwise permitted by law to retain such data."

14    **MR. REES:** So first there is a reasonableness to it,
15  and so we did -- the ones that we could do which had nothing,
16  we just wiped from our memory as if it didn't exist. The
17  Government's usually concerned about maintaining evidence, but
18  we did exactly that. And --

19    **THE COURT:** Okay. Well, I just -- then I think -- and
20  I'll bring this up at -- with the court, but it seems to me
21  that the magistrate judges should be made aware that either it
22  is true or at least it's the Government's position that once
23  you've seized an electronic device and find something relevant
24  on it, you are not able to delete, you say, with reasonable
25  efforts anything else that's on it.

1          **MR. REES:**  That --

2          **THE COURT:**  Because that seems to me inconsistent with

3     what the Court is saying.

4          **MR. REES:**  Again, I'm not on the committee, but this

5     was a negotiated document between our office and the

6     magistrates.  I was not in the room for any of that, but I

7     would be surprised if there was anything misleading about that.

8          Again, this is just my understanding of how drives work.

9     If you delete -- since they are ephemeral, even just the

10    process, if you were to truly say -- like this document that

11    you printed from a computer, it might come up from four

12    different places on that drive to compile what appears on your

13    computer screen.

14         So, again, that's -- that's what I understand about how

15    these work.  I would be very surprised if there was any

16    misrepresentations at all when this was negotiated.  But, yes,

17    that's my understanding.

18         And it may be that there are certain types of drives that

19    are partitioned in such a way that you can delete parts of

20    those drives and you're narrowed down to only a partition of a

21    drive.  Again, I'm not a computer expert, but that's the other

22    thing, is I think there is more nuance to this than just okay,

23    if we take a drive, that is the end of it.  There might be

24    sub-areas that we could do.

25         But at least for the drives that we found in this case,

1    they weren't partitioned in that manner, and we can't

2    selectively go in there and delete it.

3        Now, Your Honor has already suppressed the material that

4    Mr. Lonich has said was outside the scope, and we're not going

5    to use it.  We haven't appealed your order.  We're not going to

6    use that material.

7        **THE COURT:**  I know.  You can see how, for purposes of

8    a defendant who happens to be a lawyer, it's more sensitive

9    than it might even be in other circumstances.

10       **MR. REES:**  Well, in this case we had the additional --

11   because of him being a lawyer, the additional step that there

12   was a whole privilege review.  So I don't actually have -- I'm

13   going to have to call a member of the taint team at trial to

14   introduce the integrity of the evidence, but I have only had

15   documents that have been filtered through the taint team

16   through Mr. Balogh.  So the way that I have the documents is

17   much more in the nature of only those that are relevant and

18   non-privileged.

19       **THE COURT:**  Well, anyway, Mr. Balogh suggested on

20   Mr. Lonich's behalf that -- and I even -- I even thought -- and

21   this is different even from what Mr. Balogh suggested, that if

22   the problem were that metadata would be compromised by

23   eliminating the surrounding documents and then it would somehow

24   goof up the metadata on the document itself and that the

25   metadata on the document itself is the thing that you would use

1   to point to the fact that this is a real document off the real

2   computer, you could have an agent look at it, see that, and

3   then at the time of trial, the agent could testify, *In order to*

4   *provide only this document and not the others, the metadata*

5   *disappears, but I looked at it before that happened, and it*

6   *said X, Y and Z.*  So there would be a way to preserve that --

7           **MR. REES:**  The way that I understand his declaration

8   and my conversation with Mr. Wilbur is the only way he can say

9   this -- truthfully this is the drive that was taken from

10  that -- from that residence is if there's no deletions

11  whatsoever because even the one -- the deletion of a single

12  period, he would then be unable to say that because the drive

13  itself has what's called a hash --

14          **THE COURT:**  Is the drive a piece of matter?

15          **MR. REES:**  It's -- it's --

16          **THE COURT:**  It's a thing; right?

17          **MR. REES:**  Well, no.  Originally it was a thing, but

18  because of our protocol, we don't usually take the thing.

19          **THE COURT:**  You have copied it onto another thing?

20          **MR. REES:**  We have copied it on to another thing.

21          **THE COURT:**  Couldn't you put like letter A on that

22  other thing?

23          **MR. REES:**  Well, the way you could say this thing that

24  I'm testifying about at trial is the thing or is a copy of the

25  thing at Mr. Lonich's house or wherever it was is that not even

1    a period can be removed from this.  Otherwise, you now have a

2    difference between what this thing at Lonich's house was and

3    this thing at trial, and the forensic agent can no longer say

4    that -- *I can't say with confidence that this is what was*

5    *seized.*  Again, that's part of --

6         **THE COURT:**  Well, I'm not sure if I even agree with

7    you on the science of that, although my knowledge and yours are

8    probably equally low on how they do computers.

9         But leaving that to one side, what would be the problem

10   with doing as Mr. Balogh suggested and lodge the mirrored one

11   that has everything on it with the Court so we've got it if

12   there is a serious question about authenticity?

13        **MR. REES:**  Well, I think that's effectively what we

14   have done because of the taint team.  Mr. Wilbur is on the

15   taint team.  He is bound and has never disclosed to me anything

16   other than what went through the taint process.

17        He will testify at trial solely to introduce those

18   applications of evidence that I would seek to introduce which

19   would not be any of the suppressed evidence, and he doesn't --

20   he's not allowed to let me look at that drive because of the

21   nature of the taint and the trial team.

22        So I do not have the trial -- the trial team does not have

23   access to this drive; only to the documents that came through.

24   It's just in order for me to put those documents into trial, I

25   need him to eventually get up here and say, *Yeah, that really*

42

*did come from Mr. Lonich's computer.* And that would be the
nature of his testimony. He wouldn't be talking about other
documents. He wouldn't be referencing them. We can't even
attempt to introduce them at trial.

      **THE COURT:** Okay.

  Mr. Balogh?

      **MR. BALOGH:** Nothing.

      **THE COURT:** All right. Well, I think we should do
what Mr. Balogh suggested, which is take the thing that he has
got, and he should look at it and flyspeck it and all of that,
and then you can seal it up and lodge it with the Court and
then delete the documents that aren't the things he's going to
testify about, and you can tell him that we had this discussion
today so he should do that in a way that he can then come in
and say, *Yeah, on that thing in the sealed envelope, it says
thus and such and this is a little piece of it that doesn't
have the metadata on it* --

      **MR. REES:** Well, he would have to delete all of it. I
don't -- I'm just not sure if that's -- to lodge it --

      **THE COURT:** Well, I think that's the proper solution.
But I would like you to go talk to him about that, and if there
is some reason that can't be done, then tell Mr. Balogh
immediately and let me know, and we will see if there is
another way to do it. But it seems to me that is a good
compromise because at least then --

1    **MR. REES:** But he can't --

2    **THE COURT:** It physically won't be in the Government's

3    possession just like the Government represented to the Court it

4    would not be in the Government's possession.

5    **MR. REES:** Again, I'm not sure if there's even a

6    process by which to truly be able within one drive. The other

7    concern I have is that, you know, this is not just about

8    Mr. Lonich. There are other defendants here. And to not have

9    a full forensic image for future appeals or *Brady* claims or

10   whatever --

11   **THE COURT:** It will be there in the envelope. The

12   forensic image won't be altered.

13   **MR. REES:** Okay.

14   **THE COURT:** That is the record of the case.

15   **MR. REES:** Okay.

16   **THE COURT:** Ask your guy if there is a way to do that.

17   **MR. REES:** It would probably -- I think he would just

18   have to delete everything the Government had, and the only

19   possessor of that information would be the Court.

20   **THE COURT:** I don't believe that -- find out from him

21   if that's the case. That doesn't sound reasonable to me.

22   **MR. BALOGH:** Neither to me.

23   **MR. REES:** Okay. I will ask him.

24   **THE COURT:** Okay. This will be -- that is my intended

25   resolution, but I will wait to hear from you before I order you

1  to do that.

2          MR. REES:  Thank you, Your Honor.

3          MR. BALOGH:  Let me raise a different issue.

4          THE COURT:  Okay.

5          MR. BALOGH:  We don't want -- we don't want two

6  trials.  This doesn't make any sense to me.  I understand the

7  Court's rulings.  I disagree with them to the extent I disagree

8  with them.  That doesn't really matter much today.

9      But I don't want two trials.  My client doesn't want two

10  trials.  And so if they're going to go on the Superseding

11  Indictment, let's schedule that trial.

12          THE COURT:  What?  What did you just say?

13          MR. BALOGH:  I said this in my original papers when

14  they moved for reconsideration.  We don't want two trials.

15          THE COURT:  You mean two trials on the original --

16          MR. BALOGH:  There is an original Indictment and they

17  filed a Superseding Indictment last year.  That doesn't make a

18  lick of sense to me as far as resources, jeopardy.  That

19  doesn't make any sense.  It's not the relief we requested.  I

20  understand it's the relief the Court granted.  But from the

21  jump I said I didn't want that and I don't want that.

22      It doesn't make any sense to put my client in jeopardy in

23  March so he can sit in jeopardy again in September or October

24  later this year.  That doesn't make any sense to me.

25      So I understand the Court's ruling.  But if that is the

1    Court's ruling, which it is -- I don't see you backtracking

2    from that -- then I want to vacate the March trial date and

3    schedule the Superseding Indictment and let's have one trial of

4    all these cases.

5        **THE COURT:**  Well, the Superseding Indictment would

6    have to be filed as a new Indictment; right?

7        **MR. BALOGH:**  That's fine.  And it would be

8    low-numbered to you and it would be low-numbered to this case

9    and we still have the same case number and we can go forward.

10       I have no desire to try this case twice, to try a

11   bifurcated Houseco scheme and then next year or later this year

12   try an LLL scheme and try the -- what's the other one?  The

13   first scheme is now the LLL Petaluma Greenbriar scheme with

14   Houseco added to it with SBV as the victim, and then second

15   scheme where SBV is not the victim, the original Houseco scheme

16   recapitulated.  So there has been three schemes alleged in this

17   case.

18       Trying one now and the two later doesn't make any sense.

19   The Court came down where it came down.  That's unfortunate,

20   but I'll live with that, obviously.  But there is no way in

21   God's green earth I want to show up here next month and then

22   have to come back in six months and try a different version of

23   the case then, and giving the Government two bites at the apple

24   and putting my client in jeopardy twice is a terrible idea.

25       And so if -- the Court issued its ruling, whatever, Monday

or Tuesday of this week or Friday of last week -- I'm getting

dotty.  But given that state of affairs, I want to move this

trial date, and I'm asking the Court to vacate the March 20th

trial date and let's right now set a new trial date.  The

Government can be ordered to file their Superseding within 30

days, and let's try this case once.  That's my request.

　　　　THE COURT:  Does anybody have a point of view on that

request?

　　　　MR. BOISSEAU:  As a person who is in trial right now

before this very Court, I have unique concerns, but just

joining Mr. Balogh's comments, if the Government is indeed

going to supersede, which includes my client, the Greenbriar, I

don't want to try a case twice either.

　　　And that's -- I'm court-appointed, so I suppose the -- I

will remain court-appointed.  So that won't be a problem, but

that is a significant harm to my client forcing him to go to

trial twice.

　　　So I would move -- join to move to vacate the March 20th

trial date.

　　　　MR. STEPHENS:  Thank you, Your Honor.

　　　　THE COURT:  I am reminded that people should be

careful what they ask for for them to get it.

　　　　MR. STEPHENS:  So, Your Honor, for some of the reasons

that Mr. Balogh pointed out, I understand why there shouldn't

be two trials.  These motions that were brought in November and

December related to conduct from the Government which we had grave concerns about as it related to the filing of the Superseding Indictment and their *Brady* responsibilities.

I am concerned, just to make sure if that is ultimately the Court's order, that on behalf of Mr. Cutting, his -- he is maintaining his Sixth Amendment rights, and we are not viewed to have waived those.

**THE COURT:** You are not what?

**MR. STEPHENS:** That we have not waived any Sixth Amendment rights by having one trial that is going to be pushed down the road.

**THE COURT:** Thank you.

**MR. REES:** I think we do need some clarity on that because if he's -- if he wants to go to trial on March 20th, we will accommodate that and we are prepared to do that. If he wants to continue the case, then he should state that he wants to continue the case in light of the Court's order.

**MR. STEPHENS:** They are handing me back the Bill of Rights, Your Honor, with the menu saying *check one box*. I don't think that's fair to put us in this position.

**THE COURT:** You made a motion under the Sixth Amendment which would not have allowed the re-filing of the second set of claims.

**MR. STEPHENS:** Correct.

**THE COURT:** And that was denied effectively because I

granted it on different terms.  So you made a motion that the
Court denied.  So I don't see how you have waived anything.

     But now we are all facing a reality we need to cope with.
So I guess the question is what to do about the trial date?
I'm prepared to leave the trial date on calendar.  I'm ready to
go.  I've got -- the Court's calendar is clear for that.  And
for a long time, Mr. Balogh was the one saying, "Come hell or
high water, we're going to stick to that trial date," and so
I'm prepared to do that.

     But if the joint request is that it be moved, I will be
happy to consider that as well.  And I would not view,
anyway -- I mean, you tell me differently if you feel
differently.  I would not view that concession to reality to be
waiving any priorly-asserted constitutional rights.

     **MR. STEPHENS:**  With that understanding, Your Honor,
then we agree that it makes no sense to have two trials in this
case on behalf of Mr. Cutting as well.

     **THE COURT:**  Well, what do you want to do about that
then?

     **MR. REES:**  We are at the Court's pleasure on that.
Like the Court, we are ready for March 20th, but if the Court
feels it's appropriate to grant the defense's, I guess --

     **THE COURT:**  Well, I guess it's a question of what the
Government plans to do, because if you plan to file another
Indictment or seek another Indictment on the same charges that

1    you had previously put in the Superseding Indictment --

2        **MR. REES:** Oh, yes, we definitely intend to do that

3    and we intend to do that in fairly short order.

4        **THE COURT:** How short is short?

5        **MR. REES:** Within 30 days sounds reasonable. I think

6    it would probably be sooner than that.

7        **MR. REEVES:** We're not going to wait, Your Honor. I

8    can assure you of that. We are going to go as quickly as

9    possible.

10       **THE COURT:** Good. And also assume for a moment that I

11   resolve the matter in the way really that you've outlined,

12   which is to say you've got to look at all of those documents,

13   that would also be the same universe, would it not --

14       **MR. REES:** It would.

15       **THE COURT:** -- that would apply to any of the other

16   charges?

17       **MR. REES:** It would.

18       **THE COURT:** So we ought not run into the same need for

19   delay on the trial date as to the new charges that we are now

20   experiencing with the first charges; correct?

21       **MR. REEVES:** I agree, Your Honor, yes. I think that

22   if the trial date were to move -- first, the Government does

23   intend to proceed with the new Indictment.

24       **THE COURT:** Soon.

25       **MR. REEVES:** Very soon.

1    Second, if all counsel agree that they don't want to face

2    the prospect of two trials, etc., as they've explained and

3    they're asking for a continuance, the Government would not

4    oppose that.

5    And third, I do think that that would create a window of

6    time for us to resolve the issues that have been raised with

7    regard to the FDIC-R documents, and I would want to move

8    quickly on that as well, Your Honor.

9    **THE COURT:**  So when are you talking?

10   **MR. BALOGH:**  Can we get one in mid September?

11   **THE COURT:**  Well, I think Mr. Pon, who was in court

12   this morning earlier, has mid September.

13   **MR. BALOGH:**  Why don't we have the first date after

14   mid September, Your Honor.

15   **THE COURT:**  How about October 10th?

16   **MR. BALOGH:**  I would love to see you on October 10th,

17   Your Honor.

18   **MR. STEPHENS:**  Your Honor, I am available, as is

19   Mr. Cutting, on October 10th, but just so the record is clear,

20   from what Mr. Reeves just said, we, on behalf of Mr. Cutting,

21   have not moved for a continuance.  I don't oppose an

22   October 10th setting, but it's not my motion.

23   **MR. BALOGH:**  It's my motion.

24   **MR. BOISSEAU:**  Joined.

25   **MR. BALOGH:**  October 10th is a Tuesday.  Do you mean

the 9th, Your Honor, or do we start on Tuesday?

        **THE CLERK:**  That's a holiday.

        **MR. BALOGH:**  Thank you, Ms. Sutton.  I apologize.
October 10th.

        **THE COURT:**  Mr. Boisseau, is October 10th all right?

        **MR. BOISSEAU:**  It appears to be.

        **THE COURT:**  And you two, is the 10th all right?

        **MR. REEVES:**  Yes, Your Honor.

        **THE CLERK:**  And the pretrial?

        **MR. BALOGH:**  Could we get two weeks before for the
pretrial?

        **THE COURT:**  Yes.  It would be September 26th.

        **MR. BALOGH:**  Yes, Your Honor.

        **THE COURT:**  At --

        **MR. BALOGH:**  3:00?

        **THE COURT:**  3:30.  Let me ask you this.  Just knowing
you all as well as I do now, I think maybe we should move that
pretrial up to September 19th.  Give us three weeks to --

        **MR. REEVES:**  That sounds wise, Your Honor.

        **MR. BALOGH:**  Could we trigger pretrial -- can you get
an order out, but I would suggest our pretrial filings such as
jury instructions, motions in limine, and replies be due two
weeks before that?  Can you set out an order giving us just
hard deadlines?

        **THE COURT:**  September 5th.  How about the pretrial

1    filings that normally come in from each of you would be due

2    September 5th, and then-- the responses have dates built in.

3          MR. BALOGH:  Three days to respond.

4          MR. REEVES:  If you would like, we are happy to try

5    and confer and negotiate a Case Management Order addressing all

6    these dates and deadlines.

7          THE COURT:  That would be great.

8          MR. BALOGH:  That's a good idea, Mr. Reeves.

9    Excellent.

10         THE COURT:  And I am doing this --

11         THE CLERK:  So they'll draft the order?  I don't need

12   to prepare your order?

13         MR. REEVES:  Yes.

14         THE COURT:  You'll put it in the minutes that we have

15   those dates.

16         THE CLERK:  Yes.  But I mean the order.

17         THE COURT:  If we don't get an order from you within a

18   few days, we will go ahead and do one, but it would great --

19         MR. BALOGH:  Me and Mr. Reeves will get together with

20   the team and do it.

21         THE COURT:  I'm going to put this down, assuming that

22   all the charges the U.S. Government plans to bring against

23   these guys related to the unfortunate Sonoma Valley Bank

24   experiences will be tried in this trial.

25         MR. BALOGH:  Yes.

1    MR. REEVES:  That would be fine, Your Honor, yes.

2    THE COURT:  So that much I will order today.  The

3    other two I will --

4    MR. REEVES:  Just -- I'm sorry to interrupt the Court.

5    There will be now two Indictments --

6    THE COURT:  Yes.

7    MR. REEVES:  -- tried on --

8    THE COURT:  Well --

9    MR. REEVES:  -- on October 10th.  We may need to

10   conform them.  Is that what the Court had --

11   THE COURT:  Right.

12   MR. BALOGH:  I understand -- whatever they have in the

13   superseder we are going to try so whatever they --

14   THE COURT:  See, on account of your having won the

15   motion, it's not a Superseding Indictment.  It's a new

16   Indictment.

17   MR. REEVES:  Yes.

18   THE COURT:  So my question, though, would be when you

19   sit down and confer about the trial dates in a pleasant and

20   reasoned manner, you may want to figure out whether a

21   Superseding Indictment actually might be a better vehicle, if

22   you could all agree on that.

23   MR. BALOGH:  I agree to that right now.  That's fine.

24   We litigated the motion.  The record is the record.  So if they

25   want to bring it in --

1      **THE COURT:**  Talk to yourselves and to one another and

2   see if -- I mean, to me that would be a more efficient way to

3   go, but on the record that we have -- you folks are the

4   criminal experts.  Just make sure that whatever we go to trial

5   on is properly in place.

6      **MR. BALOGH:**  Okay.

7      **MR. REEVES:**  I think there are several ways to attack

8   this.  I think accomplishing a Superseding Indictment with what

9   has occurred may be the most difficult, but two Indictments

10  that are later conformed in some appropriate way or an

11  Information that is agreed to that encompasses all the counts

12  are all certainly within the realm of possibilities.

13      **THE COURT:**  Talk with one other.  I will work with you

14  on those things, but I plan to try all the issues in the one

15  trial.

16      **MR. REEVES:**  If that's what you want, we will be ready

17  to do that, Your Honor.

18      **MR. BALOGH:**  Can we get this -- whatever method of

19  charging instrument we are going to find ourselves facing in

20  the next 30 days or fewer, we are going to have an arraignment.

21  Can we get a 30-day control date before this Court or 45-day

22  control date?  We're going to get the two orders from you in

23  short course about today's discussion.  And at least we can

24  have an on-the-record discussion of what that trial looks like,

25  what are the boundaries --

1    THE COURT:  Sure.  A status --

2        MR. BALOGH:  We may -- there can theoretically be

3    additional challenges.  There could be no additional

4    challenges.  We have litigated this case, I think the word

5    would be, extensively.

6        THE COURT:  That's a good word.

7        MR. BALOGH:  It's a good word.  But at least we can

8    make sure we're all on the same page and leave for the

9    intervening months to just prepare for that trial.

10       THE COURT:  Did you say 30 days out?

11       MR. BALOGH:  That would be great.

12       MR. BOISSEAU:  Thirty days from when the -- from now?

13   From today's date before we know whether they're going to file

14   their pleadings, their -- whatever we call it?

15       MR. BALOGH:  They are going to file the charging

16   instrument within 30 days.

17       THE COURT:  Well, I was anticipating that sooner than

18   that you folks would talk to each other.  Do you want to say 45

19   days?  Would that make you more comfortable?

20       MR. BOISSEAU:  Yes.  We could do that or we could

21   count days when they actually file it.

22       THE COURT:  How about May 5th?

23       MR. BALOGH:  I will be in Montana that week.  Could we

24   do the week before that, Your Honor?

25       THE COURT:  April 28th in the morning.

1        **MR. BALOGH:**  That would be wonderful.

2        **MR. STEPHENS:**  Available, yes, Your Honor.

3        **MR. BOISSEAU:**  Yes.

4        **MR. REES:**  Yes, Your Honor.

5        **THE COURT:**  We will have a status on April 28th.  And

6 it would be excellent if we could resolve some of these sort of

7 procedural questions.

8        **THE CLERK:**  Do you want to set it for perhaps 10:30,

9 like a little earlier, just so we have a --

10        **THE COURT:**  Is there a big calendar?

11        **THE CLERK:**  It's not a big calendar, but you have to

12 be out of here -- and you have that other case that you just

13 set.

14        **THE COURT:**  Is there much of a civil --

15        **THE CLERK:**  There's nothing.

16        **THE COURT:**  How about 10:30 on the 28th?

17        **MR. BALOGH:**  That's good.

18        **MR. STEPHENS:**  Fine, Your Honor.

19        **MR. REES:**  That's fine.

20        **THE COURT:**  April 28th at 10:30 we will have further

21 discussions.

22        **MR. BALOGH:**  And the trial date is vacated.

23        **THE COURT:**  Yes.  The trial date is vacated and reset

24 to October 10th.

25        **MR. REES:**  Your Honor, I think an exclusion of time

```
1   between now and October 10th would be appropriate on this
2   record.
3           THE COURT:  Well, it's been excluded through March
4   20th.
5           MR. REES:  I know.  But our trial is getting vacated
6   on March 20th, being set for October 10th.
7           THE COURT:  Right.
8           MR. BALOGH:  Effective preparation, Your Honor.  I
9   have no objection to such an order.
10          MR. BOISSEAU:  It's deemed complex, is it not?
11          THE COURT:  As well.
12          MR. BALOGH:  It has been deemed complex.
13          THE COURT:  Without waiving your Sixth Amendment claim
14  on the first motion --
15          MR. STEPHENS:  I still reserve.
16          THE COURT:  I don't think I can do much more than
17  that.  But I do find it's appropriate to exclude the time
18  between now and October 10th for all the reasons mentioned, and
19  if the Government gets me a written order to that effect, I
20  will sign it.
21          MR. REES:  I will Your Honor.
22          MR. REEVES:  We do that.  Thank you very much,
23  Your Honor.
24          THE COURT:  You're welcome.
25                  (Proceedings adjourned at 12:46 p.m.)
```

1

2

3                    CERTIFICATE OF REPORTER

4         I certify that the foregoing is a correct transcript

5    from the record of proceedings in the above-entitled matter.

6

7    DATE:   Friday, March 3, 2017

8

9    _Pamela A. Batalo_

10   _____
     Pamela A. Batalo, CSR No. 3593, RMR, FCRR
     U.S. Court Reporter

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25